**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| PETER M. GALLIGAN, | § | |
| | § | |
| PLAINTIFF | § | |
| | § | |
| V. | § | CIVIL CASE NO. 1:17-cv-06310 |
| | § | |
| ADTALEM GLOBAL EDUCATION INC. F/K/A | § | |
| DEVRY EDUCATION GROUP; ADTALEM | § | |
| GLOBAL HEALTH, INC. F/K/A DEVRY | § | |
| MEDICAL INTERNATIONAL, INC.; ROSS | § | |
| UNIVERSITY SCHOOL OF MEDICINE | § | |
| SCHOOL OF VETERINARY MEDICINE (ST. | § | |
| KITTS) LIMITED; AND DOES 1 THROUGH | § | |
| 50, | § | JURY TRIAL DEMANDED |
| | | |
| DEFENDANTS | | |

## FIRST AMENDED COMPLAINT

Plaintiff Peter M. Galligan ("Galligan") files this First Amended Complaint against Defendants Adtalem Global Education Inc. ("Adtalem") f/k/a DeVry Education Group ("DeVry"), Adtalem Global Health, Inc. f/k/a DeVry Medical International, Inc. ("DeVry Medical"), Ross University School of Medicine School of Veterinary Medicine (St. Kitts) Limited ("RUSVM"), and Does 1 through 50 (Adtalem, DeVry Medical, RUSVM, and Does 1 through 50 are referred to collectively as "Defendants"), and alleges as follows:

## NATURE OF THE ACTION

1.     From early childhood, Galligan's lifelong ambition and dream has been to be a practicing veterinarian. He majored at California Polytechnic State University in animal science with an emphasis in veterinary medicine. Whereas many students apply to vet school after performing a few hundred hours of clinical internship work, Galligan applied to RUSVM with over 5,000 hours of internship experience, mostly

uncompensated, demonstrating his passion for animals and full effort to achieve his vocational goal. He derives great joy treating animals, both large and small, and caring for and ministering to pet owners—his "calling" in life. Thus, when he matriculated to RUSVM in May 2013 after being enticed by the school's promotional materials, Galligan felt as though his goal was in reach.

2. However, Galligan was at a disadvantage when it came to taking exams, a handicap of which RUSVM was well aware. Because of severe test anxiety—which has been diagnosed and treated by physicians, psychologists, and learning specialists—Galligan requested certain concessions from RUSVM administration when it came to taking his exams. However, despite numerous requests, which were paired with documentation from Galligan's disability treators, RUSVM refused to permit Galligan to take exams in the manner prescribed and otherwise did nothing to help Galligan with his anxiety issues. Consequently, despite countless hours studying for his classes and mastering course materials, Galligan struggled to excel on his exams.

3. Galligan presented his documented diagnostic tests, learning challenges and treator recommendations to RUSVM Administration on three different occasions – upon admission, during Semester II when he was effectively gurgling blood and experiencing high levels of test anxiety, and upon his return from extensive interventional therapy over a four-month sabbatical from RUSVM. However, RUSVM did nothing to help Galligan with and certainly demonstrated no concern for his anxiety issues. To the contrary, at every presentation, Galligan was silenced, discriminated against, denied equal opportunity, and totally blown off by RUSVM administrative personnel who afforded him no class examination accommodations of any kind as required by law.

2

4.     Galligan was dismissed from RUSVM in September 2015 without any valid basis.  Galligan's dismissal as caused by several factors, including but not limited to the following:

a.   RUSVM's knowing violation of both the Rehabilitation Act of 1973 (hereinafter referred to as the "Rehab Act") and Title III of the Americans with Disability Act of 1990, as amended in 2009 (hereinafter referred to as the "ADA");

b.   RUSVM's knowing violation of Illinois state law;

c.   RUSVM's knowing non-compliance with the policies and procedures of its accrediting body (the AVMA), including "misleading advertisements," "integrity and responsibility in student recruitment," "services to support student wellness," "support for students with disabilities," "the protection of students," and "access to equal opportunity";

d.   RUSVM's knowing non-compliance with its own published policies relating to accommodations for students with documented disabilities;

e.   The absence of good faith and fair dealing in RUSMV's adjudication and dismissal of Galligan, which denied Galligan his right to present witnesses and evidence of his physical disability, and RUSVM's refusal, on three separate occasions, to accommodate his treators' recommendations during tests; and

f.   RUSVM's refusal to disclose the identities of or allow Galligan the opportunity to appear before his judges during a summary dismissal appeals process.

In essence, at every turn, Galligan was silenced, discriminated against, denied equal opportunity, and totally blown off by RUSVM administrative personnel who afforded him no class examination accommodations of any kind.  Now, two years later, Peter remains just a few credits shy of attaining his lifelong dream, but for no valid reason he lacks the opportunity to do so.  Left with no choice but to pursue legal action, Galligan seeks damages for the harm resulting from his abrupt dismissal from RUSVM, which are believed to be in excess of several million dollars.

3

## PARTIES

5.     Plaintiff Peter M. Galligan is a United States citizen and a resident of the State of California.

6.     Defendant Adtalem is a foreign, publicly traded, for-profit, post-secondary education, and Delaware-based corporation with its principal place of business located at 3005 Highland Parkway, Downers Grove, DuPage County, Illinois.  Adtalem was known as DeVry Education Group until May 25, 2017.[1]  Defendants' counsel has agreed to waive service of process on Adtalem.

7.     Defendant DeVry Medical is foreign corporation organized and existing under the laws of Florida with its principal place of business located at 630 U.S. Highway One, Suite 300, North Brunswick, New Jersey 08902.  According to DeVry's Form 10-K filed with the United States Securities and Exchange Commission ("SEC") on August 25, 2016, DeVry Medical is one of Adtalem's "reporting segments," and DeVry Medical operates RUSVM.  Defendants' counsel has agreed to waive service of process on DeVry Medical.

8.     Defendant RUSVM is located in Nevis, St. Kitts in the Caribbean. According to DeVry's SEC Form 10-K filed on August 25, 2016, RUSVM is operated by DeVry Medical, which is doing business on behalf of itself and its operating entity, RUSVM.  Defendants' counsel has agreed to waive service of process on RUSVM.

