# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| PETER M. GALLIGAN, | § | |
| | § | |
| PLAINTIFF | § | |
| | § | |
| V. | § | CIVIL CASE NO. 1:17-cv-06310 |
| | § | |
| ADTALEM GLOBAL EDUCATION INC. F/K/A | § | |
| DEVRY EDUCATION GROUP; ADTALEM | § | |
| GLOBAL HEALTH, INC. F/K/A DEVRY | § | |
| MEDICAL INTERNATIONAL, INC.; ROSS | § | |
| UNIVERSITY SCHOOL OF MEDICINE | § | |
| SCHOOL OF VETERINARY MEDICINE (ST. | § | |
| KITTS) LIMITED; AND DOES 1 THROUGH 50, | § | |
| | § | |
| DEFENDANTS | § | JURY TRIAL DEMANDED |

## PLAINTIFF'S RESPONSE TO
## DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT[1]

---

[1] Plaintiff's Response addresses Claims 1, 2, and 5-12 of his First Amended Complaint (the "Complaint"). Plaintiff does not address Claims 3 and 4, which he intends to voluntarily dismiss in accordance with Federal Rule of Civil Procedure 41(a).

6456041

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

RELEVANT BACKGROUND .......................................................................................... 1

LEGAL STANDARD.......................................................................................................... 2

I.   Because the Rehabilitation Act of 1973 and Title III of the Americans with
     Disabilities Act Can Apply Extraterritorially, Plaintiff's Claims 1 and 2 Should
     Not Be Dismissed. ...................................................................................................... 3

     A.   Decisions by Other Courts and OCR to Extraterritorially Apply the Rehab
          Act and Title III are Highly Persuasive. ................................................... 4

     B.   Extraterritoriality is Further Supported by the Language of the Rehab Act
          and Title III. ............................................................................................... 8

     C.   Public Policy Further Warrants the Extraterritorial Application of the
          Rehab Act and Title III. .............................................................................. 8

II.  Because Plaintiff Pleads a Viable Claim under the Illinois Consumer Fraud and
     Deceptive Business Practices Act, Claim 6 Should Not Be Dismissed........................... 9

     A.   Defendants' Conduct Occurred Primarily and Substantially in Illinois. .............. 10

     B.   Defendants' Statements Amount to More than Mere Puffing. ........................... 12

III. Plaintiff's Claims 5 and 7 Should Not Be Dismissed Because They Are Based on
     Actionable Statements and Because Plaintiff Has Adequately Pled Damages................ 14

     A.   Defendants Made False Statements of Material Fact on Which Plaintiff
          Justifiably Relied. ....................................................................................... 14

     B.   Plaintiff Adequately Pled Damages for Claims 5 and 7. ..................................... 16

     C.   At the Very Least, Plaintiff Should Be Permitted to Amend His Complaint
          to More Clearly Plead Damages. ................................................................ 17

IV.  Plaintiff has Alleged a Cognizable Breach of Contract Claim, and Therefore
     Claims 8 and 9 Should Not Be Dismissed. ...................................................................... 18

     A.   Plaintiff Has Alleged the Existence of an Express or Implied Contract.............. 19

     B.   Plaintiff Has a Cognizable Breach of Contract Claim for Defendants'
          Arbitrary and Capricious Conduct. ............................................................ 23

V.   Defendants' Laconic Argument Regarding Breach of Fiduciary Duty Does Not
     Support the Dismissal of Claim 10. .................................................................................. 24

VI.    Claim 11 Should Not Be Dismissed because Plaintiff Has Pled a Viable Claim of
       Civil Conspiracy. ................................................................................................. 25

VII.   Plaintiff Has Accurately Pled Alter Ego. ........................................................... 28

CONCLUSION ......................................................................................................... 29

6456041

**TABLE OF AUTHORITIES**

Page(s)

**Cases**

*Abrams v. Ill. Coll. of Podiatric Med.*,
   77 Ill. App. 3d 471, 395 N.E.2d 1061 (Ill. App. Ct. 1st Dist. 1979)..................................19, 20

*Al Maha Trading & Contracting Holding Co. v. W.S. Darley & Co.*,
   No. 12 C 1920, 2014 WL 2459674 (N.D. Ill. June 2, 2014) ...................................26

*Am. Guardian Warranty Servs., Inc. v. JCR-Wesley Chapel, LLC*,
   2017 WL 2224883 (N.D. Ill. May 22, 2017) ........................................................18

*ASARCO, LLC v. Americas Mining Corp.*,
   382 B.R. 49 (S.D. Tex. 2007) ...............................................................................27

*Avery v. State Farm Mut. Auto. Ins. Co.*,
   216 Ill.2d 100, 835 N.E.2d 801 (2005) ....................................................10, 11, 13

*Barbara's Sales, Inc. v. Intel Corp.*,
   227 Ill. 2d 45, 879 N.E.2d 910 (2007) ..............................................................13, 14

*Bird v. Lewis & Clark College*,
   104 F. Supp. 2d 1271 (D. Ore. 2000)....................................................................4, 5

*City of Chicago v. Michigan Beach Housing Cooperative*,
   297 Ill. App. 3d 317, 696 N.E.2d 804 (Ill. App. Ct. 1st Dist. 1998)......................16

*Clearing Corp. v. Fin. & Energy Exch. Ltd.*,
   No. 09 C 5383, 2010 WL 2836717 (N.D. Ill. July 16, 2010) .................................10

*In re Conticommodity Servs., Inc.*,
   733 F. Supp. 1555 (N.D. Ill. 1990), *rev'd in part on other grounds*, *Brown v.*
   *U.S.*, 976 F.2d 1104 (7th Cir. 1992)......................................................................27

*Copperweld Corp. v. Indep. Tube Corp.*,
   467 U.S. 752 (1984)...............................................................................................27

*Cosmetique, Inc. v. ValueClick, Inc.*,
   753 F. Supp. 2d 716 (N.D. Ill. 2010) .....................................................................10

*Crichton v. Golden Rule Ins. Co.*,
   576 F.3d 392 (7th Cir. 2009) .................................................................................12

*Dean-Hines v. Ross Univ. Sch. of Veterinary Med.*,
   No. 05-3486, 2006 U.S. Dist. LEXIS 101375 (D.N.J. Aug. 10, 2006) (**Ex. 3**).........................5

iii

*Dewick v. Maytag Corp.*,
    296 F. Supp. 2d 905 (N.D. Ill. 2003) ............................................................................17, 18

*Dloogatch v. Brincat*,
    396 Ill. App. 3d 842, 920 N.E.2d 1161 (Ill. App. Ct. 1st Dist. 2009)......................................16

*EEOC v. Arabian American Oil Company*,
    499 U.S. 244 (1991)..................................................................................................................4

*Eisele v. Ayers*,
    63 Ill. App. 3d 1039, 381 N.E.2d 21 (Ill. Ct. App. 1st Dist. 1978)..................................19, 20

*Evans v. Ill. Inst. of Tech.*,
    2014 IL App (1st) 123611-U (Ill. App. Ct. 1st Dist. Sept. 26, 2014) .....................................15

*Gittens-Altman, A.M.A. v. HCB Contractors*,
    No. 90-6908, 1992 WL 111357 (E.D. Pa. May 15, 1992) ......................................................18

*Glenwood Farms, Inc. v. Ivey*,
    228 F.R.D. 47 (D. Me. 2005) ..................................................................................................18

*Illinois ex rel. Hammer v. Twin Rivers Ins. Co.*,
    16 C 7371, 2017 WL 2880899 (N.D. Ill. July 5, 2017) .........................................................18

*Harris v. Adler Sch. of Prof'l Psychology*,
    309 Ill. App. 3d 856, 723 N.E.2d 717 (Ill. App. Ct. 1st Dist. 1999)......................................22

*Int'l Equip. Trading, Ltd. v. AB SCIEX LLC*,
    No. 13 C 1129, 2013 WL 4599903 (N.D. Ill. Aug. 29, 2013) ................................................10

*IPOX Schuster, LLC v. Nikko Asset Mgmt. Co., Ltd.*,
    191 F. Supp. 3d 790 (N.D. Ill. 2016) .....................................................................................12

*Johnson v. John Marshall Law Sch*,
    2014 IL App (1st) 123610-U (Ill. App. Ct. 1st Dist. Sept. 26, 2014) .....................................15

*King v. Eastern Michigan University*,
    221 F. Supp. 2d 783 (D. Mich. 2002) .......................................................................................5

*Kleen Prods., LLC v. Packaging Corp. of Am.*,
    775 F. Supp. 2d 1071 (N.D. Ill. 2011) ....................................................................................27

*LeDonne v. Axa Equitable Life Ins. Co.*,
    411 F. Supp. 2d 957 (N.D. Ill. 2006) .......................................................................................9

*Liu v. Nw. Univ.*,
    78 F. Supp. 3d 839 (N.D. Ill. 2015) ............................................................................19, 21, 23

iv

*Maas v. Corp. of Gonzaga Univ.*,
618 P.2d 106 (Wash. Ct. App. 1980) ............................................................24, 25

*Miller v. William Chevrolet/GEO, Inc.*,
326 Ill. App. 3d 642, 762 N.E.2d 1 (Ill. App. Ct. 1st Dist. 2001) ......................12, 13

*Minuti v. Johnson*,
No. 02 C 4551, 2003 WL 260705 (N.D. Ill. Feb. 5, 2003) ................................16, 17

*Mostaghim v. Fashion Inst. of Tech.*,
No. 01 Civ. 8090 (HB), 2002 WL 1339098 (S.D.N.Y. June 19, 2002) ..................20

