## *College of St. Scholastica (MN)*

National Disability Law Reporter

Office for Civil Rights, Region V

Complaint No. 05-92-2095

September 15, 1992, Decided

Copyright (c) LRP Publications 1992

**Cite:** 1992 NDLR (LRP) LEXIS 1110;

3 NDLR (LRP) 196

**Abstract:**

A former student alleged that a college discriminated against her on the basis of her hearing impairment by denying her request for sign language interpreter services for use in a study abroad program. Because the college did not provide the services, the student did not participate in the program.

 HELD: for the student.

OCR determined that the college had failed to take steps necessary to ensure that the student was not denied the benefits of or excluded from participation in the program due to the absence of effective auxiliary aids, in violation of 34 C.F.R. 104.44(d)(1) and (2). Although it offered to provide a portable FM amplification device, the college did not adequately address the student's concern that the system would not be effective. Also, it impermissibly considered the cost of the requested interpreter services in determining which auxiliary aids were available for participation in the program. It did not properly analyze the cost of such services before denying the request; nor did it fully endeavor to determine whether the cost could have been defrayed by funding from outside sources, or whether an interpreter could have been found at the program location. Further, the college violated 34 C.F.R. 104.7(b) in that it had not established a grievance procedure. Finally, the college's notice of nondiscrimination was inadequate.

Addressed To :

Dr. Daniel H. Pilon

President

The College of St. Scholastica

1200 Kenwood Avenue

Duluth, Minnesota 55811

## Body

College of St. Scholastica (MN)

Exhibit 2

College of St. Scholastica (MN)

The U.S. Department of Education (Department), Office for Civil Rights (OCR), has completed its investigation of the above-referenced complaint that was filed against The College of St. Scholastica (College). The complainant, a former student of the College, alleged that the College discriminated against her on the basis of her handicap (hearing disability) by denying her request for sign language interpreter services. The complainant wished to receive the requested services for her participation in the College's Ireland Study Abroad Program (ISAP) for spring 1992.

OCR is responsible for enforcing Section 504 of the Rehabilitation Act of 1973, as amended, _29 U.S.C. § 794,_ and its implementing regulation at 34 C.F.R. Part 104, which prohibit discrimination on the basis of physical or mental handicap in programs and activities receiving Federal financial assistance from the Department. In addition, OCR is responsible for enforcing Title IX of the Education Amendments of 1972, _20 U.S.C. § 1681_ et seq., and its implementing regulation at 34 C.F.R. Part 106, which prohibit discrimination on the basis of sex in programs and activities receiving Department funds. The College is a recipient of Department funds and is, therefore, subject to the provisions of Section 504, Title IX and their implementing regulations.

During the investigation of the complaint, OCR interviewed the complainant, College officials and pertinent witnesses. OCR also examined documentary evidence obtained from the complainant and the College. Based on these sources of information, OCR determined that the College failed to take the steps necessary to ensure that the complainant was not denied the benefits of nor excluded from participation in ISAP due to the absence of effective educational auxiliary aids, in violation of Section 504 and its implementing regulation at 34 C.F.R. § 104.44(d)(1) and (2). OCR also found that the College failed to comply with certain procedural requirements of the regulations implementing Section 504 and Title IX. The College has, however, provided the enclosed settlement agreement to OCR which, when fully implemented, will resolve the areas of noncompliance. Following is the analysis upon which OCR's findings are based.

Complainant's Status as a Qualified Handicapped Person

The Section 504 regulation prohibits discrimination against qualified handicapped persons in postsecondary education programs. A handicapped person is defined at 34 C.F.R. § 104.3(j)(1) as any person who has a physical or mental impairment which substantially limits one or more major life activities, has a record of such an impairment, or is regarded as having such an impairment. The definition of physical or mental impairment, at 34 C.F.R. § 104.3(j)(2), includes any physiological disorder or condition affecting special sense organs. Under 34 C.F.R. § 104.3(j)(2)(ii), major life activities include hearing.

