# St. Louis University (MO)

National Disability Law Reporter

Office for Civil Rights, Region VII

Complaint No. 07-90-2032

December 12, 1990, Decided

Copyright (c) LRP Publications 1990

**Cite:** 1990 NDLR (LRP) LEXIS 609;

1 NDLR (LRP) 259

**Abstract:**

A student with a learning disability alleged that a university violated Section 504 when it failed to provide him with an appropriate auxiliary aid. In response to the student's request that he be provided access to a Macintosh computer, the university initially provided access to its IBM computer lab. The student argued that he was unable to utilize the IBM computers due to lack of familiarity with them. Evidence showed that the university offered access to a Macintosh computer six weeks after the start of school.

HELD: for the university.

First, OCR determined that the student had provided the university with notice of his disability in writing during the admission process. It then concluded that the provision by the university of access to IBM computers was a reasonable response to the student's request for an academic adjustment. It stated that an IBM computer was capable of assisting with the problems presented by the student's learning disability; it also decided that the university had provided access to a Macintosh computer within a reasonable period of time. OCR further concluded that the provision of an IBM computer was an effective auxiliary aid to accommodate the student's learning disability. Thus, OCR concluded that the university had not violated Section 504 or any implementing regulation.

Addressed To :

Reverend Lawrence Biondi

President

St. Louis University

221 North Grand Boulevard

St. Louis, Missouri 63103

# Body

St. Louis University (MO)

Exhibit 1

St. Louis University (MO)

The Office for Civil Rights (OCR) has completed its investigation of the above-referenced complaint filed against the St. Louis University (University), St. Louis, Missouri, which alleges discrimination on the basis of handicap. Specifically, the complainants allege that the University did not provide an appropriate auxiliary aid for one of the complainant's (injured party) handicapping condition.

The investigation was conducted under the regulation implementing Section 504 of the Rehabilitation Act of 1973 (Section 504), as amended by the Civil Rights Restoration Act of 1987, Pub. L. No. 100-259, *102 Stat. 28 (1988).* The Section 504 regulation was designed to eliminate discrimination on the basis of handicap by recipients of Federal financial assistance from the U.S. Department of Education. The University is a recipient of Federal financial assistance and, therefore, must comply with the regulation implementing Section 504.

Based on our investigation, we have determined that the available evidence does not support a finding of discrimination in violation of the regulation implementing Section 504 as alleged in the complaint. Our conclusion is based on a review of the University's policies, procedures, official publications, pertinent records and documents, and on interviews.

The complainants allege that the University and its Madrid, Spain, program discriminated against the injured party on the basis of handicap by its failure to provide a Macintosh computer as an auxiliary aid to accommodate the injured party's handicap (learning disability). The injured party has a learning disability which he has been aware of since the second grade. On April 20, 1989, the Virginia Commonwealth University (the University that the injured party attended prior to enrolling in the University's Madrid, Spain, program) evaluated the injured party and confirmed that he has a learning disability. The injured party's learning disability manifests itself by weak ability to discriminate visually, attend to visual detail, and make visual verbal associations. The injured party has difficulty with written expression and learning a foreign language. The injured party has a physical impairment which substantially limits his major life activity of learning, has a record of such an impairment, and is regarded by University officials as having such an impairment. The injured party meets the definition of a handicapped person in accordance with the Section 504 regulation at 34 C.F.R. § 104.3(j) which defines a handicapped person as any person who (i) has a physical or mental impairment which substantially limits one or more major life activities, (ii) has a record of such impairment, or (iii) is regarded as having such an impairment.

For postsecondary education purposes, the Section 504 regulation at 34 C.F.R. § 104.3(k)(3) defines a qualified handicapped person as a person who meets the academic and technical standards requisite to admission or participation in the recipient's education program or activity. In the injured party's case, the education program involved is the University's Madrid, Spain, program. The University determined that the injured party met the academic and technical standards requisite to admission to the Madrid, Spain, program and admitted him in a letter dated November 1, 1989. The injured party is a qualified handicapped person as defined in the Section 504 regulation at 34 C.F.R. § 104.3(k)(3).

The evidence revealed that the injured party entered the University's Madrid, Spain, program and began classes on January 15, 1990. He withdrew from the University on February 24, 1990, (after classes had been in session for six weeks), and returned home on February 26, 1990. According to the injured party, he stopped attending classes two weeks prior to his withdrawal from the University.

