# IN THE UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| PETER M. GALLIGAN, | ) |
|       Plaintiff, | ) |
| v. | ) Case No. 17 C 6310 |
| ADTALEM GLOBAL EDUCATION INC. F/K/A DEVRY EDUCATION GROUP; ADTALEM GLOBAL HEALTH, INC. F/K/A DEVRY MEDICAL INTERNATIONAL, INC.; ROSS UNIVERSITY SCHOOL OF MEDICINE SCHOOL OF VETERINARY MEDICINE (ST. KITTS) LIMITED; and DOES 1 THROUGH 50, | ) Judge Joan H. Lefkow |
|       Defendants. | ) |

## OPINION AND ORDER

In 2017, Peter Galligan brought this action against Ross University School of Medicine School of Veterinary Medicine (St. Kitts) Ltd.; Adtalem Global Health, Inc. f/k/a DeVry Medical International, Inc.; Adtalem Global Education Inc. f/k/a DeVry Education Group; and fifty Does. In his second amended complaint (dkt. 32), Galligan pleads nine counts, against all defendants unless otherwise specified:

1. Violation of the Rehabilitation Act of 1973 (Rehab Act);
2. Violation of Title III of the Americans with Disabilities Act (ADA);
3. Fraudulent Inducement;
4. Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act (ICFA);
5. Negligent misrepresentation;
6. Breach of contract;
7. Breach of fiduciary duty;
8. Civil conspiracy;
9. Alter ego (in the alternative to Count 8; not against Does).

The entity defendants have moved to dismiss all counts under Federal Rule of Civil Procedure 12(b)(6). (Dkt. 35.)[1]

## BACKGROUND[2]

Peter Galligan graduated from California Polytechnic State University with a degree in animal science and an ambition to one day become a veterinarian. (Dkt. 31 ¶ 1.) But Galligan suffers from severe test anxiety, which requires special accommodations when he takes exams. (*Id.* ¶ 2.) While looking for a veterinary school, Galligan found Ross, which is in the Caribbean nation of St. Kitts and Nevis. (*Id.* ¶ 22.)[3] Ross is operated by DeVry Medical, a Florida corporation with its principal place of business in New Jersey that is a "reporting division" of Adtalem, a Delaware corporation headquartered in Illinois. (*Id.* ¶¶ 6–8.) Ross receives funds from federal grants and loans. (*Id.* ¶ 18.) It is eligible for these funds because it is accredited by the American Veterinary Medical Association (AVMA). (*Id.* ¶ 20.)

When Galligan was researching veterinary schools, Ross advertised on the internet that it fostered an environment that supported students, announcing that it would "make [your dreams] come true" and provide "an abundant amount of support and encouragement" and "faculty [who] treat[] you as colleagues . . . supportive, . . . friendly, . . . available, . . . wonderful, . . . always there for you . . . with one-on-one care." (*Id.*) Galligan also "read, researched, and believed" that

---

[1] This court has jurisdiction under 28 U.S.C. §§ 1331, 1332, and 1367(a). Although the court dismisses all federal claims, diversity jurisdiction covers the remaining claims. Venue is proper under 28 U.S.C. § 1391(b)(1) because Adtalem resides here.

[2] Unless otherwise noted, the following facts are taken from Galligan's second amended complaint (dkt. 32) and are presumed true for this motion. *Active Disposal, Inc.* v. *City of Darien*, 635 F.3d 883, 886 (7th Cir. 2011).

[3] It is unclear from the complaint whether Ross is physically located on the island of St. Kitts or the island of Nevis, which together constitute the nation of St. Kitts and Nevis. *See* U.S. Dep't of State, *St. Kitts & Nevis*, https://www.state.gov/p/wha/ci/sc/ (last visited Feb. 4, 2019).

Ross would "embrace diversity" and help him become a "sought-after, practice-ready veterinarian[]." (*Id.* ¶¶ 22–24.) Galligan also alleges that Adtalem made several general statements about its culture but does not allege that those statements related to Ross or that he saw them before applying. (*Id.* ¶¶ 25–26.)