9.     On information and belief, Does 1 through 50 are individuals and/or entities whose identities and addresses are unknown.  On information and belief, Does 1

---

[1] All references herein to "Adtalem" include the acts of its predecessor, DeVry.

4

through 50 are responsible in some actionable manner for the events, occurrences, injuries and damages alleged herein.

## <u>JURISDICTION AND VENUE</u>

10.     This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1331 based on questions of federal law relating to Section 504 of the Rehabilitation Act of 1973 and Title III of the Americans with Disability Act of 1990, as amended in 2009. This Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.

11.     This Court also has supplemental jurisdiction over the state law claims in this action pursuant to 28 U.S.C. § 1367(a) because Galligan's state law claims are so related to his federal claims that both form a part of the same case or controversy.

12.     This Court has personal jurisdiction over Defendants because Defendants committed the complained-of acts in this District and/or have sufficient minimum contacts with this District.

13.     Venue is proper in this Court pursuant to 28 U.S.C. §1391 because a substantial part of the events or omissions giving rise to Galligan's claims occurred in this District, which is where Adtalem is headquartered and maintains its principal place of business.

## <u>FACTUAL BACKGROUND</u>

### *Structure of Defendant Entities*

14.     Adtalem's predecessor, DeVry, began offering bachelor's degrees in 1970. Now, with over 13,000 employees and a market capitalization of $2.1 billion, Adtalem

has more than 60 academic sites throughout the United States and offshore and offers more than 10 majors and 40 specializations including areas as diverse as healthcare, technology, accounting, finance and law across five college.  According to Adtalem's SEC Form 10-K filed on August 25, 2016,[2] Adtalem "operates three reporting segments," one of which is Defendant DeVry Medical located at 630 U.S. Highway One North Brunswick, New Jersey.  DeVry Medical, in turn, operates Defendant RUSVM.

15.    The last reported student enrollments at various Adtalem schools were as follows: DeVry Medical: 5,978; Nursing: 27,406; Carrington College: 6,466; DeVry Brasil: 58,724; DeVry University Undergraduate: 26,492; DeVry University Graduate: 10,810.

16.    According to its 10-K, during fiscal years 2016, 2015, and 2014, respectively, Adtalem spent $227 million, $264 million, and $259 million on advertising, marketing, and other promotions of its educational products and services.

17.    Adtalem's 10-K also noted that RUSVM was founded in 1982 and acquired by Adtalem in 2003 and has graduated over 4000 students to date.  As of September 2016, tuition and fees for RUSVM's basic science and clinical courses were $18,310 and $22,985, respectively, per semester, exclusive of the costs of books, supplies, transportation, and living expenses.

18.    Adtalem's total gross revenues between 2008 and mid-2016 exceeded $16 billion and it recorded $1.83 billion in FYE 2016 revenues.  Approximately 59 percent of Adtalem's revenues and 84 percent of RUSVM's revenues were sourced from federal

---

[2] *See*
https://www.sec.gov/Archives/edgar/data/730464/000114420416121173/0001144204-16-121173-index.htm.

6

assistance grants and loans issued pursuant to the Higher Education Act of 1965 ("HEA"). The vast majority of RUSVM students, including Galligan, applied to and received funds through either or both the Federal Direct Unsubsidized Loan Program or Federal Direct Graduate PLUS Loan Program.

19.     RUSVM, a graduate school of veterinary medicine, is located in the Caribbean. RUSVM students complete a seven-semester, pre-clinical curriculum and, then, enter a clinical clerkship lasting approximately 12 months at one of more than 20 affiliated colleges of veterinary medicine in the U.S., Canada, Australia and Ireland, eventually earning a Doctor of Veterinary Medicine ("DVM") degree.

*Accreditation of RUSVM*

20.     The U.S. Government provides an estimated $150 billion in loans every year to students participating in higher education programs through the U.S. Department of Education ("DOE"). This funding is only available to students attending accredited programs. Despite the large amount of federal dollars at stake, the DOE does not itself accredit educational programs. Rather, the DOE relies on accrediting agencies—which are federally-approved, private organizations—to assure taxpayers and students that federal financial aid is going to qualified institutions. In this case, the relevant accrediting agency is the American Veterinary Medical Association ("AVMA").[3]

21.     Schools seeking accreditation must go through a multi-step process whereby an accrediting agency evaluates the academic program to measure its performance against the agency's own standards and those mandated by the DOE. After

---

[3] In or about 2013, the AVMA placed RUSVM on probation, apparently for various facility, research, and other violations of its policies and procedures, causing the vast majority of its revenue stream to be at high risk.

initial accreditation, schools must follow those criteria to maintain accreditation. With approximately 84 percent of RUSMV's revenues coming from the federal government, DOE's and AVMA's disability accommodation requirements and discrimination prohibitions are extremely relevant to the issues presented and to be adjudicated in this case at bar.

*The Inducement*

22.     Galligan applied to RUSVM because he read, researched, and believed the promotional advertisements and inducements promulgated by RUSVM that included, for example, these video quotes[4]:

- "Follow your dreams ... [we] make [your dreams] come true...";

- "[You will experience] an abundant amount of support and encouragement during your time at Ross University..." (emphasis added);

- "Everyone is always looking out for each other...";

- "[RUSVM] is an amazing family...";

- "The [RUSVM] faculty treats you as colleagues ... supportive, ... friendly, ... available, ... wonderful, ... always there for you ... with one-on-one care..." (emphasis added); and

- "[RUSVM] gave me the opportunity to be a vet."

23.     Galligan also read, researched, and believed the Mission Statement of RUSVM posted on its website[5] that promised prospective students its commitment "to embrace diversity and offer students from a wide range of backgrounds the opportunity to follow their chosen career in veterinary medicine." Galligan also was enticed by RUSVM's Strategic Vision underscoring its effort to "[i]ncrease total student numbers

---

[4] *See* www.youtube.com/user/rossvetschool.
[5] *See* http://www.rossu.edu/veterinary-school.

8

via reduced attrition ... by increasing the quantity of quality student applicants, resulting in an increased completion rate...."