*Moy v. Adelphi Inst., Inc.*,
866 F. Supp. 696 (E.D.N.Y. 1994) ...................................................................24

*Muir v. Playtex Prods., LLC*,
983 F. Supp. 2d 980 (N.D. Ill. 2013) ................................................................13

*Mulvey v. Carl Sandburg High School*,
2017 IL App (1st) 151615, 66 N.E.3d 507 (Ill. App. Ct. 1st Dist. 2016) ...............22

*O'Driscoll v. Argosy Univ.*,
No. 12 C 10164, 2014 WL 714023 (N.D. Ill. Feb. 25, 2014) ....................19, 21, 23

*Ohio Univ. Bd. of Trs. v. Smith*,
724 N.E.2d 1155 (Ohio App. Ct. 1999) ............................................................25

*Olson v. Champaign Cty., Ill.*,
784 F.3d 1093 (7th Cir. 2015) ...........................................................................2

*Omnicare, Inc. v. UnitedHealth Grp., Inc.*,
524 F. Supp. 2d 1031 (N.D. Ill. 2007) ..............................................................26

*Phillips v. Bally Total Fitness Holding Corp.*,
372 Ill. App. 3d 53, 865 N.E.2d 310 (Ill. App. Ct. 1st Dist. 2007) ...........12, 24, 25

*Phillips v. DePaul Univ.*,
No. 12 ..........................................................................................................24

*Pickett v. Hous. Auth. of Cook Cty.*,
114 F. Supp. 3d 663 (N.D. Ill. 2015) ..............................................................2, 3

*In re Plasma-Derivative Protein Therapies Antitrust Litig.*,
764 F. Supp. 2d 991 (N.D. Ill. 2011) ................................................................26

*Purepecha Enters., Inc. v. El Matador Spices & Dry Chiles*,
No. 11 C 2569, 2012 WL 3686776 (N.D. Ill. Aug. 24, 2012) ..............................12

6456041

*Renfrow v. CTX Mortg. Co., LLC*,
    No. 3:11-CV-3132-L, 2012 WL 3582752 (N.D. Tex. Aug. 20, 2012).....................................18

*Seifert v. Solem*,
    387 F.2d 925 (7th Cir. 1967) ...........................................................................................17

*Smith v. Short Term Loans*,
    No. 99 C 1288, 2001 WL 127303 (N.D. Ill. Feb. 14, 2001)...........................................16, 24

*Specht v. Google, Inc.*,
    660 F. Supp. 2d 858 (N.D. Ill. 2009) ................................................................................10

*Spector v. Norwegian Cruise Line Ltd.*,
    545 U.S. 119 (2005).............................................................................................................6

*Stargel v. NutraSweet Co.*,
    No. 13-cv-7575, 2014 WL 1662989 (N.D. Ill. Apr. 24, 2014).......................................28, 29

*Std. Iron Works v. ArcelorMittal*,
    639 F. Supp. 2d 877 (N.D. Ill. 2009) ...........................................................................26, 27

*Stevens v. Premier Cruises, Inc.*,
    215 F.3d 1237 (11th Cir. 2000) (per curiam)......................................................................6

*Tango Music, L.L.C. v. Deadquick Music, Inc.*,
    No. 99 C 7331, 2001 WL 897606 (N.D. Ill. Aug. 9, 2001).................................................28

*Univ. of Balt. v. Iz*,
    716 A.2d 1107 (Md. App. 1998).........................................................................................22

*UOP v. Andersen Consulting*,
    No. CV 950145753, 1997 WL 219820 (Conn. Super. Ct. Apr. 24, 1997) ...........................13

*Vulcan Golf, LLC v. Google Inc.*,
    552 F. Supp. 2d 752 (N.D. Ill. 2008) .................................................................................11

**Statutes**

815 ILCS § 505/2..........................................................................................................................9

20 U.S.C. § 1681............................................................................................................................5

29 U.S.C. § 794..............................................................................................................................8

29 U.S.C. § 794(a) .........................................................................................................................3

42 U.S.C. 12181(7)(J)..................................................................................................................8, 9

42 U.S.C. § 12181(a) ......................................................................................................................3

42 U.S.C. § 12182(a) ...................................................................................................3, 8

**Other Authorities**

Fed. R. Civ. P. 8(a)(2) .........................................................................................................2

Fed. R. Civ. P. 9 ...............................................................................................................16

Fed. R. Civ. P. 15 .............................................................................................................17

Fed. R. Civ. P. 15(a)(2) .....................................................................................................17

6456041

Plaintiff Peter M. Galligan ("Plaintiff") files this Response to the Motion to Dismiss Amended Complaint [Dkts. 18-20] filed by Defendants Adtalem Global Education Inc. f/k/a DeVry Education Group ("DeVry Group"), Adtalem Global Health, Inc. f/k/a DeVry Medical International, Inc. ("DeVry Medical"), Ross University School of Medicine School of Veterinary Medicine (St. Kitts) Limited ("Ross"), and Does 1 through 50 (collectively, "Defendants").

## INTRODUCTION

Defendants seek the dismissal of all of Plaintiff's claims asserted in this lawsuit stemming from his inducement to attend Ross, Defendants' failure to adhere to their policies and accommodate his documented learning disabilities, and their unjustified and wrongful dismissal of him from campus and refusal to grant him any right to appeal. Contrary to Defendants' assertions, Plaintiff's claims are legally and factually supported and should not be dismissed. Accordingly, Defendants' Motion should be denied.

## RELEVANT BACKGROUND

Plaintiff has dreamed his whole life of becoming a veterinarian. To that end, he extensively researched veterinary programs and ultimately decided on Ross. Ross, which is located in Nevis, St. Kitts in the Caribbean, is a subsidiary of DeVry Medical, which in turn falls under the umbrella of DeVry Group. First Amended Complaint (hereinafter "Am. Compl.") at ¶¶ 6-8, 17. Defendants receive hundreds of millions of dollars in federal funding each year for student loans and grants pursuant to the Higher Education Act of 1965 ("HEA"). *Id.* ¶¶ 18-19.

Although Plaintiff has suffered from a learning challenge since junior high school which caused him to suffer anxiety attacks during examinations, he was reassured by Defendants' publicly-available materials citing their commitment to accommodating students with disabilities and to ensuring the mental and emotional stability of students. *Id.* at ¶¶22-26, 29, 46. Upon arriving at Ross in May 2013, he immediately notified Ross psychologist Dr. Janet Camp of his

1

6456041

disability and presented her with documentation supporting his diagnosis and treator recommendations (*i.e.*, testing accommodations). *Id.* at ¶31.

The basis for Plaintiff's claims is that Defendants failed to reasonably accommodate his documented learning disability throughout his time at Ross, despite numerous policies and procedures that were in place requiring them to do so. *Id.* at ¶¶22-39, 44-48. In short, despite offering Defendants ample documentation supporting his learning disability, Plaintiff was repeatedly denied the reasonable accommodations prescribed by his treating physicians. *Id.* at ¶¶29-39. As a direct consequence, Plaintiff was unable to perform to his full ability on examinations. He was initially put on academic probation and, subsequently in May 2015, dismissed from Ross for failing multiple classes. *Id.* at ¶¶35-41. To make matters worse, Plaintiff was denied any right to investigate or appeal his dismissal, and instead was threatened if he continued his efforts to do so. *Id.* at ¶¶42-43, 48, 51. Plaintiff filed suit against Defendants seeking to recover for their wrongdoing.

## LEGAL STANDARD

To survive a motion to dismiss pursuant to Rule 12(b)(6), a plaintiff's complaint "must state a claim to relief that is plausible on its face." *Pickett v. Hous. Auth. of Cook Cty.*, 114 F. Supp. 3d 663, 665 (N.D. Ill. 2015) (internal quotations and citation omitted). A complaint need only give the defendant fair notice of what the claim is and the grounds upon which it rests; specific facts are not necessary. *Olson v. Champaign Cty., Ill.*, 784 F.3d 1093, 1099–2000 (7th Cir. 2015) (internal quotations and citation omitted); *see also* FED. R. CIV. P. 8(a)(2). "A claim satisfies this standard when its factual allegations raise a right to relief above the speculative level." *Pickett*, 114 F. Supp. 3d at 665 (internal quotations and citations omitted).

2

On a motion to dismiss, "the court takes all facts alleged by the plaintiff as true and draws all reasonable inferences from those facts in the plaintiff's favor, although conclusory allegations [. . .] are not entitled to this presumption of truth." *Id.* (citation omitted).

## ARGUMENT AND AUTHORITIES

I.  **BECAUSE THE REHABILITATION ACT OF 1973 AND TITLE III OF THE AMERICANS WITH DISABILITIES ACT CAN APPLY EXTRATERRITORIALLY, PLAINTIFF'S CLAIMS 1 AND 2 SHOULD NOT BE DISMISSED.**

Plaintiff's Claims 1 and 2 center on Defendants' failure to accommodate his documented learning disability and, moreover, their discrimination against him and denial of rights and benefits owed to him. Am. Compl. ¶¶52-63. Section 504 of the Rehabilitation Act of 1973 ("Rehab Act") prohibits discrimination against disabled individuals by entities that receive federal funding.[2] 29 U.S.C. § 794(a). Similarly, Title III of the Americans with Disabilities Act ("Title III") prohibits discrimination against disabled individuals in any place of public accommodation.[3] 42 U.S.C. § 12182(a).