A clinical audiologist's evaluation report of the complainant's hearing, dated April 9, 1985, indicates that the complainant has a severe to profound hearing loss in both ears. The complainant stated that her hearing loss is 90% to 100% without hearing aids and 70% to 80% with the use of hearing aids. The College was aware at the time of the complainant's enrollment in the College, in fall 1988, that the complainant is a person with a hearing disability. Therefore, OCR concludes that the complainant is a handicapped person as defined by 34 C.F.R. § 104.3(j)(1).

A qualified handicapped person with respect to postsecondary education services is defined at 34 C.F.R. § 104.3(k)(3) as a handicapped person who meets the academic and technical standards requisite to admission or participation in the recipient's education program or activity. By letter dated January 19, 1988, the College advised the complainant that she was admitted as a student to the College's

College of St. Scholastica (MN)

undergraduate program for fall 1988. In April 1991, the complainant applied for admission and was accepted to ISAP for spring 1992. As such, the complainant was a person with a hearing disability at the College who was determined eligible for participation in the College's undergraduate education program, including ISAP. On this basis, OCR determined that the complainant meets the definition of a qualified handicapped person as defined at 34 C.F.R. § 104.3(k)(3).

### Denial of Interpreter Services

The complainant alleged that she was subjected to discrimination on the basis of her handicap when in fall 1991 the College denied her request for sign language interpreter services. She requested that interpreter services be provided for her use in ISAP during the 1992 spring quarter. The complainant did not participate in ISAP due to the College's refusal to provide her the requested services. By the end of the 1992 winter quarter, the complainant completed the requirements for receipt of a Bachelor of Arts degree and subsequently graduated from the College.

The College does not have written policies or procedures regarding the provision of auxiliary aids and services, including sign language interpreter services, to qualified hearing impaired students. The Director of the College's Academic Support Services Program (Director), who is responsible for processing and responding to requests for academic adjustments made by students with hearing disabilities, determines what auxiliary aids or services to provide to a student making a request for assistance by relying exclusively on information provided by the student. He stated he asks the student to identify what specific aid or service the student wishes to receive, what aids or services the student received in the past, and which aids or services used in the past were effective. The Director averred that cost of the requested aid or service is not a consideration in choosing which aids or services to provide. Relying on these standards, the College provided the complainant with interpreter services for all classroom instruction as well as certain activities outside of the classroom from the time of her enrollment at the College in fall 1988.

The coordinator (Coordinator) of academic support services for persons with hearing disabilities at a university near the College assists the College, at no cost, in providing requested interpreter services. The Coordinator scheduled interpreter services for the complainant throughout the complainant's tenure at the College. The Minnesota Department of Jobs and Training, Division of Rehabilitation Services (DRS), reimbursed the College for a portion of the College's costs in providing interpreter services to the complainant.

By application dated April 3, 1991, the complainant applied for admission to ISAP. In ISAP, students pursue in Ireland a full quarter's course work and have the opportunity to benefit from cultural enrichment. During the 1992 ISAP, each of the two College instructors who traveled to Ireland taught two courses to the 17 student participants. Both instructors utilized lectures and group discussion formats to present and discuss course content. The ISAP curriculum was augmented by presentations from guest lecturers, by attendance at plays, and by field trips to various points of interest that were, at times, directed by native guides. Student attendance in ISAP activities was mandatory.

On April 15, 1991, the Dean of the College (Dean), who is the Director of ISAP, met with the complainant after receiving the complainant's ISAP application. The Dean informed the complainant that the College could not provide interpreter services to the complainant for ISAP due to the cost of the services. However, the Dean informed the complainant that the Director would seek out external sources that could possibly provide funds to subsidize interpreter services.

College of St. Scholastica (MN)

At the meeting, the complainant indicated that she would speak with the Director about exploring technological advances that may have improved portable FM amplification devices (FM system) to ascertain whether the FM system could be used effectively by her as an auxiliary aid. The FM system, which the complainant had used in elementary school and until grade 9, consists of two units, a transmitting unit with a microphone worn by the speaker and a receiving unit with a neck loop worn by the hearing impaired person. The voices and other audio signals are picked up by the microphone and transmitted to the neck loop which sends an amplified signal to the hearing aids worn by the hearing impaired person. The complainant stated that she did not insist on receiving interpreter services from the College out of fear that her ISAP application would be rejected. By letter dated April 16, 1991, the day following the meeting with the Dean, the Dean informed the complainant that she had been accepted to ISAP.