The Section 504 regulation at 34 C.F.R. § 104.44(d)(1) and (2) states: (d) Auxiliary Aids (1) A recipient to which this subpart applies shall take such steps as are necessary to ensure that no handicapped student is denied the benefits of, excluded from participation in, or otherwise subjected to discrimination under

the education program or activity operated by the recipient because of the absence of educational auxiliary aids for students with impaired sensory, manual, or speaking skills. (2) Auxiliary aids may include taped texts, interpreters, or other effective methods of making orally delivered materials available to students with hearing impairments, readers in libraries for students with visual impairments, classroom equipment adapted for use by students with manual impairments, and other similar services and actions. Recipients need not provide attendants, individually prescribed devices, readers for personal use or study, or other devices or services of a personal nature.

During this investigation, OCR answered the following questions: (1) Did the injured party provide adequate notice that the auxiliary aid was requested?; (2) Was the auxiliary aid necessary?; (3) Was an appropriate auxiliary aid provided?; and (4) Was the auxiliary aid of adequate quality and effectiveness?

    Notice

The investigation established that the injured party notified University officials in writing of his handicapping condition during the admission process prior to going to Madrid, Spain. The injured party provided the University a copy of a September 7, 1989, memorandum from the Coordinator of the Program of Services for Students with Disabilities at the Virginia Commonwealth University to faculty and staff at Virginia Commonwealth University. This memorandum stated the injured party had a learning disability and recommended that the injured party be allowed to use a Franklin Speller and that his responses be evaluated on content as opposed to the mechanics of English. This memorandum stated that the injured party would require editing for papers prepared outside of the classroom. It was recommended that instructors consider removing time limits for the injured party during exams and for other papers written in class. During the course of the investigation, the complainants did not allege that the injured party was denied any of these academic adjustments or auxiliary aids. Their only complaint was that the injured party was denied the use of a Macintosh computer. There was no written recommendation in this memorandum that the injured party use a Macintosh computer.

The injured party stated that he informed the University's Assistant Dean of Admissions of the Overseas Program of his need for a Macintosh computer in a letter dated October 4, 1989. OCR reviewed this letter and found that it did not mention the injured party's need for a Macintosh computer. The injured party stated that he orally informed the Assistant Dean of this in a telephone conversation on October 24, 1989. The Assistant Dean denied this and states that she was not informed of the injured party's need for a Macintosh computer.

The injured party also stated that he orally informed the Dean of Students of the Madrid, Spain, program of his need for a Macintosh computer on December 13, 1989, when he was in Spain. The injured party also stated he orally informed the President of the Madrid, Spain, program (President) on December 15, 1989. He stated that he orally informed the President of this need 20 or more times thereafter.

The Dean of Students stated in his response submitted to OCR that the injured party informed him of his learning disability and that he was accustomed to working with a Macintosh computer as a study aid in mid-December 1989 during finals, prior to the beginning of the second semester. He informed the injured party at that time that he thought there was a Macintosh computer in the Registrar's Office but that he did not think it could be made available to students. The Dean of Students stated that he informed the injured party of the IBM computers in the computer lab. The Dean of Students stated that he was not under the impression that the Macintosh computer was "absolutely imperative to the successful completion of his Spring 1990 academic semester."

St. Louis University (MO)

The Dean of Students stated that the injured party informed him after the completion of orientation week, January 9 through 12, 1990, that the injured party needed access to the Macintosh computer in the Registrar's Office because the programs and set-ups of the IBM computers in the computer lab were of no help to him.

The Dean of Students stated that he approached the President about usage of the Macintosh computer during the end of the second week in January 1990. He stated that the President's response was that he would look into it. The Dean of Students stated that during the third week of the semester the injured party informed him that he needed a Macintosh computer or he would have to withdraw. The Dean of Students stated that he informed the President of this and the request was denied. The reason given was that the Macintosh computer was needed on a 24 hour a day basis for the Bit-Net Communication System. The Dean stated that the request was also denied when the Dean approached the Registrar on the subject a few weeks earlier. The Registrar informed him that the only off hours for the Macintosh were when the office was closed and that she could not allow a student to be there alone with student records.

The Dean of Students stated that a week or so later the injured party informed him that he was leaving. The Dean of Students Stated that he again went to the President and informed him that the injured party was returning home because he had been unable to secure use of the Macintosh computer in the Registrar's Office. He also informed the President that the injured party wished to secure a full refund of money spent while in Madrid. The President requested that the Dean of Students request that the injured party come and visit with him.