Galligan matriculated at Ross in 2013. (*Id.* ¶ 28.) He immediately notified a Ross psychologist of his test anxiety and physician-recommended accommodations of extended testing time and use of a separate room. (*Id.* ¶¶ 29–31.) The AVMA's policies require accredited veterinary schools to provide "support . . . for students with learning or other disabilities," and the Ross student handbook promises an environment free of unlawful harassment based on disability; compliance with "applicable laws regarding discrimination, harassment, retaliation and equal opportunity"; "commit[ment] to ensuring that qualified students with disabilities are afforded reasonable accommodations"; and making "[t]he [Ross] Counseling Center . . . available to provide support and assistance to [Ross] students." (*Id.* ¶¶ 44, 46.) The psychologist nonetheless denied Galligan these accommodations despite routinely giving them to other students. (*Id.* ¶ 31.) Galligan passed his classes his first semester but, after another round of denied accommodation requests, failed three of his four classes his second semester. (*Id.* ¶ 32.)

Galligan was given permission to leave school to "get [his] medical condition stabilized . . . ." (*Id.* ¶ 33.) Galligan went to California to work with a psychologist to address his anxiety for a few months. (*Id.* ¶ 34.) He returned to Ross in 2014 to repeat his second semester on academic probation, which required him to earn a cumulative GPA of at least 2.0 and not fail any classes. (*Id.* ¶¶ 35, 37.) Remaining on academic probation for consecutive semesters or failing any class while on probation could be grounds for dismissal. (*Id.* ¶ 37.)

3

Galligan requested the same testing accommodations again and was denied. (*Id.* ¶ 36.) He still exceeded the required 2.0 GPA and did not fail any classes in his second, third, or fourth semesters. (*Id.* ¶ 38.) In his fifth semester, he failed a class and was dismissed from Ross in 2015. (*Id.* ¶¶ 40–41.) He unsuccessfully appealed the dismissal, arguing that (1) he had been removed from academic probation by performing adequately in his second through fourth semesters, and (2) he was treated differently from other students who had failed classes but were not dismissed. (*Id.* ¶¶ 41–42.) He claims that Ross refused to consider his appeal as retaliation for his accommodation requests. (*Id.* ¶ 48.)

This suit followed. He alleges under several legal theories that Ross defrauded him into applying and enrolling by falsely claiming to be supportive, but then discriminated against him based on his disability and retaliated against him for requesting accommodations.

## LEGAL STANDARD

A motion to dismiss under Rule 12(b)(6) challenges a complaint for failure to state a claim on which relief may be granted. In ruling on such a motion, the court accepts as true all well-pleaded facts in the plaintiff's complaint and draws all reasonable inferences from those facts in the plaintiff's favor. *Active Disposal, Inc.* v. *City of Darien*, 635 F.3d 883, 886 (7th Cir. 2011) (citation omitted). To survive a Rule 12(b)(6) motion, the complaint must not only provide the defendant with fair notice of a claim's basis but must also establish that the requested relief is plausible on its face. *See Ashcroft* v. *Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937 (2009); *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955 (2007). The allegations in the complaint must be "enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. At the same time, the plaintiff need not plead legal theories; it is the facts that count. *Hatmaker* v. *Mem'l Med. Ctr.*, 619 F.3d 741, 743 (7th Cir. 2010).

## ANALYSIS

I.  **Rehab Act (Count 1) and Title III of the ADA (Count 2)**

"It is a longstanding principle of American law that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States." *Morrison* v. *National Australia Bank Ltd.*, 561 U.S. 247, 255, 130 S. Ct. 2869 (2010). This principle manifests as a canon of construction that statutes are presumed not to apply extraterritorially; "[w]hen a statute gives no clear indication of extraterritorial application, it has none." *Id.*

Neither of the federal statutes on which Galligan relies applies outside the United States. *See Archut* v. *Ross Univ. Sch. of. Veterinary Medicine*, 580 F. App'x 90, 90–91 (3d Cir. 2014) (mem.) (holding neither Rehab Act nor Title III of ADA applies extraterritorially). The Rehab Act prohibits "any program or activity receiving Federal financial assistance" from discriminating against "individual[s] with a disability in the United States" based on their disability. 29 U.S.C. § 794(a). The statute by its own terms limits relief to those "in the United States," language which supports rather than rebuts the presumption against extraterritoriality. Galligan argues that by applying to "any program," the Rehab Act demonstrates its intent to apply extraterritorially. But broad statutory language does not indicate worldwide scope. In *Morrison*, the Court held that section 10(b) of the Securities Exchange Act "contains nothing to suggest it applies abroad," even though it prohibits "*any* person" from using "*any* manipulative or deceptive device" "in connection with the purchase or sale of *any* security." 561 U.S. at 262 (emphasis added).