24.    Galligan also read, researched, and believed former Dean Elaine Watson's "Dean's Message," which was also posted on RUSVM's website, which assured him that RUSVM was a place "where students ... are [RUSVM's] primary focus" and that RUSVM is "dedicated ... to providing academic excellence for our students as the foundation for becoming sought-after, practice-ready veterinarians." Dean Watson's welcome message also emphasized RUSVM's "value-driven educational opportunities for students…"

25.    Adtalem published a "Purpose, Vision and Values" promotional document, which included self-congratulatory boasts like:

- "[We offer educational programs that are] supported by <u>exceptional service to students</u> and . . . <u>delivered with integrity and accountability</u>" (emphases added);

- "[We] communicate with candor and respect";

- "<u>Accountability + Integrity</u> = Ownership" (emphasis added);

- "[We] <u>help our students achieve their goals</u>" (emphasis added);

- "[We] <u>always put students first</u>" (emphasis added); and

- "[We] put 'care' into <u>service excellence</u>" (emphasis added).

26.    Further, published statements by former Adtalem President and CEO Daniel Hamburger included the following:

> [O]ur <u>culture of care</u> enables us to execute our strategy even more effectively. That is why I think it is critical for shareholders to understand that our culture of care is a palpable differentiator for us, <u>for our students</u> and also for attracting and retaining the professors other colleagues who <u>share our values</u>. Fundamentally, DeVry Group's culture of care is about

9

our collective passion and focus on <u>achieving the best outcomes for our students</u>. It is the glue that binds our colleagues together.

And how do we deliver DeVry Group Care? By staying true to DeVry Group's purpose, vision and [. . .] values. [. . .] Accountability. We are owners. We take initiatives (*sic*), speak up and act with integrity in all we do. (emphases added).

27.     Among other accountabilities, the above representations by Adtalem and RUSVM must comply with and honor the AVMA's "Programmatic, Advertising and Student Recruitment Policies," which decree:

The following are some of the areas where special efforts must be made to ensure integrity of the [accreditation] process:

[. . .]

    b. The college must refrain from <u>misleading advertisements of the program, and must correct any inaccuracies</u>.

[. . .]

Accredited veterinary medical colleges, or individuals acting on their behalf, are expected to exhibit <u>integrity and responsibility</u> in programmatic advertising and student recruitment. Responsible self-regulation requires <u>rigorous attention</u> to the ethical principles [. . .] in all matters of conduct.

[. . .]

Colleges shall adhere to the following principles of ethics:

    b. All statements and representations must be <u>clear, factually accurate, and current</u>.[6]

However, the trophy-rhetoric by Adtalem, DeVry Medical, and RUSVM through their advertisements, RUSVM's Mission Statement, promotional documents, and the

---

[6] Accreditation Policies and Procedures of the AVMA Council on Education §§ 5.2(b), 5.6 (March 2014) (revised September 2014) (emphases added).

10

published statements of its Former Dean and Former CEO did not comport with AVMA's policy mandates or RUSVM's actual practices with its vet students.[7]

*Plaintiff's Beginnings at RUSVM*

28.     After notification of his acceptance to RUSVM, Galligan moved to St. Kitts—a remote, crime-ridden, and poverty-stricken island in the Caribbean—and began Semester I classes in May 2013. The academic rigors were challenging, generally requiring 100 or more hours of study, class attendance, and clinical work each week by Galligan, which he undertook with button-bursting enthusiasm and positive expectancy.

29.     Immediately upon arriving in St. Kitts, Galligan notified RUSVM psychologist Dr. Janet Camp—the only school resource available on campus for 900 students—of a learning challenge that had plagued him since junior high school. Galligan has an extremely high IQ and exceptional long-term memory, but suffers anxiety attacks during school examinations. Psychiatrists, psychologists, and learning specialists had given and interpreted for Galligan a battery of diagnostic tests over the years, including:

---

[7] This is not the first time Defendants have faced complaints with respect to their advertising. In January 2016, the U.S. Federal Trade Commission ("FTC") filed suit against DeVry, DeVry University, Inc., and DeVry New York, Inc. alleging that their advertisements deceived consumers about the likelihood that students would find jobs in their fields of study and would earn more than those graduating with Bachelor's degrees from other colleges or universities. In its complaint, the FTC alleged that DeVry's representation that 90 percent of its graduates actively seeking employment landed jobs in their field within six months of graduation was deceptive. The complaint also charged that another contention made by DeVry—that its graduates had 15 percent higher incomes one year after graduation on average than the graduates of all other colleges or universities—was deceptive. The complaint noted these claims appeared in DeVry's advertising on television, radio, online, print, and other media. On December 15, 2016, the FTC announced that Adtalem agreed to a $100 million settlement that "secure[d] significant financial redress for tens of thousands of students harmed by DeVry's conduct."

- Woodcock Cognitive: Processing Speed Cluster;

- Beery-Buktenica Test of Visional Motor Integration;

- Gates MacGinitie Silent Reading Test, Woodcock-Johnson Achievement;

- Woodcock-McGrew Werder MBA;

- Woodcock-Johnson III Tests of Cognitive Ability;

- Woodcock-Johnson III Tests of Achievement, Reading, Math, Written Language and Academic Fluency;

- Wechsler Adult Intelligence Scale - Third Edition;

- Learning Efficiency Test - Second Edition;

- Nelson-Denny Reading Test - Form G - Comprehension;

- Comprehension Test of Phonological Processing, Development Test of Visual Motor Integration, Achenbach Child Behavior Checklist; and

- Brown ADD Scales Test.

30.     During his periods of test-induced trauma, Galligan suffered from a racing heart, rapid and uncontrollable breathing paradoxically coupled with a desperate need for more oxygen, hot sweats, paranoid ideation, unclear thoughts, poor decisions, and a sense of hopelessness.   The   treatment   recommendation   during   school   examinations   as excerpted from the medical chart of one of his treators:

> "Because of his learning disabilities, Peter will benefit from academic accommodations to insure (sic) his success.  Extended test time and use of a separate room on school tests and standardized exams will be useful and appropriate accommodations."

31.     Galligan   presented   Dr.   Camp   with   these   test   results   and   treator recommendations, all of which had been granted during his high school and college examinations.  However, Dr. Camp refused Galligan's plaintive pleas for more time and

12

quiet space, despite the fact that these same minor concessions were routinely given to other students.