Defendants' argument that the general presumption against the extraterritorial application of the Rehab Act and Title III necessitates the dismissal of these claims is flawed for three reasons. First, this issue remains undecided by the Seventh Circuit, and there exists authority from other jurisdictions as well as the U.S. Department of Education Office for Civil Rights ("OCR") supporting the extraterritorial application of these laws. Second, the plain language of the Rehab Act and Title III support their extraterritorial application in this case. Third, extraterritoriality should apply here in the interests of public policy.

---

[2] "No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of his or her disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).

[3] "No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations, of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12181(a).

3

### A. Decisions by Other Courts and OCR to Extraterritorially Apply the Rehab Act and Title III are Highly Persuasive.

Although some jurisdictions and OCR have upheld the presumption of extraterritoriality on certain occasions, there also exists authority to the contrary on this issue. Moreover, this precise issue has never been considered by the Seventh Circuit. As such, it is hardly "beyond serious dispute" (Motion at 4) that the Rehab Act and Title III cannot apply in this case.

As a preliminary matter, there is substantial authority extending the Rehab Act and Title III to conduct occurring outside U.S. borders. For instance, in a case addressing disability-based discrimination against St. Louis University concerning its study-abroad program, OCR glossed over the issue of extraterritoriality, remarking simply that "the University is a recipient of Federal financial assistance and, therefore, must comply with the regulation implementing Section 504." *St. Louis Univ. (MO)*, Complaint No. 07-90-2032, 1 NDLR P 259 (Dep't. of Educ. Dec. 12, 1990) (**Ex. 1**).[4] OCR reaffirmed its stance even after the Supreme Court's *Aramco* decision[5] in a case involving the College of St. Scholastica. *Coll. of St. Scholastica (MN)*, Complaint No. 05-92-2095, 3 NDLR P 196 (Dep't. of Educ. Sept. 15, 1992) (**Ex. 2**). There, OCR readily applied the Rehab Act to the school without even considering the question of extraterritoriality in connection with a deaf student's complaint surrounding the school's failure to provide an American Sign Language interpreter during a study abroad program in Ireland. *Id.*

More recently, some courts have applied the Rehab Act and Title III to study abroad programs notwithstanding the presumption against extraterritoriality. In *Bird v. Lewis & Clark College*, 104 F. Supp. 2d 1271 (D. Ore. 2000), a paraplegic student pursued her claims against a

---

[4] The fact that OCR found for the University is not dispositive to the issue at hand. What is important is that OCR readily applied the requirements of the Rehab Act to the University notwithstanding the fact that the conduct transpired abroad, rather than domestically. *See St. Louis Univ. (MO)*, 1 NDLR P at 259.

[5] In *EEOC v. Arabian American Oil Company*, 499 U.S. 244, 246–47 (1991), the Supreme Court held that Title VII, as worded at the time, did not apply to a suit by a U.S. employee working abroad for a U.S. employer.

4

university for its alleged failure to accommodate her disability during a study abroad program in Australia.[6] Extraterritoriality also finds support in *King v. Eastern Michigan University*, 221 F. Supp. 2d 783 (D. Mich. 2002), in which the court, faced with a matter of first impression, found sufficient evidence for the extraterritorial application of Title IX to incidents of sexual harassment that occurred during the university's study abroad program in South Africa.[7]

The fact that the foregoing opinions concerned American-based universities operating foreign study-abroad programs—rather than foreign-based universities operating domestically— is of no consequence. Indeed, one court permitted a student to pursue her ADA claim (among others) against Defendant Ross and its parent entities[8] notwithstanding Ross's extraterritoriality arguments. *Dean-Hines v. Ross Univ. Sch. of Veterinary Med.*, No. 05-3486, 2006 U.S. Dist. LEXIS 101375, at *7–9 (D.N.J. Aug. 10, 2006) (**Ex. 3**). In *Dean-Hines*, the plaintiff asserted claims against Ross for, *inter alia*, violation of the Rehab Act and the ADA stemming from Ross's representations that she would be re-admitted after a sabbatical as long as she took courses to help her overcome her learning disabilities. *Id.* at *3–5. Defendants moved to dismiss plaintiff's case. *Id.* at *6. Importantly, the court denied defendants' motion with respect to plaintiff's ADA claim and was not persuaded by their extraterritoriality argument. *Id.* at *9. Because New Jersey had significant contact with the dispute, where Ross's headquarters and

---

[6] *Bird* came on summary judgment, not a motion to dismiss. 104 F. Supp. 2d at 1273. At neither the district court level nor on appeal did the courts consider the question of extraterritoriality, perhaps because Lewis & Clark satisfied the applicable disabilities laws. *Id.* at 1276, *aff'd*, 303 F.3d 1015, 1021 (9th Cir. 2002). Nevertheless, *Bird* is instructive because the courts mechanically applied those federal laws, and moreover the defendant did not object on the basis of extraterritoriality until the appeal. *Id.*

[7] *King* is instructive because the language of Title IX is very similar to that of the Rehab Act and Title III. *See* 20 U.S.C. § 1681 ("*No person in the United States* shall, on the basis of sex, be excluded from participation in, be denied the befits of, or be subjected to discrimination under *any education program or activity receiving Federal financial assistance . . . .*" (emphases added)).

[8] The *Dean-Hines* plaintiff filed suit against Ross, DeVry Inc., and Dominica Management, Inc. alleging that Ross was owned and/or operated by DeVry, an Illinois corporation, through Dominica, a foreign corporation registered to do business in New Jersey which "exercise[d] legal and/or de facto control over Ross's decision-making[.]" 2006 U.S. Dist. LEXIS 101375, at *2. Here, Plaintiff similarly has filed suit against Ross and the entities above it on the corporate hierarchy—DeVry Medical and DeVry.

5

6456041

Case: 1:17-cv-06310 Document #: 25 Filed: 01/26/18 Page 14 of 39 PageID #:142

administrative offices are located, the United States therefore had significant contact with the dispute, and thus "[q]uestions of extraterritorial application and congressional intent under the ADA and the [Rehab Act]" were irrelevant. *Id.* The Court should extend that same logic to this case.

Plaintiff's position is further supported by the rationale applied by courts in cases involving foreign-flag cruise ships sailing in U.S. waters. *See Spector v. Norwegian Cruise Line Ltd.*, 545 U.S. 119 (2005); *Stevens v. Premier Cruises, Inc.*, 215 F.3d 1237, 1242 (11th Cir. 2000) (per curiam). In *Spector*, the Supreme Court held that foreign-flag cruise ships operating in U.S. waters are "places of accommodation" and "specified public transportation" and thus are subject to Title III. 545 U.S. at 129. Importantly, although the cruise ships at issue were registered in the Bahamas, they were operated by a company based in the United States, served predominantly United States residents, and were "in most other respects United States-centered ventures." *Id.* at 126. Similarly, in *Stevens*, the Eleventh Circuit reversed the district court and held that a Canadian company operating a Bahamas-registered cruise ship in U.S. waters was, in fact, required to comply with Title III. 215 F.3d at 1242–43.

Here, much like in *Spector* and *Stevens*, Ross is a foreign-based entity with substantial ties to the United States. There is abundant evidence that although Ross is technically a St. Kitts entity, it has myriad connections with and exposure to the United States so as to justify the Court's application of federal laws to it. For instance, Ross is owned and operated by a domestic entity. Am. Compl. ¶8. Additionally, for fiscal year 2016, Ross derived 84 percent of its revenue on a cash basis from federal assistance grants and loans issued pursuant to the HEA. *Id.* at ¶18.[9] Further, as of 2013, 97 percent of Ross's student body was comprised of American

---

[9] Plaintiff estimates that Ross receives $100,395,368.64 in federal student loans annually (assuming that all revenues are derived from loans rather than cash tuition). To arrive at this figure, Plaintiff considers

6

6456041

citizens.[10]  Ross also publicizes the fact that it has abundant resources and offices in the United States, including its Office of Student Accounts, Office of Student Finance, Student Service Center, Office of the Registrar, Office of Admissions, and its Title IX Coordinator and Associate Consultant.[11]  There are abundant other examples of Ross availing itself of the privileges offered by the United States—namely, maintaining relationships with 23 U.S.-based clinical affiliates (of 32 total)[12]; widely advertising its program in the United States and encouraging prospective students to attend "Ross Vet Expo" events[13]; and maintaining accreditations from the American Veterinary Medical Association ("AVMA") Council on Education and the American Animal Hospital Association.[14]

Likewise, Adtalem has availed itself of the benefits of the United States, including by deriving 59 percent of its 2016 revenue from federal grants and loans (Am. Compl. ¶18) and by recently temporarily relocating the students, faculty, and staff of its medical school from St. Kitts to Knoxville, Tennessee.[15]

---

that: (1) 98 percent of Ross students borrow federal funds to pay tuition, (2) the typical graduate leaves Ross with $298,915 in debt, (3) Ross's vet program comprises seven semesters (three per calendar year), and (4) 84 percent of Ross's annual revenues are derived from federal student loans. **Ex. 4**, Adtalem Global Education Inc. Form 10-K for Fiscal Year Ended June 30, 2017, available at https://www.last10k.com/sec-filings/atge#fullReport.

[10] **Ex. 5**, "Statistics Shed Light on International Education," Malinda Larkin, May 3, 2013, available at https://www.avma.org/News/JAVMANews/Pages/130615c.aspx.