The Director subsequently informed the Dean that he would explore the possibility of obtaining funding for interpreter services from outside sources. The Director also spoke to the complainant and learned that she was willing to try the FM system during summer 1991 while away from Duluth. The Director said he left it up to the complainant to contact DRS to obtain referrals for the FM system. The College did not assist the complainant in seeking out dispensers of FM systems.

The Coordinator also spoke to the Director about the complainant's need for auxiliary aids and services. The Coordinator told the Director that she would assist the College by attempting to locate funding sources. She also expressed concern about the FM system's effectiveness for the complainant. The Coordinator, who has a graduate degree in the education of special populations and is an instructor of sign language, stated that she explained to the Director that the device was unwieldy in group discussions because the microphone has to be passed among speakers, the microphone might not pick up the voice of a guide over noise, the device might not transmit all sound frequencies, and that Irish accents and tonalities would make it difficult to understand speech. The Director indicated to OCR that the Coordinator did explain why the FM system might not work for the complainant, but he could not recall the reasons provided.

The complainant did not test the FM system during summer 1991. In September 1991, shortly after the start of the fall quarter, the complainant was asked by the Director to visit a dispenser of the FM system whose place of business was located near the College campus. The complainant was told that she could select any FM system that she thought would be effective for her. The Director indicated to OCR that he obtained the name of the dispenser either from the telephone book or DRS and believed the complainant could have tested the effectiveness of the FM system, for participation in ISAP, at the dispenser's place of business. The Director, who admitted that he was not knowledgeable about the FM system, did not ascertain the credentials of the dispenser, assist the complainant in scheduling a meeting with the dispenser, offer to accompany the complainant to the dispenser's place of business, or make arrangements to obtain feedback from the dispenser that could be useful in determining the utility or limitations of the FM system for the complainant. The Director also admitted that he did not determine that the FM system would be successful for the complainant. He said he only thought that the FM system might be a possible solution if interpreter services could not be arranged.

The complainant refused to comply with the Director's request and told him that she would not accept the FM system as an auxiliary aid for ISAP. The complainant explained to OCR that she refused to meet with the dispenser because the Director had burdened her with performing responsibilities that she felt should

have been performed by the Director himself. In addition, she felt that the FM system would not meet her needs in ISAP.

The Director indicated that the complainant told him that she had tried the FM system in high school and that it did not work for her. The complainant indicated that, based on her personal experiences with the device, she explained to the Director that the system only picked up the voice of the person wearing the microphone, which meant that she had difficulty participating in certain educational situations, that it was mechanically unreliable, and that she could not always determine the source of sounds that were transmitted, which created confusion for her. Some time afterwards, the complainant's parent also indicated to the Director that the FM system was not compatible with the type of hearing aids worn by the complainant.

At or around the time the complainant told the Director that she would not accept the FM system, she explicitly asked the Director to provide her with interpreter services for ISAP. The complainant said she also set forth her reasons why she needed interpreter services.

The Coordinator stated that, also at the beginning of the fall semester, she provided the Director with information identifying several outside sources that could potentially fund interpreter services for the complainant. The complainant said she inquired several times with the Director about his efforts to obtain funds and learned that he had not made any progress.

The Director stated he informed the complainant that he had talked to the College's Associate Vice President for Institutional Advancement (Associate Vice President) about the possibility of securing outside funding. He said he had asked the Associate Vice President to assist him in finding funds because the Associate Vice President was responsible for making all funding requests on behalf of the College.

The Associate Vice President indicated she knew that the complainant did not qualify for receipt of funds from one of the potential funding sources identified by the Coordinator. She stated that she did not recall the specifics of her conversation with the Director but thought he might have asked if there was funding to support an ISAP interpreter. The Associate Vice President noted to OCR that it may have been possible for the College to consider allocating funds for the complainant's needs from a scholarship program that was earmarked for students with disabilities. Although in the end the scholarship funds were not awarded to the College for 1991-1992, at the time the Associate Vice President spoke with the Director the College did not know that this money would not be available. The possibility of allocating funds to the complainant from this source was not explored. The Associate Vice President stated she did not make any inquiries with outside sources to ascertain whether funding could be obtained for interpreter services.