The President stated in his statement submitted to OCR that he was not aware until late February, shortly before the injured party left to return to the United States, that the injured party had ever requested the use of a Macintosh computer. The President stated that a Macintosh computer was located in the Registrar's Office which could have been made available to the injured party upon request. The President stated that the request to use the Macintosh computer was not made to him until the injured party came to him at his (the President's) request in late February. The President requested the meeting because the injured party was dropping out of classes. The meeting took place the week prior to February 23, 1990. He told the injured party at that time that he would arrange for the injured party to use the Macintosh computer and that the injured party should get back with him the following day. The President stated that he called the Registrar and arranged for the injured party's immediate use of the Macintosh. Contacts made with the Madrid campus by officials from the main campus in St. Louis established that the Registrar was instructed by the President to allow the injured party to use the Macintosh computer in the Registrar's Office on a scheduled basis as of February 22, 1990. The injured party did not return the following day.

The evidence established that in mid-December 1989, the injured party informed the University's Dean of Students that he was accustomed to using a Macintosh computer as a study aid. The Dean of Students informed the injured party of the availability of the IBM computers in the computer lab. After the week of orientation, January 9 through 12, 1990, the injured party informed the Dean of Students that the programs and set-ups in the IBM computer lab were of no help to him and requested access to the Macintosh computer.

Necessity for and Method of Providing Academic Adjustment

As noted above, the injured party provided documentation of his handicapping condition to University officials. The injured party submitted a statement describing his handicap written by the Coordinator of the Program of Services for Students with Disabilities at the Virginia Commonwealth University dated

September 7, 1989, to officials at the University. The Coordinator stated only that the injured party should be provided with a Franklin Speller and that the injured party be allowed editing for papers prepared outside of the classroom, extra time for completing tests and the submission of class written assignments, and evaluated on content and not the mechanics of English. The evidence established that the injured party has a handicap necessitating academic adjustment. In a letter dated October 4, 1989, the injured party informed the University that the only problem he had was a deficiency in his writing capabilities (spelling and punctuation, not content). The University offered access to its IBM computer lab to accommodate these problems. Given the nature of the injured party's handicap and the information provided by the injured party as to the adjustment he needed, an IBM computer is a reasonable method of providing academic adjustment for the injured party.

### Provision of Necessary Adjustments and Auxiliary Aids

The University initially made IBM computers available to the injured party. The injured party requested the use of a Macintosh computer. An IBM computer has the capability to assist with problems with spelling and punctuation, the injured party's handicap. The injured party agrees that the University offered a Macintosh computer to him on February 23, 1990, almost six weeks after school started. This was not an undue delay given the fact that the injured party was provided access to an IBM computer, and the fact that the University used the Macintosh computer during office hours in the Registrar's Office and was concerned about the injured party's access to confidential student records.

### Effectiveness of Academic Adjustments and Auxiliary Aids

The injured party requested use of a Macintosh computer. The University provided the injured party with the use of an IBM computer. The injured party contends that he could not have utilized the IBM computers because his training and programs were for a Macintosh computer. The injured party contends that it would have roughly taken a month for him to become as familiar with usage of the IBM as his familiarity with the Macintosh computer. There was no evidence to establish that the injured party should have been provided with a Macintosh computer over any other type of computer, nor that the IBM computer was less effective than the Macintosh computer. Provision of an IBM computer was an effective auxiliary aid to accommodate the injured party's difficulties with punctuation and spelling. Furthermore, the University offered the use of a Macintosh computer almost six weeks after school started.

Based on the evidence above, the University did not violate the regulation implementing Section 504 at 34 C.F.R. § 104.44(d)(1) and (2), regarding the issue of this complaint.

Based on the evidence and findings mentioned above, this case is closed as of the date of this letter. These determinations are not intended and should not be construed to cover any other issues regarding compliance with the Section 504 regulation which may exist but are not specifically discussed herein.

Under the Freedom of Information Act, it may be necessary to release this document and related correspondence and records upon request. If OCR receives such a request, we will seek to protect, to the extent provided by law, personal information that, if released, could constitute an unwarranted invasion of privacy.

We appreciate the cooperation and assistance that your staff, particularly Dr. Ruth Marquis, extended to our investigator during the course of the complaint investigation.

St. Louis University (MO)

If you have any questions about this matter, please contact Michael B. Hamilton, Director, Postsecondary Education Division, at (816) 891-8158. Judith E. Banks Regional Civil Rights Director Office for Civil Rights Department of Education, Region VII

---

**End of Document**