Title III of the ADA provides that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges,

advantages, or accommodations of any place of public accommodation by any person who owns . . . or operates a place of accommodation." 42 U.S.C. § 12182(a). Title III does not clearly indicate that it applies outside the United States. And like the Rehab Act, there is evidence pointing in the other direction, as Title I of the ADA (prohibiting employment discrimination) explicitly extends outside the United States, *see* Civil Rights Act of 1991, Pub. L. 102-166 § 109, 105 Stat. 1071 (1991) (codified at 42 U.S.C. § 12111(4)), but Title III does not. "[W]hen a statute provides for some extraterritorial application, the presumption against extraterritoriality operates to limit that provision to its terms." *Morrison*, 561 U.S. at 265.

This does not end the discussion. "If the statute is not extraterritorial, then [the court must] determine whether the case involves a domestic application of the statute, and [does so] by looking to the statute's 'focus.'" *RJR Nabisco, Inc.* v. *European Community*, 136 S. Ct. 2090, 2101 (2016). It is not enough that the challenged conduct has some connection to the United States. In *E.E.O.C.* v. *Arabian American Oil Co.* (*Aramco*), for instance, the American plaintiff accused his American employer of discriminating against him in Saudi Arabia based on his race, religion, and national origin. 499 U.S. 244, 247, 111 S. Ct. 1227 (1991). The Court affirmed summary judgment in the employer's favor because Title VII of the Civil Rights Act of 1964, as then written,[4] applied only to domestic discrimination. *Id.* at 259; *see also Morrison*, 561 U.S. at 266–70 (plaintiffs argued that deceptive conduct in the United States tricked them into buying securities in Australia, but Court held that Securities Exchange Act "focused" on purchase of securities and therefore did not apply to those transactions). The Rehab Act focuses on individuals with a disability being "excluded from participation in, be[ing] denied the benefits of,

---

[4] Congress extended the territorial reach of Title VII in response to *Aramco*, the same act that makes Title I of the ADA apply extraterritorially. Civil Rights Act of 1991, Pub. L. 102-166 § 109, 105 Stat. 1071 (1991).

6

or be[ing] subjected to discrimination under any program . . . receiving Federal financial assistance . . . ." 29 U.S.C. § 794(a). Since Galligan alleges that the program, exclusion, denial, and discrimination all took place in St. Kitts and Nevis, where the Rehab Act does not apply, he has not stated a claim for relief. Similarly, the alleged discrimination, lack of equal enjoyment, and public accommodations under Title III were all in St. Kitts and Nevis. 42 U.S.C. § 12182(a).

Because the Rehab Act and Title III of the ADA do not apply to the conduct Galligan alleges here, counts 1 and 2 are dismissed with prejudice.

## II. Fraudulent Inducement (Count 3) and Negligent Misrepresentation (Count 5)

The remaining counts are state-law claims, over which the court has jurisdiction because the parties are completely diverse and the amount in controversy exceeds $75,000. A Californian brings this suit based on events that occurred primarily in St. Kitts and Nevis, but the parties agree that Illinois law applies. "Where parties fail to raise a possible conflict of substantive laws . . . the substantive law of the forum applies." *Gonzalez* v. *Volvo of Am. Corp.*, 752 F.2d 295, 299 (7th Cir. 1985).

"In Illinois, fraudulent inducement requires proof of five elements: '(1) a false statement of material fact; (2) known or believed to be false by the person making it; (3) an intent to induce the other party to act; (4) action by the other party in reliance on the truth of the statement; and (5) damage to the other party resulting from such reliance.'" *Hoseman* v. *Weinschneider*, 322 F.3d 468, 476 (7th Cir. 2003) (citations omitted). Negligent misrepresentation is similar, but the defendant's required mental state is reduced to "carelessness or negligence in ascertaining the truth of the statement" and Galligan must also allege that defendants had "a duty . . . to communicate accurate information." *Tricontinental Indus., Ltd.* v. *PricewaterhouseCoopers, LLP*, 475 F.3d 824, 833–34 (7th Cir. 2007) (quoting *First Midwest Bank, N.A.* v. *Stewart Title*

7

*Guar. Co.*, 843 N.E.2d 327, 334–35 (Ill. 2006)). The parties do not distinguish between the two counts for this motion.