*Plaintiff's Academic Progress at RUSVM*

32.    Notwithstanding Dr. Camp's refusal to accommodate Galligan's documented learning disability, he successfully passed all classes his first semester. However, with pressures and stresses mounting, Galligan experienced excruciating test anxiety problems during Semester II and began failing examinations.  Recognizing the familiar pattern and simple cure, Galligan approached Dr. Camp toward the latter part of the semester, cited examples of other students similarly accommodated, and begged her to help him.  His entreaties for more exam time and a separate room were refused. Consequently, Galligan experienced even more severe anxiety during the remaining examinations and, ultimately, failed three of his four classes.

*A Therapeutic Sabbatical*

33.    On January 8, 2014, former Associate Dean for Academic Affairs, Guy St. Jean, approved a "leave for the Jan[uary]-April 2014 semester" so that Galligan could "get [his] medical condition stabilized," which was predicated on Galligan submitting to Dr. St. Jean "prior to the start of the May 2014 semester medical documentation from [his] physician stating that [he would be] ready to return to the program."  Dr. St. Jean's statements irrefutably evidence RUSVM's full awareness of Galligan's medical disability.

34.    Galligan returned home to California and began working intensively with his psychologist, Dr. Timothy Engelmann, over the next four months to identify anxiety-producing triggers and develop a series of interventional anxiety-reducing strategies and

various learned techniques to ameliorate his symptoms. Dr. Engelmann referred Galligan to Michelle Kwok, MD, Board-certified in adult psychiatry, who also worked on supplemental therapies after diagnosing Galligan's core issue as "Generalized Anxiety Disorder," International Statistical Classification of Diseases 10 F41.1. Treatment included prescriptions of Klonopin and Zoloft. Religiously following Drs. Engelmann's and Kwok's treatment plans and prescribed medicines, Galligan's anxiety issues were much reduced and began to resolve.

*Upward and Onward Toward His Goal*

35.    Armed with these proven remedies and a renewed sense of confidence and hope, Galligan returned to St. Kitts in April 2014 to retake make-up Semester II classes and begin Semester III.

36.    Upon his arrival, Galligan met again with Dr. Camp, updated her on the clinical diagnosis and treatment plan prescribed by Drs. Engelmann and Kwok as well as his progress to date, and presented her with a duplicate hard copy of the email Dr. Engelmann transmitted to Dr. Camp on May 5, 2014, formally requesting separate room accommodations for Galligan during examinations. Verbal recommendations for extra exam time were also made by Dr. Engelmann. Inexplicably, *for the third time*, Galligan's petition was denied.

37.    However, Galligan was encouraged by a subsequent letter sent to him by former Associate Dean St. Jean on May 21, 2014, that promised in unambiguous and quantitative words that Galligan would be removed from academic probation status if he earned a cumulative GPA of 2.0 or above, which was required to demonstrate "Satisfactory Academic Progress." Associate Dean St. Jean also referenced the RUSVM

14

Student Handbook which cautioned that students on academic probation for two consecutive semesters would be ineligible to receive Title IV financial aid and that a student "who receives a grade of 'F' or 'WF' while on Academic Warning or Academic Probation is subject to dismissal and/or loss of financial aid eligibility." So, Galligan, following St. Jean's written directive, set his goals: Pass all classes next semester to be removed from probation and maintain a 2.0 GPA thereafter—a very clear, mutually agreed, and straight path forward.

38.     Galligan threw himself into his classes and, over Semesters III, IV and V, passed the following consecutive classes: Immunology, Gross Anatomy 2, Parasitology, Virology, Pathology 1, Pharmacology 1, Bacteriology and Mycology, Mechanisms of Disease, Veterinary Public Health and Epidemiology, Pathology 2, Clinical Pathology, Pharmacology 2, Diagnostic Imaging, Anesthesiology, Toxicology. Galligan failed *no* classes. His cumulative GPA was 2.3—well above Dr. St. Jean's 2.0 minimum threshold.

39.     Emboldened by the promises and assurances in Associate Dean St. Jean's second letter, 15 classes successfully passed, the removal of probation status per the Student Handbook, and the support of RUSVM in facilitating additional Title IV loans over three semesters—thereby confirming his "deal" with St. Jean—Galligan believed he was well on his way to graduating from RUSVM in only eight months.

*Galligan's Dismissal for Two Missed Questions in One Class*

40.     As Galligan progressed successfully through Semesters II, III and IV, passing all classes with no accommodations for his disability, and as he was nearing the end of his program at RUSVM during Semester V, he entered Professor Patrick Kelly's

15

Small Animals Medicine 1 in May of 2015. Galligan did not pass Dr. Kelly's class, missing a passing grade of 70% by only two points or two questions.

41.     RSUVM Administration dismissed Galligan from its DVM program because of his "failure" to pass Dr. Kelly's Small Animals Medicine 1 class in late August 2015 and rejected his appeals during September 2015.

*"Kangaroo Court" of an Appeals Process*

42.     Having devoted most of his adult life to the pursuit of veterinary medicine, Galligan was devastated upon receiving news of his dismissal and took the following actions. Galligan attempted to:

- Meet with Dean Elaine Watson and other RUSVM administrators to discuss his dismissal appeal (which requests were denied);

- Argue that, as assured by Associate Dean St. Jean's May 21, 2014 letter, his probation period expired one year prior after successful completion of Semester II classes during the summer of 2014 and, separately, as confirmed by RUSVM's approval and facilitation of three additional semesters of Title IV loans, RUSVM Administration had no legitimate grounds for the dismissal pursuant to its own written policies and Dr. St. Jean's assurances (such argument was overruled);

- Present evidence of other students who had failed several classes, but were still on RUSVM's active roster and taking classes (this effort was rejected);

- Present evidence of his documented learning disability and unheeded written appeals communicated to Dr. Camp by his treators for examination accommodations afforded other students (which request was denied); and

- Learn the names of RUSVM faculty and staff on the appeals committee and ask to appear before them in person (which request was denied).

43.     To add insult to injury, Galligan—an Eagle Scout and church leader with no history of violence of any kind, or threats of violence of any kind, or non-academic disciplinary action of any kind—was informed without any justification whatsoever that if he appeared on campus again, he would be arrested.