[11] **Ex. 6**, https://veterinary.rossu.edu/current-students.html (listing addresses of both the Office of Student Accounts and Office of Student Finance as 630 US Highway 1, Suite 2001, North Brunswick, NJ, 08902 US); **Ex. 7**, Ross University School of Veterinary Medicine Student Handbook (eff. May 4, 2015) at §§ 1, 10.2, 2.11.3.2, 2.12.6, 2.12.11, 2.13.3, 2.13.4, 2.13.6, 2.13.8, 2.13.9, 3.4.10.20 (Student Service Center, Office of Registrar, and Title IX Coordinator and Consultant bear New Jersey telephone numbers and/or addresses); **Ex. 8**, https://veterinary.rossu.edu/admissions/dvm-admissions/how-to-apply.html (Office of Admissions is located at 630 US Highway 1, Suite 2031, North Brunswick, NJ 08902, 855-ROSSVET).

[12] *See* **Ex. 9**, http://veterinary.rossu.edu/dvm-program/curriculum/clinical-year/clinical-affiliates/.

[13] **Ex. 10**, https://veterinary.rossu.edu/dvm-program/attend-event.html (inviting prospective students to attend "Ross Vet Expos" in Costa Mesa, CA, Dallas, TX, Ft. Lauderdale, FL, New York City, NY, and elsewhere).

[14] *See* **Ex. 11**, http://veterinary.rossu.edu/about/accreditation/.

[15] **Ex. 12**, "Ross University School of Medicine to Relocate Temporarily to Knoxville, Tenn. for Continuation of Medical School Classes" (Business Wire, Nov. 8, 2017), available at

6456041

**B.      Extraterritoriality is Further Supported by the Language of the Rehab Act and Title III.**

In addition to the foregoing authority, the language of the Rehab Act and Title III provide evidence of congressional intent for those laws to be comprehensive so as to overcome the presumption against extraterritoriality.  Section 504 of the Rehab Act forbids disability-based discrimination under "*any program or activity* receiving Federal financial assistance."  29 U.S.C. § 794 (emphasis added).  Similarly, Title III guarantees the "full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of *any* place of public accommodation . . . ."  42 U.S.C. § 12182(a) (emphasis added).[16]  Regardless of Defendants' actual places of incorporation, these laws should be read to apply equally to them, particularly because of their extensive contacts with the United States.[17]

**C.      Public Policy Further Warrants the Extraterritorial Application of the Rehab Act and Title III.**

As a final point, the Rehab Act and Title III should be applied extraterritorially in this case for two policy reasons.

First, public policy should prevent the dismissal of Claims 1 and 2 because Ross's extensive contacts with the United States defy the extraterritoriality presumption.  Much like the foreign entities operating foreign-flag cruise ships in U.S. waters, Ross has opened itself up to regulation under federal laws by being overseen and operated by American entities, targeting American students (who make up the vast majority of its student body), maintaining American accreditations, and receiving approximately one hundred million dollars each year in funding

---

https://www.businesswire.com/news/home/20171108006673/en/Ross-University-School-Medicine-Relocate-Temporarily-Knoxville.

[16] Places of "public accommodation" include postgraduate private schools and other places of education. 42 U.S.C. 12181(7)(J).

[17] *See* Section I(A), *supra* pp. 4-7.

from the American government.[18]  In short, to allow an institution that receives one hundred million dollars in federal funding annually and otherwise enjoys the benefits and privileges offered by the United States to evade the reach of federal laws would be manifestly unjust.

Second, Plaintiff's Rehab Act and Title III claims should not be dismissed at this juncture because discovery may yield additional documentation evidencing Ross's ties to the United States, which would further justify the application of federal laws to it.  For instance, Plaintiff does not yet have a copy of Ross's Program Participation Agreement ("PPA") with the U.S. Department of Education, which governs its participation in Title IV of the HEA.  The information contained in Ross's PPA could further support the application of federal laws to it, as the PPA may include a provision requiring Ross to adhere to federal laws in exchange for its receipt of federal funding.

For the foregoing reasons, Defendants' Motion should be denied with respect to Claims 1 and 2.

## II.  BECAUSE PLAINTIFF PLEADS A VIABLE CLAIM UNDER THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT, CLAIM 6 SHOULD NOT BE DISMISSED.

The Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA") prohibits the use of "[u]nfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact[.]'"  815 ILCS § 505/2.  Courts liberally construe the ICFA and utilize it "to the greatest extent possible to eliminate all forms of deceptive or unfair business practices."  *LeDonne v. Axa Equitable Life Ins. Co.*, 411 F. Supp. 2d 957, 964 (N.D. Ill. 2006) (internal quotations and citations omitted).

---

[18] *See id.*

To state a claim under the ICFA, Plaintiff must allege: (1) a deceptive act or practice by the Defendants; (2) the Defendants' intent that Plaintiff rely on that deception; (3) the deception occurred in connection with a commercial transaction; and (4) the deception proximately caused his damages. *Id.* (citations omitted); *Avery v. State Farm Mut. Auto. Ins. Co.*, 216 Ill.2d 100, 835 N.E.2d 801, 850 (2005).

### A.  Defendants' Conduct Occurred Primarily and Substantially in Illinois.

In the case of an ICFA claim asserted by a non-resident, the threshold issue is whether the conduct at issue occurred "primarily and substantially in Illinois." *Avery*, 835 N.E.2d at 853–54. The Illinois Supreme Court has recognized that "there is no single formula or bright-line test for determining whether a transaction occurs within th[e] state." *Id.* at 854; *see also Cosmetique, Inc. v. ValueClick, Inc.*, 753 F. Supp. 2d 716, 723 (N.D. Ill. 2010) (noting "there is no specific requirement that a plaintiff expressly state the connection of the action to Illinois"). Instead, "each case must be decided on its own facts." *Avery*, 835 N.E.2d at 854; *Int'l Equip. Trading, Ltd. v. AB SCIEX LLC*, No. 13 C 1129, 2013 WL 4599903, at *10 (N.D. Ill. Aug. 29, 2013). Courts must consider the totality of the circumstances in deciding whether a disputed transaction occurred "primarily and substantially" in Illinois. *Avery*, 835 N.E.2d at 854.

Several factors are relevant to this determination, including: (1) the plaintiff's residence; (2) the defendant's place of business; (3) the location of the item that was the subject of the transaction; (4) the location of the plaintiff's contacts with the defendant; (5) where the contracts were executed; (6) the contracts' choice of law provision, if any; (7) where the deceptive statements were made; (8) where payments for services were sent; and (9) where complaints were to be directed. *Clearing Corp. v. Fin. & Energy Exch. Ltd.*, No. 09 C 5383, 2010 WL 2836717, at *6 (N.D. Ill. July 16, 2010), *cited in Int'l Equip. Trading*, 2013 WL 4599903, at *10; *see also Specht v. Google, Inc.*, 660 F. Supp. 2d 858, 866 (N.D. Ill. 2009).

6456041

Importantly, where the determination of this question requires an in-depth factual analysis, it is premature to do so at the pleadings stage. *Vulcan Golf, LLC v. Google Inc.*, 552 F. Supp. 2d 752, 775 (N.D. Ill. 2008) (noting that, on a motion to dismiss, "any in-depth factual inquiry is inappropriate," and instead the court "must look to whether the allegations of the [pleadings] are factually sufficient such that one could plausibly conclude that the circumstances that relate to the disputed transaction . . . occurred primarily and substantially in Illinois").

The totality of the circumstances in this case supports Plaintiff's ICFA claim. Plaintiff does more than simply allege that Defendants' headquarters is located in Illinois or that the representations at issue emanated from Illinois. Indeed, Plaintiff's claims arise from myriad instances of Illinois-centered conduct:

- Ross is wholly-owned and operated by DeVry Medical (a Florida corporation with its principal place of business in Illinois), which in turn is a wholly-owned reporting segment of DeVry Group (a Delaware corporation with its principal place of business in Illinois). Am. Compl. ¶14.

- DeVry Group advertises that it acquired Ross in 2003. Am. Compl. ¶17.[19]

- Daniel Hamburger, the former President and CEO of Illinois-based DeVry Group (Am. Compl. ¶6), publicly extolled the "culture of care," strong values, and outcome-focused approach of DeVry Group, Ross's parent entity, during DeVry Group's Q1 2016 Earnings Call—an advertising term Plaintiff encountered multiple times prior to his application and admission to Ross emanating from DeVry's Illinois headquarters. Am. Compl. ¶26.

- Following Plaintiff's dismissal from Ross, Audrey B. Kaplan—Senior Counsel for then-DeVry Group who was based in Illinois—communicated with Plaintiff via e-mail to rebuke him for pursuing his appeal. Am. Compl. ¶¶50-51.

Unlike in Defendants' cited cases,[20] there is abundant evidence of Illinois-based conduct in this case. Defendants have done more than simply maintain headquarters or a "home office"

---

[19] *See also* **Ex. 13**, http://www.adtalem.com/our-institutions/ross-vet.html.