During approximately the second week of October 1991, the Coordinator informed the Director that she estimated that interpreter services for ISAP would cost $5705.00. Since DRS had already indicated that it would provide $2000.00, the College, according to the Coordinator's estimate, needed to allocate $3705.00.

By letter dated October 14, 1991, the complainant informed the Dean that she was frustrated by the College's unwillingness to apply for funds for interpreter services. The complainant set forth her position as to why interpreter services were necessary for her and why the FM system was not an acceptable alternative. The complainant stressed that she had received interpreter services inside and outside of classroom situations during her tenure at the College and that interpreter services were known to be the only auxiliary services that were effective for her. The complainant pointed out that she relied heavily on

College of St. Scholastica (MN)

lipreading and that the dialects and accents of the Irish would make it difficult for her to read lips. She also pointed out that, when she used the FM system in the classroom setting, she had difficulty because she could hear only the voice of the miked speaker. The complainant further noted that the FM system would not work with her hearing aids and suggested that the College's failure to provide her with interpreter services excluded her from a College course of study in violation of Section 504.

In a letter dated October 21, 1991, the Dean indicated that the College could not send an interpreter to Ireland with the complainant. She stated that "[t]he only question is what [the College] can do with limited resources" and asked the complainant to cooperate with the Director.

The Dean acknowledged that, prior to making this determination, she did not consult with the ISAP course instructors or have knowledge of the complexity of the course materials and how students would be evaluated. She also acknowledged that the complainant would have had difficulty lipreading Irish speakers due to their accents and dialects. Some consideration was given to the possibility of finding an interpreter in Ireland, but this idea was not pursued. The Dean further indicated that she knew that the complainant had used interpreter services before and during her enrollment at the College and that she had very little knowledge of the FM system. She admitted that it was the Director's responsibility to determine which adjustments or auxiliary aids were appropriate and effective for a student who made a request for assistance. She explained that such determinations were not within her "bailiwick."

The Dean stated that her decision was primarily influenced by the cost of interpreter services for the ISAP and the availability of a less expensive auxiliary aid that she believed might possibly have met the complainant's needs adequately. She informed OCR that it was her position that, even if it would have been determined that the FM system was an inadequate auxiliary aid, the College would not have provided interpreter services due to the cost. However, OCR found insufficient evidence that the College had conducted a careful analysis before rejecting the complainant's request for interpreter services to determine whether the cost was prohibitive.

After the complainant's request for interpreter services was denied, in a letter dated October 30, 1991, the Director informed DRS that he believed interpreter services for the complainant would cost $4400.00. He asked DRS to increase its financial support for the requested interpreter services. DRS subsequently notified the Director that it could not increase its funding. The Director stated that the Dean and the College's Vice President for Finance also told him that his estimate of $4400.00 was too low because it failed to take into account certain expenses; they estimated the cost of interpreter services to be approximately $6000.00 to $7000.00.

After seeking assistance from DRS, the Director contacted, by telephone, one of three private charitable clubs that had been identified by the Coordinator when the fall semester started, as potential funding sources. The Director ascertained from this telephone inquiry that the club had made $500.00 available for activities of the type for which the Director was seeking funding. The Director stated that he learned during this inquiry that there would be competition for these funds. He stated that he did not apply for the funds, nor make any other inquiries with this club beyond his initial phone call, because of the competition for the funds, the fact that the amount of money was not large, and the fact that it was November and the complainant had dropped out of ISAP. The Director failed to contact the other two clubs that had been identified by the Coordinator. He stated he had not done so because the College wanted only one person from the College to seek such funding and the Associate Vice President had been

College of St. Scholastica (MN)

the person designated to do so. The Associate Vice President explained that her office does not deal with clubs.

In early November 1991, the complainant stated she met with the Director and inquired again about his efforts to secure external funding for interpreter services. She explained that it became apparent to her during this meeting that the College had made no progress in obtaining financial assistance. Consequently, she decided to withdraw from ISAP. The Director could not recall what he discussed with the complainant at their meeting but did remember encouraging her to remain in ISAP.