In the "inducements" section of Galligan's complaint, he alleges two classes of statements that form the basis for these claims. (Dkt. 32 ¶¶ 22–27.) First are Adtalem's statements that he alleges were made but does not claim to have seen before applying. (*Id.* ¶¶ 25–27.) Galligan cannot plead reliance if he does not plead that he saw the statements. Moreover, statements in this category are not pleaded with particularity as required under Rule 9(b), as Galligan does not recite when the statements were made, not even relative to the other events in this dispute. *See* Fed. R. Civ. P. 9(b); *Wigod* v. *Wells Fargo Bank, N.A.*, 673 F.3d 547, 569 (7th Cir. 2012) (particularity requires "the who, what, when, where, and how" of the alleged fraud).[5]

The second category consists of Ross's statements, which Galligan alleges to have "read, researched, and believed" before applying to Ross. (*Id.* ¶¶ 22–24.) But almost all these statements are non-actionable puffing. "Puffing denotes the exaggerations reasonably expected of a seller as to the degree of quality of his or her product, the truth or falsity of which cannot be precisely determined." *Barbara's Sales, Inc.* v. *Intel Corp.*, 879 N.E.2d 910, 926 (Ill. 2007). "Puffing in the usual sense signifies meaningless superlatives that no reasonable person would take seriously, and so it is not actionable as fraud." *Id.* (citations omitted). For example, "better" or "best" are usually puffing because they cannot be ascertained and will depend on subjective criteria, *id.* at 927, but "Proven #1 in Odor Control" is not because it "leaves no doubt as to the criterion . . . upon which to judge," *Muir* v. *Playtex Prods., LLC*, 983 F. Supp. 2d 980, 989 (N.D. Ill. 2013). "[I]t is appropriate in the context of a motion to dismiss[] for a court to decide, as a

---

[5] Galligan inadvertently highlights the importance of Rule 9(b) because his brief raises serious questions about whether the statements he lists in the "inducements" section of his complaint came from a 2016 corporate earnings call, three years after he applied to Ross. (*Compare* dkt. 32 ¶ 26, *with* dkt. 43 at 12.)

8

matter of law, whether a statement is non-actionable puffery." *Saltzman* v. *Pella Corp.*, No. 06 C 4481, 2007 WL 844883, at *4 (N.D. Ill. Mar. 20, 2007) (citation omitted); *see also Martin* v. *Wendy's Int'l, Inc.*, 183 F. Supp. 3d 925, 934–35 (N.D. Ill. 2016) (dismissing false advertisement claim because statement was puffing).

Galligan lays siege to the boundary between facts and puffing, citing "[we] make [your dreams] come true" as his first example of a statement of material fact. (Dkt. 32 ¶ 22.) Although it could be precisely determined in the literal sense, "no reasonable person would take [it] seriously." *Barbara's Sales*, 879 N.E.2d at 926. The same is true of "[e]veryone is always looking out for each other" and faculty that is "always there for you . . . with one-on-one care." (Dkt. 32 ¶ 22.)

Other statements were puffing because they were subjective, and their truth could not be precisely determined. For instance, Galligan claims that Ross defrauded him by calling itself "value-driven," which he learned was false when Ross did not give him testing accommodations. (Dkt. 32 ¶ 65.) There are driving values that do not require testing accommodations: ruggedness, loyalty, or piety, for instance. Denying one student testing accommodations would not disprove that Ross was driven by values such as inclusivity or accessibility. "Value-driven" is puffing because it is open to interpretations like these. Same with "abundant . . . support and encouragement," of which Galligan claims he received none. (*Id.*)[6] But the question is not whether "none" is less than "abundant," but whether "abundant . . . support and encouragement" is ascertainable, such that students who receive minimal, reasonable, or adequate support and encouragement would also know they were defrauded. Ditto "an amazing family," "supportive,

---

[6] He alleges elsewhere in the complaint that he received support, highlighting the difficulty of precisely ascertaining the meaning of "support." (Dkt. 32 ¶ 39 ("[Galligan was e]mboldened by . . . the support of [Ross] in facilitating additional Title IV loans . . . .").)