16

6298405

*Defendants' Non-Compliance with the AVMA's Student Disability Policies*

44.     Under its "Requirements of an Accredited College of Veterinary Medicine," the AVMA mandates:

> Student support services **must** be available within the college or university. These **must** include, but are not limited to, appropriate services to support student wellness and to assist with meeting the academic and personal challenges of the DVM program; . . . [and] support for students with learning or other disabilities.[8]

45.     However, no support or wellness services of any kind were made available to Galligan by RUSVM to assist him with his fully disclosed personal challenges or his documented learning disabilities.

*RUSVM's Non-Compliance with Its Own Disability Policies*

46.     Further, the RUSVM Student Handbook, Sections 1.11.3, 1.11.4, and 1.11.5, respectively, declare:

**1.11.3 Commitment to Non-Discrimination and Equal Opportunity**

It is RUSVM's policy to provide an environment free of unlawful harassment or discrimination based on [. . .] disability [. . .] or any other category protected by applicable law. RUSVM complies with all applicable laws regarding discrimination, harassment, retaliation and equal opportunity.

**1.11.4 Accommodation of Students with Disabilities**

As part of its dedication to making educational opportunities available to a diverse range of students, RUSVM is committed to ensuring that qualified students with disabilities are afforded reasonable accommodations . [. . .]"

**1.11.5 Mental Health**

The mental and emotional stability of students is a primary concern of RUSVM. [. . .] The RUSVM Counseling Center is available to provide

---

[8] Accreditation Policies and Procedures of the AVMA Council on Education § 7.6 (March 2014) (revised September 2014) (emphases added).

support and assistance to RUSVM students in maximizing their success while at RUSVM. [. . .]"

Yet RUSVM did not reasonably accommodate Galligan's documented test-taking disability during examinations, provide support or assistance to Galligan to maximize his success and comply with applicable law by providing Galligan an equal opportunity environment free of unlawful discrimination based on his disability.

*RUSVM's Non-Compliance with Its Own Retaliation Policies*

47.     The RUSVM Student Handbook reads: "RUSVM prohibits retaliation against anyone who reports an incident of alleged [. . .] unlawful conduct, or any person who assists or participates in a proceeding, investigation or hearing relating to such allegations.  Retaliation includes, but is not limited to, any form of intimidation, reprisal or harassment."

48.     However, Galligan was not permitted proffer witnesses to testify to the facts presented above and submit supporting documentary evidence in his dismissal appeal, was treated differently than other students who failed multiple classes and were not dismissed, was deemed to be on probationary status contrary to RUSVM policy and the terms of Associate Dean St. Jean's May 21, 2014 letter, and was effectively thrown off the island of St. Kitts—not for "flunking" Dr. Kelly's class, but rather, as a form of reprisal for having the courage to raise the issue, among others, of RUSVM's failures to accommodate a documented medical disability in his appeal.

*Adtalem Attorney Misconduct*

49.     To further muzzle Galligan, and in violation of Florida Rules of Professional Conduct 4-4.2(a), Adtalem continued its outrageous conduct by communicating directly with him through its internal legal counsel, Audrey B. Kaplan,

18

Esq., via email on December 28, 2015, without the knowledge or consent of Galligan's attorney and long after Adtalem and RUSVM had been informed multiple times in writing that Galligan was represented by counsel and intended to file an action against Adtalem and RUSVM.[9]

50.     In addition, and as a separate ethical violation, Adtalem—through its internal legal counsel, Kaplan—improperly obstructed Galligan's access to evidence.[10] Kaplan threatened Galligan in her email, not copied to his counsel, with these words of intimidation and implied retribution: "Therefore, you should refrain from continuing to pursue this matter with individual colleagues[11] at RUSVM.  It would be inappropriate for the faculty to respond, and your communications will ultimately be forwarded to me."

51.     Under threat of being arrested if he appeared on campus, and under a lawyer's threat of consequences were he to talk to classmates or faculty, Galligan had no ability to defend his rights to reinstatement and to prosecute his case against Defendants. Subsequently, through his legal counsel, Galligan appealed RUSVM's dismissal decision all the way to both the Chief Executive Officer and General Counsel of Adtalem, who did not reply to his passionate pleas for reconsideration and reinstatement.

---

[9] This act runs afoul of the Model Rules of Professional Conduct (specifically, Rule 4.2), which has been adopted verbatim as Rule 4.2 of the Illinois Rules of Professional Conduct.

[10] Such act runs afoul of the Model Rules of Professional Conduct (specifically, Rule 4.3), which has been adopted verbatim as Rule 4.3 of the Illinois Rules of Professional Conduct.

[11] Merriam-Webster defines the term "colleague" as "[a] person who works with you, a fellow worker."  By that definition, Kaplan's prohibition was directed to fellow students.

6298405

## CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF
### Violation of Section 504 of the Rehabilitation Act of 1973
### 29 U.S.C. §§ 701, *et. seq*.

52.     Plaintiff incorporates by reference and realleges all paragraphs above as if written in full herein.

53.     Section 504 of the Rehabilitation Act, 29 U.S.C. §§ 701, *et. seq*., provides that "[n]o otherwise qualified individual with a disability in the United States ... shall, solely by reason of his or her disability, be excluded from participation in, be denied the benefits of or be subjected to discrimination under any program or activity receiving federal financial assistance . . . ."  To be protected under Section 504, a student of a school receiving federal funds must be determined to: 1) have a physical or mental impairment that substantially limits one or more major life functions; 2) have a record of such impairment; or 3) be regarded as having such an impairment.

54.     Galligan is a qualified individual with a disability—which was diagnosed by a Board-certified medical doctor and licensed psychologist and which was recorded and communicated to RUSVM—that impaired his ability to take and complete academic tests in a timely manner.  He also required and took prescribed medicines.

55.      Defendants received federal money as defined by 29 U.S.C. § 794 and, as such, may not discriminate against Galligan because of his disability.

56.     RUSVM exercised bad faith in failing to provide "appropriate and necessary accommodations" for Galligan in violation of Section 504 of the Rehab Act. Additionally, Galligan was excluded from participation in, denied the benefits of and subjected to "discrimination, exploitation and a hostile" educational environment at and

dismissed from RUSVM, also in violation of Section 504. Rather than correcting this misconduct, RUSVM retaliated against Galligan when he began to advocate for his rights under Section 504 in his dismissal appeals.

57. Defendants' violations of the Rehab Act have damaged and will continue to damage Galligan in an amount to be proven at trial, but currently estimated to be several million dollars.