[20] In *Avery*, the only connection to Illinois was the defendant's headquarters. *See* 835 N.E.2d at 188 (declining to permit consumers to avail themselves of the ICFA where they did not reside in Illinois, received car repair estimates and repairs in other states, and only communicated with local agents in their

in Illinois—they published the problematic statements on Ross's Illinois-based parent entity's website. These facts render Defendants' arguments untenable. *See IPOX Schuster, LLC v. Nikko Asset Mgmt. Co., Ltd.*, 191 F. Supp. 3d 790, 808 (N.D. Ill. 2016) (denying motion to dismiss ICFA and other claims where plaintiff allegedly communicated with defendant "in Illinois by email and telephone," even though plaintiff did not physically travel to Illinois to have those discussions); *cf. Purepecha Enters., Inc. v. El Matador Spices & Dry Chiles*, No. 11 C 2569, 2012 WL 3686776, at *14–15 (N.D. Ill. Aug. 24, 2012) (denying defendant's summary judgment motion because the undisputed facts showed that defendant used the marks at issue in Illinois).[21]

### B.      Defendants' Statements Amount to More than Mere Puffing.

Plaintiff has stated a plausible claim under the IFCA arising from Defendants' actionable misrepresentations, which amount to more than mere "puffing."   Illinois courts have defined puffing as a "bare and naked statement as to value of a product" and "a nonactionable assertion of opinion."  *Miller v. William Chevrolet/GEO, Inc.*, 326 Ill. App. 3d 642, 762 N.E.2d 1, 7 (Ill. App. Ct. 1st Dist. 2001) (internal quotations and citations omitted).  "Statements of existing facts or comments that ascribe specific virtues to a product are not generally considered puffing and

---

home states and not any agents in Illinois).  Similarly, in *Crichton*, the defendant only maintained a "home office" in Illinois.  *Crichton v. Golden Rule Ins. Co.*, 576 F.3d 392, 397 (7th Cir. 2009) (plaintiff lacked standing to sue under the ICFA where he lived in Florida, received the promotional materials at issue there, entered into and renewed his insurance there, and submitted claims there).  In *Phillips*, the only connection to Illinois was the fact that the fraudulent scheme at issue emanated from the company's headquarters located there.  *Phillips v. Bally Total Fitness Holding Corp.*, 372 Ill. App. 3d 53, 865 N.E.2d 310, 312 (Ill. App. Ct. 1st Dist. 2007) (finding important the fact that plaintiffs resided, bought memberships, signed contracts, used fitness facilities, and were subject to the disputed practices in states other than Illinois; received and sent correspondence to and from states other than Illinois; and never traveled to Illinois or spoke to Bally representatives in Illinois).  As demonstrated, *supra*, this case involves substantially more connections to Illinois.

[21] As an additional point, Plaintiff reiterates that discovery of Defendants' PPA with the DOE is vital. The PPA may evidence further connections with Illinois, such as the fact that DeVry may be the recipient of federal funding on behalf of its subsidiaries—including Ross—and may be responsible for distributing such funding to Ross from its Illinois headquarters.

6456041

may be the subject of a fraud claim." *Id.* The circumstances of each particular case impact the determination of whether a representation is one of opinion or fact. *Id.*

Mere statements of value or other exaggerations made by sellers as to the degree of quality of his or her products cannot support a fraud claim. *See id.*; *see also Barbara's Sales, Inc. v. Intel Corp.*, 227 Ill. 2d 45, 879 N.E.2d 910, 926 (2007). For instance, the Illinois Supreme Court has enumerated certain phrases that constitute puffery: "high-quality," "expert workmanship," "custom quality," "perfect," "magnificent," "comfortable," and "picture perfect." *Avery*, 835 N.E.2d at 846–47. Similarly, a general characterization of one's product as "the best" is inadequate. *Barbara's Sales*, 879 N.E.2d at 926.

However, statements about existing factual situations that are "intended to conjure a specific, factual idea" about a product or service are sufficient to support an IFCA claim. *Miller*, 762 N.E.2d at 7 (phrase "executive driven" was "sufficiently susceptible of interpretation as a factual description of a car's history to defy [court's] characteriz[ation of] it as 'puffing' as a matter of law"); *see also Muir v. Playtex Prods., LLC*, 983 F. Supp. 2d 980, 989 (N.D. Ill. 2013) (phrase "Proven #1 in Odor Control" was not mere puffery because it leaves "no doubt as to the criterion . . . upon which to judge the [product]"); *UOP v. Andersen Consulting*, No. CV 950145753, 1997 WL 219820, at *4 n.3 (Conn. Super. Ct. Apr. 24, 1997), *cited in Muir*, 983 F. Supp. 2d at 990 (statement that defendant "has consistently proven its ability to manage the installation of large, complex systems like CASA" was not puffery).

Here, Defendants' statements amount to more than mere puffing; they disclose specific facts about the quality of education and overall experience students can expect to receive at Ross. It can be expected that students with disabilities would be enticed to attend a school where they would receive an "abundant amount of support and encouragement" from "supportive, friendly,

13

available, wonderful" faculty, where the faculty and administration deliver service to students with "integrity" and "accountability," and where the environment is "free of unlawful harassment or discrimination based on [. . .] disability" and is focused on "ensuring that qualified students with disabilities are afforded reasonable accommodations." Am. Compl. ¶¶22, 25, 26, 46. Because these statements are affirmative rather than implicit, and because they amount to more than merely acclaiming Ross as "the best" or using other similarly-subjective characterizations, the authority on which Defendants rely is distinguishable. *Cf. Barbara's Sales*, 879 N.E.2d at 926–27 (reversing class certification because defendant's implicit representation that Pentium 4 was the best and fastest on the market was not actionable under IFCA).

III.   **PLAINTIFF'S CLAIMS 5 AND 7 SHOULD NOT BE DISMISSED BECAUSE THEY ARE BASED ON ACTIONABLE STATEMENTS AND BECAUSE PLAINTIFF HAS ADEQUATELY PLED DAMAGES.**

Plaintiff asserts claims against Defendants for fraudulent inducement and negligent misrepresentation as a result of their representations that induced him to attend Ross, which, among other things, required him to "enter [Ross's] backbreaking veterinary medicine educational program, work day and night, six or seven days a week, for 27 months and assume almost $190,000 in Title IV federal loan and personal debt obligations." Am. Compl. ¶78; *see generally id.* at ¶¶74–78, 86–87. Defendants' effort to dismiss those claims must be denied.

A.   **Defendants Made False Statements of Material Fact on Which Plaintiff Justifiably Relied.**

Plaintiff's claims are premised on Defendants' promotional statements advertising that their students would receive an "abundant amount of support and encouragement," be treated as a "family member" and "embraced" by faculty, receive "one-on-one care" by faculty who is "always there for" students, be communicated with candidly and respectfully, and receive "help"

14

to "achieve [their] goals." *Id.* at ¶75. Plaintiff's claims are also based on provisions of Ross's Student Handbook stating that the school provides "an environment free of unlawful harassment or discrimination based on . . . disability," "complies with all applicable laws regarding discrimination, harassment, retaliation and equal opportunity," and is primarily concerned with "[t]he mental and emotional stability of students." *Id.* at ¶76.[22] As in the cases previously cited,[23] the foregoing representations constitute actionable statements of fact rather than opinion concerning the quality of the education and experience students could expect to receive at Ross. They are not subjective or unverifiable; to the contrary, they provide concrete aspirations and expectations.

Defendants' cases do not support their arguments regarding Claims 5 and 7 and are readily distinguishable. Both of those cases involved claims by students regarding the job and salary statistics posted by their law schools, which they alleged induced them to apply for and attend those schools. *See Evans v. Ill. Inst. of Tech.*, 2014 IL App (1st) 123611-U, ¶¶52–55 (Ill. App. Ct. 1st Dist. Sept. 26, 2014) (defendant's statements in promotional materials regarding students' post-graduation job and salary statistics were not actionable because many were not deceptive at all and instead were clearly explained, and because plaintiffs were unable to point to any promises made to them by the school regarding their full-time employment or salary prospects); *Johnson v. John Marshall Law Sch,*, 2014 IL App (1st) 123610-U, ¶¶46–48 (Ill. App. Ct. 1st Dist. Sept. 26, 2014) (same). Here, conversely, Plaintiff's claims arise from entirely different types of representations. He does not make any allegations concerning job statistics or the amount of salary he could expect to earn upon graduating from Ross; rather, his claims center on Defendants' representations regarding the accommodations he would enjoy and the

---

[22] *See also* **Ex. 7**, Handbook at §§ 1.9.2, 1.11.1.1, 1.11.3.
[23] *See* Section II.(B), *supra* pp. 12-14.

attentiveness of Ross's faculty despite his documented learning disability.  Am. Compl. ¶¶75–76.
As such, Defendants' authority does not justify dismissal.

> **B.      Plaintiff Adequately Pled Damages for Claims 5 and 7.**

A plaintiff generally is not required to plead a legal theory for calculating damages in his
complaint, but rather just allege "damage, i.e., a loss, hurt or harm which results from the
injury."  *Dloogatch v. Brincat*, 396 Ill. App. 3d 842, 920 N.E.2d 1161, 1169 (Ill. App. Ct. 1st
Dist. 2009) (internal quotations and citation omitted).   "Absolute certainty about the amount of
damage is not necessary to justify a recovery if damage is shown . . . ."  *Id.* (internal quotations,
emphasis, and citations omitted); *see also Minuti v. Johnson*, No. 02 C 4551, 2003 WL 260705,
at *2 (N.D. Ill. Feb. 5, 2003) ("Federal Rule of Civil Procedure 9, while requiring allegations of
fraud to be stated with particularity, does not require particularity as to the element of
damages.") (citation omitted); *Smith v. Short Term Loans*, No. 99 C 1288, 2001 WL 127303, at
*6 (N.D. Ill. Feb. 14, 2001) ("Even though [Rule] 9(b) requires particularity, the federal pleading
system is still a notice pleading system," and thus "more particularity is not required as to
damages . . . where the facts alleged are sufficient to put the defendant on notice of the who,
what, where, when, and how of the misleading practice.").