After withdrawing from ISAP, in a letter dated December 2, 1991, the complainant informed the College President that she was dissatisfied with the way the College had responded to her request for interpreter services. In a letter dated December 5, 1991, the President indicated that the College was committed to doing its best to meet individual needs. He acknowledged that the complainant's situation was a difficult one but stated that the outcome was fair to the complainant and within the requirements of Section 504.

Findings

The Section 504 regulation at 34 C.F.R. § 104.44(d)(1) requires a recipient postsecondary institution to ensure that no handicapped student is denied the benefits of or excluded from participation in the recipient's education program because of the absence of educational auxiliary aids for students with impaired sensory, manual, or speaking skills. The regulation at 34 C.F.R. § 104.44(d)(2) states that auxiliary aids may include interpreters or other effective methods of making orally delivered materials available to students with hearing disabilities.

Students who may be in need of auxiliary aids have the obligation to inform the recipient of their disabilities and to request receipt of specific auxiliary aids or services. In responding to a request by a handicapped student for provision of educational auxiliary aids, a recipient has the obligation to determine which, if any, of such aids, including sign language interpreters, are necessary to afford the handicapped student the opportunity to benefit effectively from and participate in its programs and activities. Pertinent factors to be considered in making an informed decision as to necessary auxiliary aids include the extent of the student's disability, the student's prior use of auxiliary aids, and the nature and relative complexity of program content, and modes through which content is presented (e.g., lectures, general classroom or small group discussion, field trips, etc.). Particular types of auxiliary aids may not be categorically excluded from consideration on the basis of cost. It is a recipient's obligation to provide effective aids and services at no cost to qualified handicapped students if the necessary aids and services are not available from outside sources. OCR sought to determine whether the College, in responding to the complainant's request for interpreter services, appropriately considered the above factors in determining the auxiliary aid needed to afford her the opportunity to benefit effectively from and participate meaningfully in ISAP.

OCR found that the complainant provided notice to the College that she is a person with a hearing disability, and she specifically asked to receive interpreter services for ISAP. The College recognized the complainant as a student with a hearing disability and a need for auxiliary aids or services. It denied her request for interpreter services and offered to provide her with an alternate auxiliary aid, specifically, the FM system.

OCR found that the College has an informal procedure for determining what auxiliary aids to provide to handicapped students. The College indicated it has always made informed decisions as to what aids or services are necessary for a handicapped student by relying solely on information provided by the student

College of St. Scholastica (MN)

concerning his/her needs. In the instant case, however, OCR found that the College rejected the information provided by the complainant to show why interpreter services were necessary and why the FM system would not be effective for her. In this connection, the College knew that the complainant had used interpreter services successfully inside and outside of the classroom for her three years of enrollment in the College's education program and during her enrollment in high school. The complainant notified the College that interpreter services were known to be the only services that worked for her. The complainant also notified the College that the FM system would not be an effective aid for her in ISAP. She based this notice on her prior experiences with the system before entering College. The complainant indicated that her participation in educational settings had not been effective when aided by the FM system because the system did not allow her to hear words spoken by persons who were not miked and the device was unreliable. She also explained that dialects or accents of the Irish would make it difficult for her to read the lips of native speakers.

The College indicated to the complainant that it believed that the FM system had improved from when she last used the system. However, the College took no discernible steps to ascertain whether this belief was supportable. Instead of trying to determine the system's utility and limitations from persons knowledgeable about the system, the College burdened the complainant with the task of determining whether relevant technological advances had been made. In this regard, in summer 1991, the College did not offer any guidance to the complainant as to where she could find an FM system that would be appropriate for ISAP. In fall 1991, the College failed to facilitate the testing of the FM system, to obtain information about the qualifications of the dispenser to whom it had referred the complainant, or to make arrangements for obtaining relevant feedback from the dispenser so that it could make an informed decision regarding the FM system's effectiveness.