9

. . . friendly, . . . available, . . . wonderful" faculty, "the opportunity to be a vet," "embrace diversity," "students . . . are [Ross's] primary focus," and "dedicated . . . to providing academic excellence." (*Id.* ¶¶ 22, 24.) These claims are specific only in the sense that they vaguely boast along a single vector, akin to claiming to be "the best." *See Barbara's Sales*, 879 N.E.2d at 926 ("[W]ords such as 'best' are not actionable representations of fact.")

One statement is plausibly more than puffing. Galligan claims that he was enticed by Ross's strategic vision to "increase total student numbers via reduced attrition . . . by increasing the quantity of quality student applicants, resulting in an increased completion rate." (Dkt. 32 ¶ 23.) Galligan alleges he was misled to believe that Ross maintained a low attrition rate by accepting only applicants it expected to complete their studies, but this turned out to be false because he was dismissed from Ross before he completed his studies. But Galligan does not plead this statement with the particularity required under Rule 9(b), as he does not explain when the statement is made. Although the heightened pleading standard is not "rigid" or formulaic, *see Webb* v. *Frawley*, 906 F.3d 569, 576 (7th Cir. 2018), considering that Galligan's briefing raises concerns that some of the statements listed in the complaint were made after he matriculated, this is an appropriate case to apply Rule 9(b) strictly.

Counts 3 and 4 are dismissed without prejudice, though Galligan may not replead statements that the court finds are puffing as a matter of law.

### III.  ICFA (Count 4)

Illinois statutes, like their federal counterparts, usually have limited territorial reach. The ICFA is no exception; it does not "apply to fraudulent transactions which take place outside Illinois." *Avery* v. *State Farm Mut. Auto. Ins. Co.*, 835 N.E.2d 801, 853 (Ill. 2005). A fraudulent transaction "may be said to take place within a state if the circumstances relating to the

transaction occur primarily and substantially within that state." *Id.* Thus, "for a nonresident plaintiff to have standing under the Act, the circumstances that relate to the disputed transaction [must] occur primarily and substantially in Illinois.'" *Crichton* v. *Golden Rule Ins. Co.*, 576 F.3d 392, 396 (7th Cir. 2009) (quoting *Avery*, 835 N.E.2d at 853–54).

Galligan is a Californian who claims that material posted on the internet by a St. Kitts and Nevis school tricked him into enrolling in a school in St. Kitts and Nevis. Galligan must reach up the corporate ladder to Adtalem to find a connection to Illinois, but he does not allege either that Adtalem made any statements specifically about Ross or that he saw any of Adtalem's statements before applying. (Dkt. 32 ¶¶ 25–27); *see Barbara's Sales*, 879 N.E.2d at 927–28 (plaintiff must be aware of representation to state claim under ICFA). Even had he alleged Adtalem's involvement, simply publishing the allegedly deceptive material in Illinois is not enough to make a transaction occur in Illinois. *See, e.g.*, *Crichton*, 576 F.3d at 397 (Floridian who received allegedly deceptive materials in Florida and renewed insurance in Florida lacked standing to sue Illinois corporation under ICFA).

Finally, the ICFA claim turns on the same allegedly deceptive statements as the fraudulent inducement claim; that analysis applies here as well. *Supra*, Section II.

On the facts pleaded, Count 4 fails to state a cause of action. If Galligan can plead more facts connecting Adtalem and thus Illinois to his claim, he may replead.

## IV. Breach of Contract (Count 6)

"To bring a successful breach of contract claim under Illinois law, a party must show '(1) the existence of a valid and enforceable contract; (2) substantial performance by the plaintiff; (3) a breach by the defendant; and (4) resultant damages.'" *nClosures Inc.* v. *Block & Co.*, 770 F.3d 598, 601 (7th Cir. 2014) (citation omitted). "In Illinois, 'a college or university and its students

11

have a contractual relationship, and the terms of the contract are generally set forth in the school's catalogs and bulletins.'" *DiPerna* v. *Chicago Sch. of Prof. Psych.*, 893 F.3d 1001, 1006–07 (7th Cir. 2018) (quoting *Raethz* v. *Aurora Univ.*, 805 N.E.2d 696, 699 (Ill. App. Ct. 2004)). But because of the unique relationship between university and student, courts apply a distinct standard, allowing students "a remedy for breach of contract when it is alleged that an adverse academic decision has been made . . . only if that decision was made arbitrarily, capriciously, or in bad faith." *O'Driscoll* v. *Argosy Univ.*, No. 12 C 10164, 2014 WL 714023, at *2 (N.D. Ill. Feb. 25, 2014) (quoting *Raethz*, 805 N.E.2d at 699).