## SECOND CLAIM FOR RELIEF
### Violation of Title III of the ADA of 1990, as amended in 2009
### 42 U.S.C. §§ 12101, *et. seq*.

58. Plaintiff incorporates by reference and realleges all paragraphs above as if written in full herein.

59. Title III of the ADA (42 U.S.C. §§ 12101, *et. seq*., "Equal Opportunity for Individuals with Disabilities") protects everyone with a disability and ensures that all can live a life of freedom and equality. The ADA specifically protects the civil rights of people with disabilities in all aspects of living, including access to public services such as schools. 42 U.S.C. § 12101(a)(3).

60. Galligan is a "qualified individual with a disability" as defined in 42 U.S.C. § 12131(2) for the reasons outlined above.

61. RUSVM is considered to be a "place of public accommodation," as defined in 42 U.S.C. § 12181(7), because it is a private school and, hence, subject to the directives of the ADA.

62. Galligan 's disabilities were well known to and acknowledged by RUSVM in writing (*e.g.*, St. Jean letter of January 8, 2014), and RUSVM failed to provide "reasonable accommodations" or "reasonably modify its services" to Galligan for his

disability in violation of the ADA. RUSVM discriminated against, denied reasonable accommodations to, harassed and retaliated against and dismissed Galligan in violation of the ADA.

63.     Defendants' violations of the ADA have damaged and will continue to damage Galligan in an amount to be proven at trial, but currently estimated to be several million dollars.

### THIRD CLAIM FOR RELIEF
### Violations of Title IV of the HEA
### 34 CFR §§ 668.32, 668.34

64.     Plaintiff incorporates by reference and realleges all paragraphs above as if written in full herein.

65.     In violation of 34 CFR §§ 668.32(f), *et. seq*., RUSVM terminated Galligan from its DVM program even though he maintained "satisfactory academic progress" in his course of study according to the institution's own published standards of academic progress and in accordance with 34 CFR § 668.34, to wit: a 2.3 GPA, which was well in excess of the minimum requirement of 2.0.

66.     In violation of 34 CFR §§ 668.34(a)(9)(i - iii), *et. seq*., RUSVM did not provide Galligan with information in his appeal as to how he might make satisfactory academic progress, how he might reestablish his eligibility to receive assistance under the Title IV, HEA programs, the basis on which he might file an appeal (which, per statute, includes injury or illness of the student or other special circumstances), and information he must submit regarding why he failed to make satisfactory academic progress and what might change in his situation that will allow him to demonstrate satisfactory academic progress at the next evaluation.

22

6298405

67.     In violation of 34 CFR §§ 668.34(a)(10), *et. seq*., RUSVM did not describe to Galligan how he might reestablish his eligibility to receive further assistance under Title IV, HEA programs and appeal the institution's determination that he was not making satisfactory academic progress.

68.     Defendants' violations of Title IV of the HEA have damaged and will continue to damage Galligan in an amount to be proven at trial, but currently estimated to be several million dollars.

## FOURTH CLAIM FOR RELIEF
### Violation of Student Antidiscrimination Protections
### 20 U.S.C. § 1011(a)

69.     Plaintiff incorporates by reference and realleges all paragraphs above as if written in full herein.

70.     The federal statute governing Protection of Student Speech and Association, 20 U.S.C. §1011(a), provides:

> Protection of Rights: It is the sense of Congress that no student attending an institution of higher education ... should, on the basis of participation in protected speech or protected association, be excluded from participation in, be denied the benefits of, or be subjected to discrimination or official sanctions under any education program, activity or division of the institution directly or indirectly receiving financial assistance under this chapter, whether or not such program, activity, or division is sponsored or officially sanctioned by the institution.

> [. . .]

> It is the sense of Congress that ... an institution of higher education should facilitate the free and open exchange of ideas; students should not be intimidated, harassed, discouraged from speaking out, or discriminated against; and students should be treated equally and fairly...

71.     RUSVM dismissed Galligan, even though he was making "satisfactory academic progress" (passing 15 consecutive classes with an overall GPA of 2.3), and

discriminated against him for raising the issue of his disability during a charade of an appeals process, where he was denied a hearing and knowledge of his judges, an opportunity to present evidence, freedom of speech, and equal justice.

72.     In further violation of federal law protecting student speech and association, RUSVM threatened Galligan with arrest if he appeared on campus and terminated his access to student e-mail addresses and communications without notice. To silence Galligan after his return stateside, Adtalem legal counsel then violated both Florida and Illinois Rules of Professional Conduct and threatened and intimidated Galligan by demanding in writing that he not communicate with colleagues or faculty at RUSVM.

73.     Defendants' violations of 20 U.S.C. §1011 have damaged and will continue to damage Galligan in an amount to be proven at trial, but currently estimated to be several million dollars.

### FIFTH CLAIM FOR RELIEF
### Fraudulent Inducement

74.     Plaintiff incorporates by reference and realleges all paragraphs above as if written in full herein.

75.     Defendants intentionally made material, knowing, false, misleading and deceptive representations of fact to Galligan in their advertisements and promotions intended to cause Galligan to act. Galligan relied on the truth of those inducements, resulting in severe injury. In particular, Defendants:

- Did not offer Galligan an "abundant amount of support and encouragement during (his) time at Ross University." In fact, he found no support and no encouragement from RUSVM Administration.

- Did not produce a single RUSVM administrator or staff member who "looked

24

6298405

out" for him, or treated him as a "family member," or "embraced" him, his "diversity" or his disability, or to whom he was their "primary focus," or who communicated with him with "candor and respect."

- Did not offer "educational programs supported by exceptional service" to Galligan "delivered with integrity and accountability."

- Did not render "help" of any kind to Galligan for his learning challenge or toward the "achievement of [his] goals."

- Described RUSVM as "value-driven" and an institution of "academic excellence" and, at the same time, with full knowledge of Galligan's disability, did not comply with the testing recommendations of his treators.

- Offered the antithesis of a "Culture of Caring," as RUSVM Administrators and staff cannot cite one example of their "focus on [Galligan] achieving [his] best outcomes" or show that they were "wonderful" or "available" or "always there for" him with "one-on-one care," because there was none.