Defendants' reliance on *City of Chicago v. Michigan Beach Housing Cooperative*, 297
Ill. App. 3d 317, 696 N.E.2d 804 (Ill. App. Ct. 1st Dist. 1998), is misplaced.  There, the court's
decision regarding the damages element of plaintiff's fraud claim came on summary judgment,
rather than at the motion to dismiss stage.  *Id.* at 807.  This Court has previously differentiated
between a plaintiff's obligations on pleading versus in later stages of a case.  *Minuti*, 2003 WL
260705, at *2.  In *Minuti*, the Court clarified that the Seventh Circuit only requires damages to be
***proven*** by clear and convincing evidence, and that "nothing . . . requires such evidence to be pled

in a complaint." *Id.* (emphasis added) (citing *Havoco of Am., Ltd. v. Sumitomo Corp. of Am.*, 971 F.2d 1332 (7th Cir. 1992)).

This case is only at the motion to dismiss stage, and Plaintiff adequately pled the elements of his claims for fraudulent inducement and negligent misrepresentation, including damages. Am. Compl. ¶¶74–78, 86–87. Namely, Plaintiff alleges that he assumed $190,000 in Title IV federal loan and personal debt obligations and otherwise expended countless hours and effort to attend Ross, only to be deprived of the right and opportunity to complete his studies, graduate with a veterinary degree, and secure employment as a veterinarian. *Id.* at ¶ 78. Plaintiff's pleading makes clear that the damages he seeks stem from those loan and debt obligations and the income to which he should be earning as a degreed veterinarian. *See id.* As such, Claims 5 and 7 should not be dismissed.

### C. At the Very Least, Plaintiff Should Be Permitted to Amend His Complaint to More Clearly Plead Damages.

Even if this Court is persuaded by Defendants' argument, Plaintiff should be permitted to re-plead Claims 5 and 7 to more clearly assert his alleged damages in lieu of dismissal.

Rule 15 of the Federal Rules of Civil Procedure governs amended pleadings and provides that a court "should freely give leave [to a party to amend its pleading] when justice so requires." FED. R. CIV. P. 15(a)(2). Even if a complaint as amended would fail to state a claim upon which relief could be granted, "denial of [an] amendment is called for only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Dewick v. Maytag Corp.*, 296 F. Supp. 2d 905, 907, 911 (N.D. Ill. 2003) (internal quotations and citation omitted) (permitting plaintiffs to amend their complaint to seek punitive damages, noting that it would be "wholly improvident to restrict them" from doing so); *see also Seifert v. Solem*, 387 F.2d 925, 929–30 (7th Cir. 1967) (affirming decision granting plaintiff leave to amend

complaint to include a claim for exemplary damages for fraud, where such amendment did not prejudice defendant). In such instance, courts accept all well-pleaded allegations as true and draw all reasonable inferences in the plaintiff's favor. *Dewick*, 296 F. Supp. 2d at 907.

Here, even if the Court concludes that Plaintiff's fraud claims are deficiently pled, Plaintiff's should be entitled to re-plead those claims to clarify the damages sought.[24] Such an amendment would not prejudice Defendants because they are on notice of the factual bases for Plaintiff's fraud claims, and also because this case is still very much in its infancy.

For all of the foregoing reasons, the Court should deny Defendants' Motion and decline to dismiss Claims 5 and 7.

## IV. PLAINTIFF HAS ALLEGED A COGNIZABLE BREACH OF CONTRACT CLAIM, AND THEREFORE CLAIMS 8 AND 9 SHOULD NOT BE DISMISSED.[25]

By failing to accommodate Plaintiff's documented learning disability, Defendants breached their express and implied contract with him, which arose via their advertising and promotional statements, federal and state laws, and provisions in Ross's Student Handbook and other publications relating to disability and class examination protocols, assurances, and promises. Am. Compl. ¶89. Plaintiff further claims that Defendants acted in an "arbitrary and

---

[24] While the Seventh Circuit has not expressly considered this issue, other jurisdictions have permitted such types of amendments to clarify damages sought. *See, e.g., Renfrow v. CTX Mortg. Co., LLC*, No. 3:11-CV-3132-L, 2012 WL 3582752, at *6–7 (N.D. Tex. Aug. 20, 2012) (permitting plaintiffs to amend their pleadings to clarify and set forth their bases for damages); *Glenwood Farms, Inc. v. Ivey*, 228 F.R.D. 47, 51–52 (D. Me. 2005) (granting plaintiffs' motion to amend their pleading to, *inter alia*, clarify their claim for punitive damages); *Gittens-Altman, A.M.A. v. HCB Contractors*, No. 90-6908, 1992 WL 111357, at *3 (E.D. Pa. May 15, 1992) (granting defendants' motion to amend their counterclaim to add a fraud claim and clarify their claim for contract damages).

[25] Plaintiff seeks leave of Court to amend his complaint to combine his claim for breach of the covenant of good faith and fair dealing into his breach of contract claim, in accordance with controlling case law. *See* Plaintiff's Motion for Leave to File Second Amended Complaint (filed subsequent hereto). Because Illinois courts consider a claim for breach of the covenant of good faith and fair dealing in connection with and as part of a breach of contract claim, Plaintiff should be permitted to pursue such theory as part of his breach of contract claim. *See, e.g., Illinois ex rel. Hammer v. Twin Rivers Ins. Co.*, 16 C 7371, 2017 WL 2880899, at *8 (N.D. Ill. July 5, 2017); *Am. Guardian Warranty Servs., Inc. v. JCR-Wesley Chapel, LLC*, 2017 WL 2224883, at *6 (N.D. Ill. May 22, 2017).

capricious" manner and breached their covenant of good faith and fair dealing. *Id.* at ¶82. Because Defendants rely on distinguishable case law and understate the import of their own provisions and policies, their Motion should be denied.

## A.  Plaintiff Has Alleged the Existence of an Express or Implied Contract.

The general rule is that "a college or university and its students have a contractual relationship, and the terms of the contract are generally set forth in the school's catalogs and bulletins." *O'Driscoll v. Argosy Univ.*, No. 12 C 10164, 2014 WL 714023, at *2 (N.D. Ill. Feb. 25, 2014) (internal quotations and citation omitted).[26]  An implied contract arises "where the intention of the parties is not expressed but an agreement in fact creating an obligation is implied or presumed from their acts[.]" *Id.* at *2; *see also Liu v. Nw. Univ.*, 78 F. Supp. 3d 839, 846 (N.D. Ill. 2015) (undisputed that an implied contract can arise out of a university's student handbook).  Generally, courts "may not override the academic decision of a university unless it is such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment." *O'Driscoll*, 2014 WL 714023, at *2 (internal quotations and citations omitted).  However, a student is entitled to a remedy for breach of contract "when it is alleged that an adverse decision against a student supposedly for academic deficiencies, was made arbitrarily, capriciously, and in bad faith." *Id.* (internal quotations and citation omitted).

Defendants correctly note that courts have sometimes declined to find the existence of binding contracts between institutions and their students where the provisions or policies at issue were not sufficiently definite.  However, the cases on which they rely are readily distinguishable, as many of them involve nothing more than expressions of intention, hope, or desire.  *See*

---

[26] Defendants' cases cite this same rule. *Abrams v. Ill. Coll. of Podiatric Med.*, 77 Ill. App. 3d 471, 395 N.E.2d 1061, 1065 (Ill. App. Ct. 1st Dist. 1979); *Eisele v. Ayers*, 63 Ill. App. 3d 1039, 381 N.E.2d 21, 25 (Ill. Ct. App. 1st Dist. 1978).

*Abrams*, 395 N.E.2d at 1065 (provision at issue stated: "It is desirable that the instructor should periodically inform the student of his progress[.]"); *Eisele*, 381 N.E.2d at 25 (provision at issue governed defendants' right to increase tuition "without notice" or "on short notice"); *Mostaghim v. Fashion Inst. of Tech.*, No. 01 Civ. 8090 (HB), 2002 WL 1339098, at *6–7 (S.D.N.Y. June 19, 2002) (statement in school manual regarding notification of disciplinary action within 24 hours was not an enforceable promise, and school's general equal employment opportunity and affirmative action policies did not create contractual commitments not to engage in bigotry or hypocrisy).

Conversely, here, the provisions and policies on which Plaintiff relies are sufficiently definite so as to give rise to contractual obligations. For instance, Ross's Student Handbook expressly requires Ross to treat its students equally and fairly, adhere to all applicable laws, and accommodate students with disabilities and mental health issues:

### 1.11.3 Commitment to Non-Discrimination and Equal Opportunity
It is [Ross]'s policy to provide an environment free of unlawful harassment or discrimination based on [. . .] disability [. . .] or any other category protected by applicable law. [Ross] complies with all applicable laws regarding discrimination, harassment, retaliation and equal opportunity.

### 1.11.4 Accommodation of Students with Disabilities
As part of its dedication to making educational opportunities available to a diverse range of students, [Ross] is committed to ensuring that qualified students with disabilities are afforded reasonable accommodations[.]

### 1.11.5 Mental Health
The mental and emotional stability of students is a primary concern of [Ross]. [. . .] The [Ross] Counseling Center is available to provide support and assistance to [Ross] students in maximizing their success while at [Ross].

Am. Compl. ¶46. The Handbook also provides that "[Ross] prohibits retaliation against anyone who reports an incident of alleged [. . .] unlawful conduct, or any person who assists or

20

participates in a proceeding, investigation or hearing relating to such allegations." *Id.* at ¶47. These statements affirmatively and definitively obligate Ross to take (or not take) certain actions.