In addition, the College did not fully endeavor to determine the specific requirements and rigors of the ISAP courses before denying the complainant's request for interpreter services and offering her the FM system. The College did know that native speakers, such as lecturers and guides, would present information orally to ISAP students. Although the College admitted that lip reading would be difficult for the complainant due to the accents or dialects of the Irish speakers, it did not take steps to determine whether the FM system could compensate for the complainant's inability to read the lips of the native speakers or to consider whether other auxiliary aids could have been provided to allow her to participate effectively.

The College informed the complainant that it could not provide interpreter services due to the high cost. OCR was informed that the complainant would not have received interpreter services, due to cost, even if it had been determined that the FM system was inadequate. However, OCR did not find that the College adequately analyzed the cost of providing interpreter services to the complainant before denying her request for the services. The College did not develop an estimate of the cost until after it rejected the complainant's request. It also did not fully endeavor to determine if the cost could have been mitigated by funding from outside sources or by determining whether the services of an interpreter could have been found in Ireland.

OCR therefore determined that the actions taken by the College in responding to the complainant's request for interpreter services were not reasonably calculated to ensure that the requested services were unnecessary and that the alternate auxiliary aid offered would have allowed her to benefit from and participate meaningfully in its program. The College impermissibly considered the cost of the requested interpreter services in determining which auxiliary aids were available for her participation in ISAP.

College of St. Scholastica (MN)

Based on the above, OCR determined that the College failed to take the necessary steps to ensure that the complainant was not denied the benefits of or excluded from participation in ISAP due to the absence of effective educational auxiliary aids, in violation of 34 C.F.R. § 104.44(d)(1) and (2). By making the provision of interpreter services conditional upon the availability of funding, the College violated the requirements of 34 C.F.R. § 104.44(d)(1) and (2).

During the investigation, the College informed OCR that it has not adopted a grievance procedure to provide for the resolution of handicap discrimination complaints. OCR thus found that the College has not established a grievance procedure that incorporates appropriate due process standards providing for the prompt and equitable resolution of complaints alleging handicap discrimination, in violation of 34 C.F.R. § 104.7(b). OCR also found that the College's publicized notice of nondiscrimination which is contained in the College's catalog fails to give appropriate notification of the employee(s) designated to coordinate compliance activities under Section 504 and Title IX, as required by 34 C.F.R. §§ 104.8(a) and (b) and 106.9(a). In addition, the notice which is contained in the College's student handbook fails to indicate that persons with mental disabilities, and not just those with a physical or learning disability, may seek assistance from the College's coordinator of handicapped student services, in violation of 34 C.F.R. § 104.8(a) and (b).

On September 15, 1992, the College provided OCR with the enclosed settlement agreement which when fully implemented will resolve the areas of noncompliance set forth in this letter. Based on this agreement, OCR is closing its investigation effective the date of this letter. As is our standard practice, compliance by the College with the settlement agreement will be monitored by OCR.

Notice of this finding has been provided to the complainant. This determination is not intended and should not be construed to cover any other issues regarding compliance with Section 504 and Title IX which may exist and are not specifically discussed herein.

Please be advised that individuals filing a complaint or participating in an investigation are protected by Federal law against harassment, retaliation, or intimidation. 34 C.F.R. § 100.7(e), which is incorporated by reference at 34 C.F.R. §§ 104.61 and 106.71.

Under the Freedom of Information Act, *5 U.S.C. § 552,* it may be necessary to release this document and related correspondence and records upon request. In the event that OCR receives such a request, we will seek to protect, to the extent provided by law, personal information which, if released, could constitute an unwarranted invasion of privacy.

At this time, we would like to point out that this Office is prepared to provide technical assistance in response to questions that may arise in the future regarding any of the regulations enforced by OCR. If at any time you or members of your staff have a need for technical assistance, please feel free to contact Mr. Wayne G. Cunningham, Sr., Technical Assistance Coordinator, Postsecondary Education Division, at (312) 353-0550.

We wish to thank you and your staff, particularly Mr. Robin C. Merritt, Legal Counsel for the College, for the cooperation extended to OCR during our investigation. If you have any questions regarding this letter, please contact me or Dr. Mary Frances O'Shea, Director, Postsecondary Education Division, at (312) 353-3865. Linda A. McGovern Acting Regional Director