Galligan alleges that in exchange for tuition payments, Ross promised, among other things, to (1) adhere to all promises in its advertising; (2) comply with federal and state laws (student handbook § 1.11.3); (3) adhere to stated disability and examination protocols (student handbook §§ 1.11.4–5)[7]; and (4) conform with industry standards and norms, including providing testing accommodations for students with disabilities. (Dkt. 32 ¶ 79.)

There was no valid contract as to the first, second, or fourth categories that Galligan proposes. Promotional materials are not among the terms of the contract between universities and their students. *DiPerna*, 893 F.3d at 1006–07. And as discussed above, most of the promotional statements were puffing, meaning they were not concrete promises that could comprise part of a contract between student and university. *See Abrams* v. *Ill. Coll. of Podiatric Med.*, 395 N.E.2d 1061, 1065 (Ill. App. Ct. 1979) (holding student does not have "power to transform" "unenforceable expectation" "into a binding contractual obligation"). The second category must be rejected because "[t]he promise to do something one is already legally obligated to do is not

---

[7] Though not specifically cited in the breach of contract count, Galligan also appears to plead other breaches of the student handbook elsewhere in his complaint, including improperly keeping him on academic probation despite his passing all classes in his second through fourth semesters and retaliating against him by not allowing him to present evidence in his appeal. (*Id.* ¶¶ 37, 47–48.)

consideration, and no new obligation is thereby created." *Harris* v. *Adler Sch. of Prof. Psych.*, 723 N.E.2d 717, 722 (Ill. App. Ct. 1999) (affirming dismissal of contract claim against graduate school for alleged breach of nondiscrimination provisions in school catalog). And, as discussed above, because the federal laws Galligan believes were broken did not apply to Ross, Ross cannot be said to have breached a promise to comply with the law. As to the fourth category, Galligan appears to reference the AVMA accreditation standard that "[s]tudent support services must be available within the college" and "must include . . . support for students with learning or other disabilities," (*id.* ¶ 44), which was at most an agreement between the AVMA and Ross, not between Ross and Galligan.

Galligan sufficiently pleads that the third category—the student handbook—is part of a valid contract. The student handbook is a classic example of material that forms part of the contract between university and student. *DiPerna*, 893 F.3d at 1006–07 (terms of contract generally set forth in catalogs and bulletins). Though a student handbook's "expression of intention, hope or desire" is "unenforceable" and does not become part of the student's contract with the school, *see Abrams*, 395 N.E.2d at 1065, specific promises do. Section 1.11.4's statement that "[Ross] is committed to ensuring that qualified students with disabilities are afforded reasonable accommodations" is definite enough that Galligan can plausibly claim that it is a concrete promise rather than an "unenforceable expression." (Dkt. 32 ¶ 46.) Galligan also pleads less specifically but still plausibly that academic probation and anti-retaliation terms are included in the student handbook. (*Id.* ¶¶ 37, 47.)

Because he challenges a dismissal for academic reasons, Galligan must prove that the school acted arbitrarily or capriciously. *DiPerna*, 893 F.3d at 1007. Only some of his alleged breaches meet this standard. Applying academic-probation provisions differently than Galligan

13

expected is a paradigmatic example of a decision that is not reviewable under this standard. *See, e.g.*, *Raethz*, 805 N.E.2d at 700 (university did not act arbitrarily or capriciously by awarding failing grade without notice, in violation of handbook). But Galligan also alleges that he failed and was dismissed because Ross did not provide disability accommodations and retaliated against him for requesting them, and those are plausibly "arbitrary, unreasonable, or bad faith" reasons to make academic decisions. *See, e.g.*, *O'Driscoll*, 2014 WL 714023, at *3 (denying motion to dismiss breach of contract claim where graduate student alleged she received low grades as retaliation for reporting sexual harassment); *Yakin* v. *Univ. of Ill., Chi. Circle Campus*, 508 F. Supp. 848, 853–54 (N.D. Ill. 1981) (holding Ph.D. student stated a claim for breach of contract based on national-origin discrimination).

The motion to dismiss is denied as to count 6. Galligan may proceed on the theory that Ross breached the disability accommodation and anti-retaliation provisions of the student handbook.