76.    In his decision to attend RUSVM and during his time on campus, Galligan relied on RUSVM's full compliance with its own published policies, procedures and promises as memorialized in the publications cited above as well as in the RUSVM Student Handbook, including:

- "... an environment free of unlawful harassment or discrimination based on ... disability...";

- "RUSVM complies with all applicable laws regarding discrimination, harassment, retaliation and equal opportunity...";

- "RUSVM is committed to ensuring that qualified students with disabilities are afforded reasonable accommodation...";

- "The mental and emotional stability of students is a primary concern of RUSVM…"; and

- "The RUSVM Counseling Center is available to provide support and assistance to RUSVM students in maximizing their success while at RUSVM…"

However, he found none of the above statements to be real, actualized or even close to the truth.

25

6298405

77. In defiance of the imperatives of RUSVM's governing entity, the AVMA, there were no "special efforts" to "ensure integrity" at RUSVM during Galligan's tenure there; Defendants disseminated "misleading advertisements of [the RUSVM] program" and did not "correct any inaccuracies"; RUSVM did not "exhibit integrity and responsibility in [its] programmatic advertisement and recruitment" of Galligan; there was no "rigorous attention to ... ethical principles ... in all matters of conduct" by Defendants; and "all statements and representations" were not "clear, factually accurate and current."

78. Defendants fraudulently induced Galligan to leave his home in California, enter their backbreaking veterinary medicine educational program, work day and night, six or seven days a week, for 27 months and assume almost $190,000 in Title IV federal loan and personal debt obligations. As a direct and proximate result, Galligan was harmed and will continue to be harmed by Defendants' intentional misrepresentations, omissions, and concealments in an amount to be proven at trial, but currently estimated to be several million dollars.

**SIXTH CLAIM FOR RELIEF**
**Consumer Fraud and Deceptive Business Practices**
**815 ILCS §§ 505/1 *et. seq*.**

79. Plaintiff incorporates by reference and realleges all paragraphs above as if written in full herein.

80. At all relevant times to this Complaint, the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS §§ 505/1 *et. seq*. (the "Illinois Act"), was in full force and effect. Section 2 of the Illinois Act prohibits "unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use

or employment of any deception fraud, false pretense, false promise, misrepresentation or concealment, suppression or omission of any material fact with intent that others rely upon the concealment, suppression or omission of such material fact or the use of any practice described in Section 2 of the Uniform Deceptive Trade Practices Act, 815 ILCS §§ 510, *et. seq.* (hereinafter "Illinois Act II") . . . in the conduct of any trade or commerce...."

81.     The Illinois Act II at Section 2(a)(2) defines a deceptive trade practice as one that "causes likelihood of confusion or of misunderstanding as to the source, sponsorship, approval or certification of such goods or services." Section 2(a)(5) extends that to include representations "that goods or services have ... uses, benefits or qualities that they do not have," and Section 2(a)(12) further extends that to include "any other conduct which similarly creates a likelihood of confusion and misunderstanding."

82.     Galligan is a "natural person" who engaged in commerce with Defendants, as defined in Section 1(c) and 1(f) of the Illinois Act. Adtalem, DeVry Medical, and RUSVM are "persons" as defined, which engaged in commerce as defined in Section 1(c) and 1(f) of the Illinois Act.

83.     Defendants employed unfair methods of competition and unfair or deceptive acts or practices including, but not limited to, the use of fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of material facts with the intent that Galligan and others rely upon such acts, deception or the concealment, suppression or omission of material facts or used practices otherwise described in Section 2 of the Illinois Act II.

27

84.     Defendants' fraudulent and deceptive business practices, actions and omissions summarized above violate the prohibitions of the Illinois Act.

85.     As a direct and proximate result of Defendants' violations of the Illinois Act, Galligan suffered and will continue to suffer damages in an amount to be proven at trial, but currently estimated to be several million dollars.  Galligan seeks damages pursuant to the Illinois Act, as well as attorneys' fees and injunctive relief as appropriate.

### SEVENTH CLAIM FOR RELIEF
### Negligent Misrepresentation

86.     Plaintiff incorporates by reference and realleges all paragraphs above as if written in full herein.

87.     Defendants, in the course of their business, negligently provided Galligan with material, false and deceptive information, upon which he relied, to his significant detriment.  As a direct and proximate result, Galligan was harmed and will continue to be harmed by Defendants' negligent misrepresentations, omissions, and concealments in an amount to be proven at trial, but currently estimated to be several million dollars.

### EIGHTH CLAIM FOR RELIEF
### Breach of Contract

88.     Plaintiff incorporates by reference and realleges all paragraphs above as if written in full herein.

89.     By admitting Galligan to RUSVM and accepting his tuition payments, Defendants agreed to an express and implied contract with Galligan which included: actualization of all of its advertising and promotional statements; full compliance with all federal and state laws; adherence to the disability and class examination protocols, assurances, and promises contained in the RUSVM Student Handbook and other

28

6298405

publications by Defendants; and conformity with industry standards and norms including, but not limited to, accommodations for students with disabilities.

90.     Defendants' actions and omissions enumerated above constitute material and substantial breaches of that contract.  As a direct and proximate result of said breaches, Galligan was damaged and will continue being damaged in an amount to be proven at trial, but currently estimated to be several million dollars.

## NINTH CLAIM FOR RELIEF
### Breach of the Covenant of Good Faith and Fair Dealing

91.     Plaintiff incorporates by reference and realleges all paragraphs above as if written in full herein.

92.     The contract between Defendants and Galligan contained an implied covenant of good faith and fair dealing, which precluded the Defendants from evading the spirit of the contract between Defendants and Galligan, willfully or negligently rendering deficient performance, interfering with Galligan's ability to benefit from its terms and conditions, acting or not acting in contravention of Galligan's reasonable expectations, failing to abide by the standards, policies, and promises promulgated by the Defendants, or otherwise acting in an arbitrary or capricious manner with respect to Galligan.

93.     Defendants breached this covenant by making it impossible for Galligan to realize the benefits of his contract and by allowing their employees and agents to act in bad faith and in a manner that interfered with Galligan's reasonable contract expectations.

6298405

94.     As a direct and proximate result of these breaches, Galligan has suffered and will continue to suffer substantial damages in an amount to be proven at trial, but currently estimated to be several million dollars.