Illinois courts have declined to dismiss plaintiffs' breach of contract claims in circumstances similar to those present here. For instance, in *O'Driscoll*, the plaintiff—a former student in the defendant's master's program—claimed that the university had, among other things, breached the provision of its academic catalog prohibiting the display of sexually suggestive materials and improperly retaliated against her for reporting a professor's inappropriate behavior by dismissing her from enrollment. 2014 WL 714023, at *1–2. Because that provision of the catalog was sufficiently definite, and because the plaintiff alleged that the defendants had "substantially departed from the accepted academic norms by retaliating against her for reporting inappropriate conduct and basing the decision to terminate her on false statements," the defendants' motion to dismiss was denied. *Id.* at *3. Similarly, in *Liu*, the plaintiff—a former law student who was denied the right to re-enroll after taking a medical leave of absence—alleged that the university breached its contract by failing to follow the procedures outlined in the student handbook for suspected honor code violations and by failing to promptly investigate the grievance she filed. 78 F. Supp. 3d at 846. The handbook provision at issue granted students rights "in all cases involving allegations of a violation of the standards of academic integrity." *Id.* at 847. The court held that the plaintiff sufficiently alleged that the university departed from acceptable academic norms when it imposed unreasonable conditions on her return from her leave of absence, which effectively amounted to charges of academic dishonesty, and denied her the right to pursue the remedial procedures outlined in the handbook. *Id.* at 847–48. Here, like the plaintiffs in *O'Driscoll* and *Liu*, Plaintiff has alleged that Defendants breached express provisions of their handbook and other policies and also departed

21

from acceptable academic norms by retaliating against him for complaining about those breaches. Am. Compl. ¶¶46, 47.

Defendants' arguments are also untenable because the cases they cite do not support their position. Indeed, the standard applied by courts to high schools is different than that applied to colleges and postgraduate institutions because the element of consideration is necessarily missing between a student and a high school, because "[p]erforming an act which one is legally obligated to do is not consideration which could support a contract." *Mulvey v. Carl Sandburg High School*, 2017 IL App (1st) 151615, 66 N.E.3d 507, 515 (Ill. App. Ct. 1st Dist. 2016). Additionally, the question of whether courts have the authority to judicially review academic decisions is very different from the issue at hand. *See Harris v. Adler Sch. of Prof'l Psychology*, 309 Ill. App. 3d 856, 723 N.E.2d 717, 720 (Ill. App. Ct. 1st Dist. 1999). Further, a school's generalized tenure policy—which simply describes the tenure process rather than promising faculty certain treatment or rights—is very different from representations that students who attend a school will be free from unequal treatment, harassment, and retaliation. *See Univ. of Balt. v. Iz*, 716 A.2d 1107 (Md. App. 1998).[27]

Defendants' handbook prohibits unequal treatment, harassment, and retaliation. Am. Compl. ¶46-47. Their materials also promise students "support," "encouragement," "supportive, . . . friendly, .. . available, . . . wonderful" faculty, a commitment to "embrac[ing] diversity," "an increased completion rate," and an education delivered with "integrity" and "accountability." *Id.* at ¶¶22-26. These representations are very different than those at issue in the aforementioned cases.

---

[27] *Iz* also is distinguishable because the issue of tenure is a special one in which institutions have wide discretion, and courts are generally reluctant to "become ensnared in an academic institution's decision with regard to tenure." 716 A.2d at 1117.

### B.    Plaintiff Has a Cognizable Breach of Contract Claim for Defendants' Arbitrary and Capricious Conduct.[28]

Plaintiff lodges specific allegations regarding Defendants' failure to accommodate his documented learning disability and thus has met his pleading burden by alleging, with particularity, that Defendants' actions were "arbitrary and capricious." Indeed, Plaintiff alleges that Ross's psychologist—Dr. Camp—refused to accommodate his documented learning disability, even after she was made aware of other students who enjoyed accommodations for their learning disabilities. *Id.* at ¶¶31-32. Plaintiff also alleges that Dr. Camp continued to refuse to accommodate his learning disability even after he returned to school following his leave of absence with documents from his treating physicians. *Id.* at ¶36. Additionally, Plaintiff makes specific allegations regarding his attempted appeal of his dismissal from Ross and Ross's retaliation against him. *Id.* at ¶¶42-48. Namely, Plaintiff delineates the various attempts he made to appeal his dismissal by, *inter alia*, presenting evidence of other students who were treated more leniently under similar circumstances. *Id.* at ¶42. He also alleges that he was informed by Ross administration that he would be arrested if he appeared on campus again, without any justification whatsoever. *Id.* at ¶43. Further, he alleges the specific bases for Defendants' violations of AVMA policies and Ross's Student Handbook. *Id.* at ¶¶44-48. Clearly, these specific allegations are not merely conclusory, but instead adequately allege arbitrary and capricious conduct by Defendants toward Plaintiff so as to support his breach of contract claim.

While courts may be reluctant to interfere with the academic affairs of private colleges and universities, they will intervene when a student alleges that an adverse academic decision was made arbitrarily, capriciously, or in bad faith. *O'Driscoll*, 2014 WL 714023, at *2–3; *Liu*,

---

[28] Plaintiff's contention regarding Defendants' arbitrary and capricious conduct should be considered in connection with his breach of contract claim. *See* note 19, *supra* p. 11.

78 F. Supp. 3d at 848. As previously shown, Plaintiff has alleged arbitrary and capricious conduct to support his breach of contract claim and pled facts in support.

For all of the foregoing reasons, Plaintiff's breach of contract claim should not be dismissed, and his claim for Defendants arbitrary and capricious conduct should be treated in connection with his breach of contract claim.

## V. DEFENDANTS' LACONIC ARGUMENT REGARDING BREACH OF FIDUCIARY DUTY DOES NOT SUPPORT THE DISMISSAL OF CLAIM 10.

Defendants seek dismissal of Claim 10 with a one-sentence argument contending that "there is no fiduciary duty between an institution of higher education and its students." Motion at 12. However, contrary to Defendants' statement, this is not necessarily the case. Whether a fiduciary duty exists between a university and its students is an open question in the Seventh Circuit that depends upon the facts at issue and the facts pled. As such, dismissing Plaintiff's claim at this stage would be inappropriate.

Moreover, Defendants' cited authority does not necessitate the extension of those holdings to this case. The *Phillips* case—which, notably, is the only Illinois precedent cited— expressly considers that the plaintiffs could have alleged certain facts showing the existence of a special relationship between themselves and DePaul University, such as "facts showing that DePaul exercised overwhelming[] influence over them." *Phillips v. DePaul Univ.*, No. 12 CH 3523, 2012 Ill. Cir. LEXIS 3299, at *11 (Cir. Ct. Cook Cty. Sept. 11, 2012) (**Ex. 14**). Similarly, the *Moy* Court noted that the plaintiffs could have alleged facts to suggest a fiduciary relationship, but simply failed to do so. *Moy v. Adelphi Inst., Inc.*, 866 F. Supp. 696, 708 (E.D.N.Y. 1994). The other two cases Defendants cite are factually distinguishable, as *Smith* faced the issue of whether there is a fiduciary relationship between an institution and a prospective student, and *Maas* considered whether a university has a fiduciary obligation—rather

24

than simply a contractual one—to warn students about "the obvious" (*i.e.*, that they would likely fail given their LSAT scores and undergraduate grade-point averages). *Ohio Univ. Bd. of Trs. v. Smith*, 724 N.E.2d 1155, 1160 (Ohio App. Ct. 1999); *Maas v. Corp. of Gonzaga Univ.*, 618 P.2d 106, 108 (Wash. Ct. App. 1980).

Unlike in the aforementioned cases, Plaintiff has pled facts to suggest more than a mere business relationship between himself and Defendants. Indeed, Defendants did more than simply take Plaintiff's tuition in exchange for veterinary education; they held themselves out as providing "abundant . . . support and encouragement" and "exceptional service . . . delivered with integrity and accountability," faculty that would provide "one-on-one care," policies that prohibited discriminatory practices and accommodations for disabilities, and an environment free from unequal treatment, harassment, and retaliation. Am. Compl. ¶¶22-26, 46-47. These facts show that Defendants exercised the kind of "overwhelming influence" over Plaintiff that the *Phillips* Court noted could give rise to a fiduciary relationship. The fact that Ross is located on a remote island in the West Indies totaling only 68 square miles with a population of less than 50,000 and limited food, daily living needs, and basic communications (Am. Compl. ¶96) further supports a finding of fiduciary duty in this case.[29]

Accordingly, Defendants' motion to dismiss Claim 10 should be denied.

## VI. CLAIM 11 SHOULD NOT BE DISMISSED BECAUSE PLAINTIFF HAS PLED A VIABLE CLAIM OF CIVIL CONSPIRACY.

Contrary to Defendants' assertion, Plaintiff has alleged a cognizable claim of civil conspiracy because he has sufficiently pled independent causes of action underlying such claim—namely, violation of the ICFA, fraudulent inducement, and negligent

---

[29] This fact renders Defendants' cited authority even more distinguishable, as all of the institutions named as defendants in those lawsuits were located on the mainland United States.

misrepresentation.[30]   Like in one of Defendants' cited cases, Plaintiff has sufficiently pled unlawful acts capable of underlying his conspiracy claim.   *See Al Maha Trading & Contracting Holding Co. v. W.S. Darley & Co.*, No. 12 C 1920, 2014 WL 2459674, at *9 (N.D. Ill. June 2, 2014).