## V. Breach of Fiduciary Duty (Count 7)

"To establish a breach of fiduciary duty under Illinois law, a plaintiff must show that '(1) a fiduciary duty exists; (2) the fiduciary duty was breached; and (3) the breach proximately caused the injury of which the plaintiff complains.'" *nClosures*, 770 F.3d at 603 (citations omitted). Under Illinois law, "[f]iduciary duties exist as a matter of law in certain relationships," *Autotech Tech. Ltd. P'ship* v. *Automationdirect.com*, 471 F.3d 745, 748 (7th Cir. 2006), but professional school/student is not among them. "Special circumstances can also give rise to a fiduciary duty. To determine if special circumstances exist, courts consider the degree of kinship between the parties; the disparity in age, health, mental condition, education, and business

14

experience between the parties; and the extent to which the servient party entrusted his business affairs to the dominant party and placed trust and confidence in it." *Id.* at 749.

Galligan alleges two special circumstances. First, he claims that Ross owed him a fiduciary duty because it was in the small, remote island nation of St. Kitts and Nevis with "limited food, daily living needs, and basic communications." (*Id.*) But that describes geography, not a fiduciary relationship. He is entitled to the inference that Ross knew St. Kitts and Nevis better than he did, but it does not follow that Ross was therefore his fiduciary. Second, he alleges that he "entrusted his actual and loaned money to Defendants in exchange for an education," (*id.*), but that describes payment for services, not a fiduciary relationship. *Estate of Brown* v. *Arc Music Grp.*, 523 F. App'x 407, 410 (7th Cir. 2013) ("[I]n Illinois a business or contractual relationship alone does not create a fiduciary duty.")

Count 7 is dismissed without prejudice.

## VI.     Conspiracy (Count 8)

Finally, although Galligan appears to allege that Ross alone committed the torts and contractual breaches above, he nonetheless seeks relief from all three entities and all fifty Does. To do so, he alleges in count 8 that all defendants conspired to defraud him. (Dkt. 32 ¶ 89.) Under Illinois law, "[c]ivil conspiracy consists of a combination of two or more persons for the purpose of accomplishing by some concerted action either an unlawful purpose or a lawful purpose by unlawful means." *Adcock* v. *Brakegate, Ltd.*, 645 N.E.2d 888, 894 (Ill. 1994). Galligan alleges none of those requirements. To the contrary, his specific allegations of conspiracy all implicate only Ross. (*Id.* ¶ 88 ("Defendants conspired . . . in several ways including . . . [Ross] not following or enforcing its own disability policies; [Ross] not abiding by the standards . . . of the AVMA; [Ross] Administration organizing a sham of an appeals

15

process . . . .").) His only allegation that even names another party is that Adtalem's counsel communicated with Galligan after he was dismissed from Ross. (*Id.*) This is insufficient to show any conspiracy to defraud him years before Adtalem's counsel communicated with him. *See, e.g.*, *Twombly*, 550 U.S. at 554–56 (claim of conspiracy must be plausible to survive motion to dismiss).

Count 8 is dismissed without prejudice.

## VII. Alter Ego (Count 9)

In the alternative, Galligan posits in count 9 that Adtalem, DeVry Medical, and Ross are all a single entity. "Under Illinois law, to establish alter ego liability, '(1) there must be such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist; and (2) circumstances must be such that adherence to the fiction of separate corporate existence would sanction a fraud or promote injustice.'" *UIRC-GSA Holdings Inc.* v. *William Blair & Co.*, 289 F. Supp. 3d 852, 858 (N.D. Ill. 2018). The entities do not argue that Galligan did not allege these criteria. Instead, they argue that the alter ego count must fail if all other claims fail. Because not all other claims fail, neither does the alter ego count.

The motion to dismiss is denied as to count 9.

## CONCLUSION

The motion to dismiss is granted in part and denied in part. Counts 1 and 2 are dismissed with prejudice. Counts 3, 4, 5, 7, and 8 are dismissed without prejudice. As to counts 3, 4, and 5, Galligan may not replead statements that the court holds are non-actionable puffing. The motion is denied as to count 6—which is limited to breaches of the student handbook's disability accommodations and anti-retaliation provisions—and count 9.

Date: February 4, 2019

_Joan N. Lefkow_

U.S. District Judge Joan H. Lefkow