## TENTH CLAIM FOR RELIEF
### Breach of Fiduciary Duty

95.     Plaintiff incorporates by reference and realleges all paragraphs above as if written in full herein.

96.     Defendants owed Galligan fiduciary duties of the highest order, especially because Adtalem and DeVry Medical placed RUSVM on a remote island in the West Indies of only 68 square miles, with a population of less than 50,000 and limited food, daily living needs, and basic communications.  Defendants also charged Galligan tuition in excess of $100,000.  Galligan entrusted his actual and loaned money to Defendants in exchange for an education leading to a DVM degree and a veterinary vocation for the rest of his life.  Galligan has a right to the immediate return of approximately $190,000 taken or caused to be incurred by Defendants.

97.     The duties owed by Defendants included good faith, fair dealing, loyalty, candor, full and accurate disclosure, oversight, the exercise of prudent academic and business judgment, compliance with all applicable federal and state laws, and due care.

98.     Defendants breached the fiduciary duties as described above and, as a direct and proximate result, Galligan suffered and will continue to suffer damages in an amount to be proven at trial, but currently estimated to be several million dollars.

6298405

## ELEVENTH CLAIM FOR RELIEF
### Civil Conspiracy

99.    Plaintiff incorporates by reference and realleges all paragraphs above as if written in full herein.

100.    Defendants conspired with each other and with third parties to pursue a scheme to defraud Galligan by concerted action in several ways including, but not limited to: RUSVM not following or enforcing its own disability policies; RUSVM not abiding by the standards, decrees, and directives of the AVMA; RUSVM Administration organizing a sham of an appeals process to which Galligan was subjected; and, among other things, Adtalem's legal counsel (Kaplan) communicating directly with and threatening Galligan after his notification of representation and intention to commence litigation in clear and inexcusable violation of ethical rules.

101.    Defendants knowingly, maliciously, and voluntarily participated in this scheme and committed illegal and tortious acts to defraud Galligan.

102.    As a direct and proximate result, Galligan suffered and will continue to suffer damages in an amount to be proven at trial, but currently estimated to be several million dollars.

## TWELFTH CLAIM FOR RELIEF
### Alter Ego

103.    Plaintiff incorporates by reference and realleges all paragraphs above as if written in full herein.

104.    There is such a unity of interest and ownership that the separate personalities of Adtalem, DeVry Medical, and RUSVM no longer exist; therefore the

adherence to the corporate fiction of the separate corporate existence of those entities would sanction a fraud or promote injustice.

105.    Indeed, as set forth on DeVry's SEC Form 10-K filed on August 25, 2016, DeVry Medical is one of Adtalem's "reporting segments," and DeVry Medical in turn operates RUSVM. Adtalem also characterizes the employees of RUSVM and other educational programs under its umbrella as Adtalem employees. DeVry's SEC Form 10-K further recognizes that RUSVM is "supported by administrative staff located in Miramar, Florida and North Brunswick, New Jersey." Thus, Adtalem itself recognizes that it controls and manipulates DeVry Medical and RUSVM. To find otherwise would promote injustice, because individuals such as Plaintiff rely on DeVry's 10-K to accurately represent Adtalem's corporate structure.

## DEMAND FOR JURY TRIAL

Plaintiff hereby requests a trial by jury.

## PRAYER

WHEREFORE, Plaintiff Peter M. Galligan requests that the Court grant the following relief in his favor:

- Compensatory damages suffered by Galligan in an amount to be proven at trial, but believed to be in excess of several million dollars;

- Restitution in an amount to be proven at trial, but believed to be in excess of $190,000, plus accrued interest owed to the federal government;

- Punitive damages;

- An injunction requiring Defendants to reverse their decision to dismiss Galligan, adjust Galligan's Small Animals Medicine 1 grade and all other course grades in a fair manner weighted with allowances for his documented disability, and readmit Galligan to the DVM program or cause Galligan to be matriculated to another vet school's DVM program with adequate safeguards to prevent future retribution and/or retaliation;

32

- An injunction enjoining, preliminarily and permanently, Defendants from continuing their unlawful conduct as alleged herein;

- Reasonable attorneys' fees and costs of suit;

- Prejudgment interest; and

- Any such additional and further relief, at law or in equity, which the Court deems to be just, proper, and equitable.

6298405

Dated this 19th day of October, 2017.

Respectfully submitted,

/s/ Michael W. Ford

Michael W. Ford, Esq.
Law Offices of Michael W. Ford
*(local counsel)*
4 Timberwood Lane
Riverwoods, IL 60015
Telephone: (847) 948-7884
Email: mfordski@aol.com
IL Bar # 0846139
Member, Trial Bar U.S. District Court N.D.
IL

- and -

/s/ Emil T. Bayko

Emil T. Bayko
PORTER HEDGES LLP
1000 Main Street, 36th Floor
Houston, Texas 77002
Telephone: (713) 226-6608
Facsimile: (713) 226-6208
Email: tbayko@porterhedges.com
IL Bar # 0141356

**ATTORNEYS FOR PLAINTIFF
PETER M. GALLIGAN**

OF COUNSEL:
Kyle Reeb (*pro hac vice* pending)
Texas State Bar No. 24091604
Federal ID No. 2571829
Jim Aycock (*pro hac vice* pending)
Texas State Bar No. 24034309
Federal ID No. 20675
Alison P. Henderson (*pro hac vice* pending)
Texas State Bar No. 24087707
Federal ID No. 2228628
PORTER HEDGES LLP
1000 Main Street, 36th Floor
Houston, Texas 77002
Telephone: (713) 226-6000
Facsimile: (713) 226-6211
kreeb@porterhedges.com
jaycock@porterhedges.com
ahenderson@porterhedges.com

34

6298405

## CERTIFICATE OF SERVICE

I hereby certify that on October 19, 2017, a true and correct copy of the foregoing pleading was electronically filed in accordance with the Federal Rules of Civil Procedure and was served via e-mail upon the following counsel of record:

Brian Stolzenbach
Megan Troy
Seyfarth Shaw LLP
233 S. Wacker Drive, Suite 8000
Chicago, IL 60606-6448
(312) 460-5551
bstolzenbach@seyfarth.com
mtroy@seyfarth.com

/s/ Emil T. Bayko
Emil T. Bayko

35

6298405