Further, Plaintiff has pled facts to support the elements of a conspiracy claim.   Under Illinois law, the elements of civil conspiracy are: (1) a combination of two or more persons, (2) for the purpose of accomplishing either an unlawful purpose or a lawful purpose by unlawful means in a concerted action, (3) in furtherance of which one of the conspirators committed an overt tortious or unlawful act.  *Id.* at *8.  To survive dismissal, a plaintiff's allegations of parallel conduct by alleged conspirators must "raise[] a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action," and must "cross the line between factually neutral and factually suggestive."  *Std. Iron Works v. ArcelorMittal*, 639 F. Supp. 2d 877, 880 (N.D. Ill. 2009) (citations omitted).  Even so, at the motion to dismiss stage, a plaintiff need not demonstrate probability; he simply must plead "enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement."  *Id.*  at 894 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)).

Illinois courts have historically denied motions to dismiss and permitted plaintiffs to pursue conspiracy claims in various circumstances.  Namely, a court has refused to dismiss an antitrust conspiracy claim against three related entities (a parent and its subsidiaries).  *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 524 F. Supp. 2d 1031, 1037–39 (N.D. Ill. 2007).  Plaintiffs also have been permitted to pursue conspiracy claims against competitors in a particular industry or market where the facts pled suggested the existence of an agreement (*i.e.*, more than mere "conscious parallelism").  *E.g., In re Plasma-Derivative Protein Therapies Antitrust Litig.*, 764

---

[30] *See* Sections II & III, *supra* pp. 9-18.

26

F. Supp. 2d 991, 1002 (N.D. Ill. 2011); *Kleen Prods., LLC v. Packaging Corp. of Am.*, 775 F. Supp. 2d 1071, 1078–82 (N.D. Ill. 2011); *Std. Iron Works*, 639 F. Supp. 2d at 900, 902.

Plaintiff in this case has made clear that each Defendant constitutes a separate—albeit related—entity. Am. Compl. ¶¶6-9. As such, the first element of his claim for conspiracy—combination of two or more persons—is easily satisfied.[31] Plaintiff also has pled facts sufficient to support the remaining elements of a conspiracy claim. In particular, after delineating the various policies and promotional statements of Ross and DeVry Group touting their commitment to attentiveness to and care for their students (*id.* at ¶¶22-26), Ross's own anti-discrimination (*id.* at ¶46) and anti-retaliation (*id.* at ¶47) policies, and the student disability policy of the AVMA (to which Defendants must adhere given their accreditation by AVMA), Plaintiff pleads facts demonstrating the concerted efforts by administrators at Ross and its parent—DeVry—to deprive him of his right to a just appeal. *Id.* at ¶¶42-43, 48, 50-51. In particular, Plaintiff was:

> not permitted to proffer witnesses to testify to the facts [. . .] and submit supporting documentary evidence in his dismissal appeal, was treated differently than other students who failed multiple classes and were not dismissed, was deemed to be on probationary status contrary to [Ross] policy and the terms of Associate Dean St. Jean's May 21, 2014 letter, and was effectively thrown off the island of St. Kitts—not for 'flunking' Dr. Kelly's class, but rather, as a form of reprisal for having the courage to raise the issue, among others, of [Ross]'s failures to accommodate a documented medical disability in his appeal.

---

[31] Any argument by Defendants that they do not constitute separate entities for purposes of a conspiracy claim is refuted by the fact that the Supreme Court expressly limited its prior holding in *Copperweld* to the antitrust context to bar conspiracy claims against parents and wholly-owned subsidiaries under the Sherman Act. *See Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 771–72 (1984) ("[T]he coordinated activity of a parent and its wholly owned subsidiary must be viewed as that of a single enterprise **for purposes of § 1 of the Sherman Act**." (emphasis added)); *see also ASARCO, LLC v. Americas Mining Corp.*, 382 B.R. 49, 76–79 (S.D. Tex. 2007) (collecting cases, and noting that "the prevailing view allows claims for common-law conspiracy among a parent corporation and its wholly-owned subsidiary, at least in certain circumstances"). Illinois courts have affirmed the limited nature of the *Copperweld* holding. *See In re Conticommodity Servs., Inc.*, 733 F. Supp. 1555, 1568 (N.D. Ill. 1990) (limiting *Copperweld* "to the context of antitrust actions" and refusing to hold that a wholly-owned subsidiary can never engage in civil conspiracy with its parent), *rev'd in part on other grounds*, *Brown v. U.S.*, 976 F.2d 1104 (7th Cir. 1992).

6456041

*Id.* at ¶48. Further, DeVry "improperly obstructed [Plaintiff]'s access to evidence" and threatened him if he continued to pursue his appeal by asking questions of his colleagues and faculty at Ross. *Id.* at ¶49. Clearly, Ross and DeVry did more than simply engage in parallel conduct—they colluded to ensure that their policies were not applied equally to Plaintiff so that he would be deprived of his right to continue his education at Ross. This certainly rises to the level of an actionable conspiracy, and thus Claim 11 should not be dismissed.

## VII. PLAINTIFF HAS ACCURATELY PLED ALTER EGO.[32]

Although Defendants correctly note that alter ego is not an independent cause of action, they fail to appreciate "one who seeks to have the courts apply an exception to the rule of separate corporate existence . . . must seek that relief in his pleading." *Stargel v. NutraSweet Co.*, No. 13-cv-7575, 2014 WL 1662989, at *3 (N.D. Ill. Apr. 24, 2014) (internal quotations and citation omitted). Because Claim 12 incorporates the other paragraphs of his pleading (Am. Compl. ¶103), and because Plaintiff pleads other cognizable claims,[33] his alter ego claim truly does not stand alone and thus should not be dismissed. *See Stargel*, 2014 WL 1662989, at *3 (refusing to dismiss alter ego claim where plaintiff also pled that company breached its contractual obligation); *Tango Music, L.L.C. v. Deadquick Music, Inc.*, No. 99 C 7331, 2001 WL 897606, at *7 (N.D. Ill. Aug. 9, 2001) (because plaintiff's claim for breach of license agreement survived, alter ego claim was not dismissed).

Moreover, Plaintiff has pled sufficient facts to support his alter ego claim. Under Illinois law, to establish that a corporation is merely an alter ego, a plaintiff must show: (1) there is such

---

[32] Plaintiff recognizes that an alter ego claim requires allegations and evidence of a unity of interest between multiple entities. Because such allegation and evidence is contrary to the allegations and evidence necessary for a civil conspiracy claim—namely, for the first element requiring two or more persons—Plaintiff seeks leave of Court to amend his pleading and assert Claim 12 in the alternative. *See* Plaintiff's Motion for Leave to File Second Amended Complaint (filed subsequent hereto).

[33] *See* Sections I-VI, *supra* pp. 3-28.

unity of interest and ownership that the separate personalities of the entities at issue no longer exist; and (2) the circumstances are such that an adherence to the fiction of separate corporate existence would sanction a fraud or promote injustice. *Stargel*, 2014 WL 1662989, at *3. Plaintiff has made these specific allegations. Am. Compl. ¶104. Furthermore, Plaintiff has alleged particular facts demonstrating the hierarchical relationship between Defendants. *Id.* at ¶¶7 (DeVry Medical is one of DeVry's "reporting segments" and operates Ross), 8 (Ross is operated by DeVry Medical), 105 ("DeVry itself recognizes that it controls and manipulates DeVry Medical and [Ross]" based on the language in its SEC Form 10-K). As such, the dismissal of Plaintiff's alter ego claim would be improper.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court deny Defendants' Motion to Dismiss and permit Claims 1, 2, and 5-12 to proceed. Plaintiff further requests such other and further relief, at law or in equity, to which he may be justly entitled.

6456041

Dated this 26th day of January, 2018.

<div style="margin-left: 40%;">

Respectfully submitted,

*/s/ Michael W. Ford*
Michael W. Ford, Esq.
Law Offices of Michael W. Ford
*(local counsel)*
4 Timberwood Lane
Riverwoods, IL 60015
Telephone: (847) 948-7884
Email: mfordski@aol.com
IL Bar # 0846139
Member, Trial Bar U.S. District Court N.D. IL

- and -

*/s/ Emil T. Bayko*
Emil T. Bayko
PORTER HEDGES LLP
1000 Main Street, 36th Floor
Houston, Texas  77002
Telephone: (713) 226-6608
Facsimile: (713) 226-6208
Email: tbayko@porterhedges.com
IL Bar # 0141356

**ATTORNEYS FOR PLAINTIFF
PETER M. GALLIGAN**

</div>

OF COUNSEL:
Kyle Reeb
Texas State Bar No. 24091604
Federal ID No. 2571829
Jim Aycock
Texas State Bar No. 24034309
Federal ID No. 20675
Alison P. Henderson
Texas State Bar No. 24087707
Federal ID No. 2228628
PORTER HEDGES LLP
1000 Main Street, 36th Floor
Houston, Texas  77002
Telephone: (713) 226-6000
Facsimile: (713) 226-6211
kreeb@porterhedges.com
jaycock@porterhedges.com
ahenderson@porterhedges.com

<div style="text-align: center;">30</div>

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 26, 2018, a true and correct copy of the foregoing pleading was electronically filed in accordance with the Federal Rules of Civil Procedure and was served via e-mail upon the following counsel of record:

Brian Stolzenbach
Megan Troy
SEYFARTH SHAW LLP
233 S. Wacker Drive, Suite 8000
Chicago, IL 60606-6448
(312) 460-5551
bstolzenbach@seyfarth.com
mtroy@seyfarth.com

*/s/ Emil T. Bayko*
Emil T. Bayko

31

6456041