## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| PETER M. GALLIGAN, | § | |
| | § | |
| PLAINTIFF | § | |
| | § | |
| V. | § | CIVIL CASE NO. 1:17-cv-06310 |
| | § | |
| ADTALEM GLOBAL EDUCATION INC. F/K/A | § | |
| DEVRY EDUCATION GROUP; ADTALEM | § | |
| GLOBAL HEALTH, INC. F/K/A DEVRY | § | |
| MEDICAL INTERNATIONAL, INC.; ROSS | § | |
| UNIVERSITY SCHOOL OF MEDICINE | § | |
| SCHOOL OF VETERINARY MEDICINE (ST. | § | |
| KITTS) LIMITED; AND DOES 1 THROUGH 50, | § | |
| | § | |
| DEFENDANTS | § | |
| | § | JURY TRIAL DEMANDED |

### THIRD AMENDED COMPLAINT

Plaintiff Peter M. Galligan ("Galligan") files this Third Amended Complaint against Defendants Adtalem Global Education Inc. ("Adtalem") f/k/a DeVry Education Group ("DeVry"), Adtalem Global Health, Inc. f/k/a DeVry Medical International, Inc. ("DeVry Medical"), Ross University School of Medicine School of Veterinary Medicine (St. Kitts) Limited ("RUSVM"), and Does 1 through 50 (Adtalem, DeVry Medical, RUSVM, and Does 1 through 50 are referred to collectively as "Defendants"), and alleges as follows:

### NATURE OF THE ACTION

1.      From early childhood, Galligan's lifelong ambition and dream has been to be a practicing veterinarian.  He majored at California Polytechnic State University in animal science with an emphasis in veterinary medicine.  Whereas many students apply to vet school after performing a few hundred hours of clinical internship work, Galligan applied to RUSVM with over 5,000 hours of internship experience, mostly uncompensated, demonstrating his passion for

animals and full effort to achieve his vocational goal. He derives great joy treating animals, both large and small, and caring for and ministering to pet owners—his "calling" in life. Thus, when he matriculated to RUSVM in May 2013 after being enticed by the school's promotional materials, Galligan felt as though his goal was in reach.

2.      However, Galligan was at a disadvantage when it came to taking exams, a handicap of which RUSVM was well aware. Because of severe test anxiety—which has been diagnosed and treated by physicians, psychologists, and learning specialists—Galligan requested certain concessions from RUSVM administration when it came to taking his exams. However, despite numerous requests, which were paired with documentation from Galligan's disability treators, RUSVM refused to permit Galligan to take exams in the manner prescribed and otherwise did nothing to help Galligan with his anxiety issues. Consequently, despite countless hours studying for his classes and mastering course materials, Galligan struggled to excel on his exams.

3.      Galligan presented his documented diagnostic tests, learning challenges and treator recommendations to RUSVM Administration on three different occasions – (1) upon admission, (2) during Semester II when he was effectively gurgling blood and experiencing high levels of test anxiety, and (3) upon his return from extensive interventional therapy over a four-month sabbatical from RUSVM. However, RUSVM did nothing to help Galligan with and certainly demonstrated no concern for his anxiety issues. To the contrary, at every presentation, Galligan was silenced, discriminated against, denied equal opportunity, and totally blown off by RUSVM administrative personnel who afforded him no class examination accommodations of any kind as required by law.

4.      The inequities faced by Galligan were exacerbated by the fact that, unlike the

2

majority of his peers, he did not cheat on examinations, despite the fact that RUSVM knew that the vast majority of its students were cheating on examinations and RUSVM condoned such cheating. This reality harmed Galligan personally because RUSVM professors graded most exams on a curve. Because of its blatant disregard for this reality, RUSVM falsified applications to the Federal Government by misrepresenting the success of its students so as to enrich itself with hundreds of millions of federally-backed tuition dollars. RUSVM's actions (or inactions) also amounted to a violation of its Student Handbook, which prohibited "academic misconduct" or any acts of academic dishonesty.

5.     Galligan was dismissed from RUSVM in September 2015 without any valid basis. Galligan's dismissal was caused by several factors, including but not limited to the following:

     a. RUSVM's knowing non-compliance with the policies and procedures of its accrediting body (the AVMA), including "misleading advertisements," "integrity and responsibility in student recruitment," "services to support student wellness," "support for students with disabilities," "the protection of students," and "access to equal opportunity";

     b. RUSVM's knowing non-compliance with its own published policies relating to accommodations for students with documented disabilities;

     c. The absence of good faith and fair dealing in RUSMV's adjudication and dismissal of Galligan, which denied Galligan his right to present witnesses and evidence of his physical disability, and RUSVM's refusal, on three separate occasions, to accommodate his treators' recommendations during tests; and

     d. RUSVM's refusal to disclose the identities of or allow Galligan the opportunity to appear before his judges during a summary dismissal appeals process.

In essence, at every turn, Galligan was silenced, discriminated against, denied equal opportunity, and totally blown off by RUSVM administrative personnel who afforded him no class examination accommodations of any kind and who turned a blind eye to blatant acts of dishonesty committed by other students. Now, years later, Peter remains just a few credits shy of

attaining his lifelong dream, but for no valid reason he lacks the opportunity to do so. Left with no choice but to pursue legal action, Galligan seeks damages for the harm resulting from his abrupt dismissal from RUSVM, which are believed to be in excess of several million dollars.

## PARTIES

6. Plaintiff Peter M. Galligan is a United States citizen and a resident of the State of California.

7. Defendant Adtalem is a foreign, publicly traded, for-profit, post-secondary education, and Delaware-based corporation with its principal place of business located at 3005 Highland Parkway, Downers Grove, DuPage County, Illinois. Adtalem was known as DeVry Education Group until May 25, 2017.[1] Defendants' counsel has agreed to waive service of process on Adtalem.

8. Defendant DeVry Medical is foreign corporation organized and existing under the laws of Florida with its principal place of business located at 630 U.S. Highway One, Suite 300, North Brunswick, New Jersey 08902. According to DeVry's Form 10-K filed with the United States Securities and Exchange Commission ("SEC") on August 25, 2016, DeVry Medical is one of Adtalem's "reporting segments," and DeVry Medical operates RUSVM. Defendants' counsel has agreed to waive service of process on DeVry Medical.

9. Defendant RUSVM is located in Nevis, St. Kitts in the Caribbean. According to DeVry's SEC Form 10-K filed on August 25, 2016, RUSVM is operated by DeVry Medical, which is doing business on behalf of itself and its operating entity, RUSVM. Defendants' counsel has agreed to waive service of process on RUSVM.

10. On information and belief, Does 1 through 50 are individuals and/or entities whose identities and addresses are unknown. On information and belief, Does 1 through 50 are

---

[1] All references herein to "Adtalem" include the acts of its predecessor, DeVry.

7265291

responsible in some actionable manner for the events, occurrences, injuries and damages alleged herein.

## JURISDICTION AND VENUE

11.     This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1331 based on questions of federal law relating to Section 504 of the Rehabilitation Act of 1973, Title III of the Americans with Disability Act of 1990 (as amended), and Title IV of the Higher Education Act of 1965 ("HEA").   This Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.  Further, the Court has jurisdiction over the claims relating to Title IV, HEA because all student loan paperwork, approvals and money flowed through Adtalem/DeVry's New Jersey office in North Brunswick and the parent was located in and senior management directives were issued from Downers Grove, IL, respectively.

12.     This Court also has supplemental jurisdiction over the state law claims in this action pursuant to 28 U.S.C. § 1367(a) because Galligan's state law claims are so related to his federal claims that both form a part of the same case or controversy.

13.     This Court has personal jurisdiction over Defendants because Defendants committed the complained-of acts in this District and/or have sufficient minimum contacts with this District.

14.     Venue is proper in this Court pursuant to 28 U.S.C. §1391 because a substantial part of the events or omissions giving rise to Galligan's claims occurred in this District, which is where Adtalem is headquartered and maintains its principal place of business.

## FACTUAL BACKGROUND

*Structure of Defendant Entities*

15.     Adtalem's predecessor, DeVry, began offering bachelor's degrees in 1970.  Now, with 12,318 employees and a market capitalization of $2.75 billion (as of June 30, 2018), Adtalem has numerous academic sites throughout the United States and offshore and offers many majors and specializations including areas as diverse as healthcare, public health, technology, marketing, and business.  According to Adtalem's SEC Form 10-K filed on August 24, 2018,[2] Adtalem "operates three reporting segments," one of which is Defendant DeVry Medical located at 630 U.S. Highway One North Brunswick, New Jersey.  DeVry Medical, in turn, operates Defendant RUSVM.

16.     The last reported student enrollments at various Adtalem schools were as follows: Medical and Veterinary Schools: 5,556; Nursing: 30,309; and Adtalem Brasil: 75,700.

17.     According to its most recent 10-K, during fiscal years 2018, 2017, and 2016, respectively, Adtalem spent $80.5 million, $75.6 million, and $68.3 million on advertising, marketing, and other promotions of its educational products and services.

18.     Adtalem's 10-K also noted that RUSVM was founded in 1982 and acquired by Adtalem in 2003 and has graduated over 5000 students to date.  Effective for semesters beginning September 2017, tuition rates for the beginning basic sciences and clinical portions of the programs at RUSVM are $22,345 and $24,666, respectively, per semester.

19.     Adtalem's total gross revenues between 2008 and mid-2016 exceeded $16 billion and it recorded $1.08 billion in FYI 2017 revenues and $1.23 billion in FYE 2018 revenues.  In September 2016, Adtalem committed to voluntarily limit to 85 percent the amount of revenue that each of its six Title IV-eligible institutions derives from federal funding.  For fiscal year

---

[2] *See* https://investors.adtalem.com/Cache/394769427.pdf.

2017, 83 percent of RUSVM's revenues were sourced from federal assistance grants and loans issued pursuant to the HEA. The vast majority of RUSVM students, including Galligan, have applied to and received funds through either or both the Federal Direct Unsubsidized Loan Program or Federal Direct Graduate PLUS Loan Program.

20. RUSVM, a graduate school of veterinary medicine, is located in the Caribbean. RUSVM students complete a seven-semester, pre-clinical curriculum and, then, enter a clinical clerkship lasting approximately 12 months at one of more than 20 affiliated colleges of veterinary medicine in the U.S., Canada, Australia and Ireland, eventually earning a Doctor of Veterinary Medicine ("DVM") degree.

*Accreditation of RUSVM*

21. The U.S. Government provides an estimated $150 billion in loans every year to students participating in higher education programs through the U.S. Department of Education ("DOE"). This funding is only available to students attending accredited programs. Despite the large amount of federal dollars at stake, the DOE does not itself accredit educational programs. Rather, the DOE relies on accrediting agencies—which are federally-approved, private organizations—to assure taxpayers and students that federal financial aid is going to qualified institutions. In this case, the relevant accrediting agency is the American Veterinary Medical Association ("AVMA").[3]

---

[3] In or about 2013, the AVMA placed RUSVM on probation, apparently for various facility, research, and other violations of its policies and procedures, causing the vast majority of its revenue stream to be at high risk.

7265291

22.     Schools seeking accreditation must go through a multi-step process whereby an accrediting agency evaluates the academic program to measure its performance against the agency's own standards and those mandated by the DOE. After initial accreditation, schools must follow those criteria to maintain accreditation.

23.     Additionally, to continue to receive DOE funding, schools must adhere to the highest fiduciary standards of honesty, integrity, and truthfulness in their statements to the DOE and to the Secretary of Education. Among other things, schools must enter into Program Participation Agreements ("PPAs") with the Secretary of Education and agree to "comply with the program statutes, regulations, and policies governing the [Federal Student Aid] programs." 34 C.F.R. §§ 600, *et seq.* Schools must also certify that they have the capability of "adequately administering" a Title IV, HEA program by, among other things, "establish[ing], publish[ing], and appl[ying] reasonable standards for measuring whether an otherwise eligible student is maintaining satisfactory academic progress in his or her academic program." 34 C.F.R. § 668.32(f); *see also* 34 C.F.R. § 668.34. "Satisfactory academic progress" means that, upon review by the institution, the student is confirmed to have a "cumulative C average[] or its equivalent or academic standing consistent with the requirements for graduation, as determined by the institution[.]" 34 C.F.R. § 668.34(c)(1).

24.     With approximately 83 percent of RUSMV's revenues coming from the federal government, DOE's and AVMA's disability accommodation requirements and discrimination prohibitions, as well as DOE's requirements for Title IV, HEA programs, are extremely relevant to the issues presented and to be adjudicated in this case at bar.

*The Inducement*

25.     While contemplating which vet schools to apply for and while completing his

8

applications, Galligan reviewed numerous promotional materials, speeches, and videos published by RUSVM. Those materials induced Galligan to apply for and, after acceptance, attend RUSVM on or around July 25, 2012.

26. Among other materials, Galligan read and was enticed to apply to RUSVM by RUSVM's Strategic Vision, which underscored its effort to "[i]ncrease total student numbers via reduced attrition ... by increasing the quantity of quality student applicants, resulting in an increased completion rate...." Galligan accessed that statement and others on RUSVM's website during the weeks prior to submitting his application in July 2012, and he returned to the webpage multiple times over the ensuing eight months while his application was pending, including in April 2013 in preparation for a conference call with a RUSVM admissions officer.[4] Galligan understood that statement to have been a representation made by school officials about the goals and practices of the school. By virtue of that statement, Galligan understood that RUSVM maintained a low attrition rate by accepting only applicants it expected to complete their studies successfully. Galligan further understood the statement to mean that RUSVM would take reasonable measures to reduce attrition and ensure high completion rates, such as by accommodating students with documented disabilities (such as himself). Doing so, Galligan believed, would unquestionably afford students the greatest opportunity to complete their studies successfully in line with the school's stated Strategic Vision. Galligan's beliefs were affirmed during his call with a RUSVM admissions officer in April 2013, who assured him of RUSVM's strong support of him and of RUSVM's low attrition rate, high graduation rate, and 90 percent-plus pass rate on the NAVLE vet licensing exam.

---

[4] The statement was available at the following URL: http://www.rossu.edu/veterinary-school/StrategicPlan.cfm. However, the statement was no longer present on RUSVM's website as of the date Galligan filed his original complaint and remains absent from the school's website as of the present date. Nevertheless, Galligan has retained a copy of that webpage in his records and can furnish a copy upon the Court's request.

7265291

27.     In addition, before applying to RUSVM in July 2012 and while his application was pending in April 2013, Galligan read on the RUSVM website and was impressed and enticed by the RUSVM Student Handbook, which prohibited "academic misconduct," "use of improper use of examination materials and other forms of dishonesty," "stealing," "breaches of ethics," and test "cheating."

28.     Further, Galligan's due diligence search on the Internet prior to applying to RUSVM (in July 2012) uncovered "Culture of Care" statements by Illinois-based DeVry Education President and CEO Daniel Hamburger.  Namely, Hamburger professed that "[. . .] I think it is critical for shareholders to understand that our culture of care is a palpable differentiator for us, for our students and also for attracting and retaining the professors other colleagues who share our values.  Fundamentally, DeVry Group's culture of care is about our collective passion and focus on achieving the best outcomes for our students.  [. . .]  And how do we deliver DeVry Group Care?  By staying true to DeVry Group's purpose, vision and ... values ... [one of which is] accountability.  We are owners.  We take initiatives [*sic*], speak up and act with integrity in all we do...." Galligan concluded, as would anyone, that Hamburger's assurances of accountability and integrity extended to RUSVM not only because RUSVM fell under DeVry's umbrella, but also because RUSVM's own Student Handbook included mandates relating to disability accommodations and academic and test-taking honesties.

29.     However, as Galligan later learned, those inducements turned out to be false because he was dismissed from RUSVM from no reason before he completed his studies, having received absolutely no accommodations for his well-documented learning disabilities or for the rampant cheating by fellow students on course examinations (in which he did not partake) which impacted course grades and curves.  In other words, RUSVM did nothing to reduce attrition or

ensure the successful completion of studies when it came to Galligan, despite abundant documentation supporting his requested and medically-necessary accommodations. Moreover, RUSVM's visionary statement also turned out to be false because, as Galligan later learned, the way the school apparently sought to increase its graduation rate and ensure low attrition was by turning a blind eye to cheating by its students. Hamburger's pronouncements regarding DeVry's "Culture of Care" likewise were false, as Defendants failed to take initiative or act with integrity or accountability by refusing to accommodate Galligan's learning disabilities and by turning a blind eye to widespread cheating.

30.     Among other accountabilities, the above representation must comply with and honor the AVMA's "Programmatic, Advertising and Student Recruitment Policies," which decrees:

> The following are some of the areas where special efforts must be made to ensure integrity of the [accreditation] process:
>
> [. . .]
>
> > b. The college must refrain from <u>misleading advertisements of the program, and must correct any inaccuracies</u>.
>
> [. . .]
>
> Accredited veterinary medical colleges, or individuals acting on their behalf, are expected to exhibit <u>integrity and responsibility</u> in programmatic advertising and student recruitment. Responsible self-regulation requires <u>rigorous attention</u> to the ethical principles [. . .] in all matters of conduct.
>
> [. . .]
>
> Colleges shall adhere to the following principles of ethics:
>
> > b. All statements and representations must be <u>clear, factually accurate, and current</u>.[5]

---

[5] Accreditation Policies and Procedures of the AVMA Council on Education (hereinafter, "AVMA Policies and Procedures") §§ 5.2(b), 5.6 (March 2014) (revised September 2014) (emphases added).

11

7265291

However, the trophy-rhetoric by Adtalem, DeVry Medical, and RUSVM through their promotional documents did not comport with the AVMA's policy mandates or RUSVM's actual practices with its vet students.[6]

*Plaintiff's Beginnings at RUSVM*

31.     After notification of his acceptance to RUSVM, Galligan moved to St. Kitts—a remote, crime-ridden, and poverty-stricken island in the Caribbean—and began Semester I classes in May 2013.  The academic rigors were challenging, generally requiring 100 or more hours of study, class attendance, and clinical work each week by Galligan, which he undertook with button-bursting enthusiasm and positive expectancy.

32.     Immediately upon arriving in St. Kitts, Galligan notified RUSVM psychologist Dr. Janet Camp—the only school resource available on campus for 900 students—of a learning challenge that had plagued him since junior high school.  Galligan has an extremely high IQ and exceptional long-term memory, but suffers anxiety attacks during school examinations.  Psychiatrists, psychologists, and learning specialists had given and interpreted for Galligan a battery of diagnostic tests over the years, including:

- Woodcock Cognitive: Processing Speed Cluster;

- Beery-Buktenica Test of Visional Motor Integration;

- Gates MacGinitie Silent Reading Test, Woodcock-Johnson Achievement;

---

[6] This is not the first time Defendants have faced complaints with respect to their advertising.  In January 2016, the U.S. Federal Trade Commission ("FTC") filed suit against DeVry, DeVry University, Inc., and DeVry New York, Inc. alleging that their advertisements deceived consumers about the likelihood that students would find jobs in their fields of study and would earn more than those graduating with Bachelor's degrees from other colleges or universities.  In its complaint, the FTC alleged that DeVry's representation that 90 percent of its graduates actively seeking employment landed jobs in their field within six months of graduation was deceptive.  The complaint also charged that another contention made by DeVry—that its graduates had 15 percent higher incomes one year after graduation on average than the graduates of all other colleges or universities—was deceptive.  The complaint noted these claims appeared in DeVry's advertising on television, radio, online, print, and other media.  On December 15, 2016, the FTC announced that Adtalem agreed to a $100 million settlement that "secure[d] significant financial redress for tens of thousands of students harmed by DeVry's conduct."

7265291

- Woodcock-McGrew Werder MBA;

- Woodcock-Johnson III Tests of Cognitive Ability;

- Woodcock-Johnson III Tests of Achievement, Reading, Math, Written Language and Academic Fluency;

- Wechsler Adult Intelligence Scale - Third Edition;

- Learning Efficiency Test - Second Edition;

- Nelson-Denny Reading Test - Form G - Comprehension;

- Comprehension Test of Phonological Processing, Development Test of Visual Motor Integration, Achenbach Child Behavior Checklist; and

- Brown ADD Scales Test.

33. During his periods of test-induced trauma, Galligan suffered from a racing heart, rapid and uncontrollable breathing paradoxically coupled with a desperate need for more oxygen, hot sweats, paranoid ideation, unclear thoughts, poor decisions, and a sense of hopelessness. The treatment recommendation during school examinations as excerpted from the medical chart of one of his treators:

> "Because of his learning disabilities, Peter will benefit from academic accommodations to insure (sic) his success. Extended test time and use of a separate room on school tests and standardized exams will be useful and appropriate accommodations."

34. Galligan presented Dr. Camp with these test results and treator recommendations, all of which had been granted during his high school and college examinations. Galligan's treating psychologist, Dr. Timothy Englemann, also e-mailed Dr. Camp directly and specifically requested testing allowances for Galligan, including "separation from other classmates." However, Dr. Camp refused Galligan's plaintive pleas for more time and quiet space, despite the fact that these same minor concessions were routinely given to other students.

13

*Plaintiff's Academic Progress at RUSVM*

35.     Notwithstanding Dr. Camp's refusal to accommodate Galligan's documented learning disability, he successfully passed all classes his first semester.  However, with pressures and stresses mounting, Galligan experienced excruciating test anxiety problems during Semester II and began failing examinations.  Recognizing the familiar pattern and simple cure, Galligan approached Dr. Camp toward the latter part of the semester, cited examples of other students similarly accommodated, and begged her to help him.  His entreaties for more exam time and a separate room were refused.  Consequently, Galligan experienced even more severe anxiety during the remaining examinations and, ultimately, failed three of his four classes.

*A Therapeutic Sabbatical*

36.     On January 8, 2014, former Associate Dean for Academic Affairs, Guy St. Jean, approved a "leave for the Jan[uary]-April 2014 semester" so that Galligan could "get [his] medical condition stabilized," which was predicated on Galligan submitting to Dr. St. Jean "prior to the start of the May 2014 semester medical documentation from [his] physician stating that [he would be] ready to return to the program."  Dr. St. Jean's statements irrefutably evidence RUSVM's full awareness of Galligan's medical disability.

37.     Galligan returned home to California and began working intensively with his psychologist, Dr. Timothy Engelmann, over the next four months to identify anxiety-producing triggers and develop a series of interventional anxiety-reducing strategies and various learned techniques to ameliorate his symptoms.  Dr. Engelmann referred Galligan to Michelle Kwok, MD, Board-certified in adult psychiatry, who also worked on supplemental therapies after diagnosing Galligan's core issue as "Generalized Anxiety Disorder," International Statistical Classification of Diseases 10 F41.1.  Treatment included prescriptions of Klonopin and Zoloft.

14

Religiously following Drs. Engelmann's and Kwok's treatment plans and prescribed medicines, Galligan's anxiety issues were much reduced and began to resolve.

*Upward and Onward Toward His Goal*

38.     Armed with these proven remedies and a renewed sense of confidence and hope, Galligan returned to St. Kitts in April 2014 to retake make-up Semester II classes and begin Semester III.

39.     Upon his arrival, Galligan met again with Dr. Camp, updated her on the clinical diagnosis and treatment plan prescribed by Drs. Engelmann and Kwok as well as his progress to date, and presented her with a duplicate hard copy of the email Dr. Engelmann transmitted to Dr. Camp on May 5, 2014, formally requesting separate room accommodations for Galligan during examinations.  Verbal recommendations for extra exam time were also made by Dr. Engelmann. Inexplicably, *for the third time*, Galligan's petition was denied.

40.     However, Galligan was encouraged by a subsequent letter sent to him by former Associate Dean St. Jean on May 21, 2014, that promised in unambiguous and quantitative words that Galligan would be removed from academic probation status if he earned a cumulative GPA of 2.0 or above, which was required to demonstrate "Satisfactory Academic Progress." Associate Dean St. Jean also referenced the RUSVM Student Handbook which cautioned that students on academic probation for two consecutive semesters would be ineligible to receive Title IV financial aid and that a student "who receives a grade of 'F' or 'WF' while on Academic Warning or Academic Probation is subject to dismissal and/or loss of financial aid eligibility." So, Galligan, following St. Jean's written directive, set his goals: Pass all classes next semester to be removed from probation and maintain a 2.0 GPA thereafter—a very clear, mutually agreed, and straight path forward.

7265291

41.     Galligan threw himself into his classes and, over Semesters III, IV and V, passed the following consecutive classes: Immunology, Gross Anatomy 2, Parasitology, Virology, Pathology 1, Pharmacology 1, Bacteriology and Mycology, Mechanisms of Disease, Veterinary Public Health and Epidemiology, Pathology 2, Clinical Pathology, Pharmacology 2, Diagnostic Imaging, Anesthesiology, Toxicology.  Galligan failed *no* classes.  His cumulative GPA was 2.3—well above Dr. St. Jean's 2.0 minimum threshold.

42.     Emboldened by the promises and assurances in Associate Dean St. Jean's second letter, 15 classes successfully passed, the removal of probation status per the Student Handbook, and the support of RUSVM in facilitating additional Title IV loans over three semesters—thereby confirming his "deal" with St. Jean—Galligan believed he was well on his way to graduating from RUSVM in only eight months.

*The School-Wide RUSVM Test Cheating Scandal*

43.     Former U.S. Secretary of Education, Arne Duncan, opined: "Cheating reflects a willingness to lie at a [student's] expense to avoid accountability – an approach I reject entirely."[7]  He further opined:

> Cheating [on school examinations] in the first degree refers to willful and sometimes premeditated acts including: ... overtly and covertly providing correct answers on tests.... Cheating in the second degree includes more subtle forms of misconduct such as: ... cueing students on incorrect answers…distributing 'cheat sheets' . . . .[8]
>
> [. . .]
>
> Test administrators [should] ... establish and monitor the chain of custody [of tests] and limit who has access to [test] materials, make sure all who have contact with the testing materials record when and where they accessed the materials, ensure the [test] materials are kept in a secure location when not being

---

[7] "Testing Integrity: Issues and Recommendations for Best Practice," DOE Institute of Education Sciences, Nat'l Center for Education Statistics (2013), at p. 1.
[8] *Id.* at p. 3.

administered ... and make clear that failure to secure materials or providing false or misleading information on the chain of custody may carry consequences . . . .[9]

44.     During 2014, RUSVM's Administration was on high "public alert" because its probationary status with the AVMA—RUSVM's money-critical and life-sustaining accrediting body—had just been lifted after RUSVM was cited for several unrelated violations.

45.     In or about mid-2014, a Teaching Assistant for one of the professors at RUSVM gave many of her students a copy of a previous test complete with often-repeated questions and professor-approved answers, and these students in turn gave a copy of the same to many other students. When the professor next tested his students (using a test comprised of the previous questions), a very high percentage of his students received inordinately high and out-of-normal-range grades on the test.

46.     The lifting of the probationary status by the AVMA and the conspicuous and embarrassing number of students in one class receiving grades of "A" prompted RUSVM's Administration to assemble all 900 RUSVM students for a lecture by Associate Dean of Teaching and Learning, Carmen Fuentealba. In her lecture, Assistant Dean Fuentealba stressed intellectual honesty, declaring that any student's use of test banks is "cheating" and is against RUSVM's policy, and that any student caught reviewing previous tests would be disciplined.

47.     Galligan, an Eagle Scout, church leader since high school and a student who follows the rules, heard Associate Dean Fuentealba's message loud and clear, and he complied fully with her mandate to never consult test banks prior to sitting for examinations.

48.     Regrettably, the vast majority of Galligan's classmates perceived Associate Dean Fuentealba's words as mere "wink and nod" banter because, as explained below, the practice of test cheating was so widespread and so implicitly shrugged off by RUSVM's Administration

---

[9] *Id.* at pp. 5-6.

and, most tellingly, the students witnessed no prior or subsequent enforcement of Associate Dean Fuentealba's test bank usage threats. Incredibly, the Teaching Assistant and the students involved were not disciplined, no students were required to take a new test, no student had his or her grades reduced, and no professors were warned to stop repeating test questions on examinations. Also, most recognized RUSVM's financial incentive to pass the students along to the next semester so that RUSVM would earn even more Title IV, HEA dollars.[10]

49. It was common practice on the RUSVM campus for most students to share previous class exams with each other through what were known as "test banks." Although student test banks and other forms of sharing examinations exist at other schools, the practice at RUSVM was different in five separate, unique and unethical ways:

A. RUSVM test banks contained copies of actual tests;

B. Few, if any, RUSVM professors returned completed examinations to students, so examinations in the test banks had to have been stolen;

C. Almost all RUSVM professors repeated some, and the majority of professors repeated many, of their previous questions on new examinations;

D. RUSVM professor-approved answers were also appended or circled for all tests in the banks, thus giving students who reviewed historical exams in advance access to both test questions and professor-desired answers before walking into the exam room and taking their examinations; and

E. RUSVM's Administration publicly condemned student test banks, but privately did little to nothing to identify how tests in the banks were stolen, hold the thieves to account and discipline those who used student test banks.

---

[10] Notably, all loan paperwork for RUSVM students, approvals, and money flowed through Adtalem/DeVry's New Jersey office in North Brunswick, whose parent was located in and senior management directives were issued from Downers Grove, IL, respectively. As such, the flow of Title IV, HEA funds to RUSVM is linked directly to Illinois.

50.     Despite the widespread use of test banks by RUSVM students,[11] Galligan at all times heeded Dean Fuentealba's mandate and studied honestly and diligently for his exams, never once accessing or using the test bank.

*Galligan's Dismissal for Two Missed Questions in One Class*

51.     As Galligan progressed successfully through Semesters II, III and IV, passing all classes with no accommodations for his documented disability, and as he was nearing the end of his program at RUSVM during Semester V, he entered Professor Patrick Kelly's Small Animals Medicine 1 in May of 2015.  Galligan did not pass Dr. Kelly's class, missing a passing grade of 70% by only two points or two questions.

52.     Dr. Kelly, an elderly professor, had a well-known reputation for repeating a very high percentage of his examination questions.  It is estimated that for his cardiology exam in Small Animal Medicine 1, Dr. Kelly took 40% or more of his test questions from his previous exams.  For instance, 15 sample test questions repeated by Dr. Kelly over and over were:

–   Which of the following statements about heart worm disease is incorrect...?
–   Which of the following statements about the prophylaxis of heart worm is incorrect...?
–   Which of the following statements about the treatment of heart worm disease is incorrect...?
–   Which statement about feline ear worm disease is incorrect...?
–   Which of the following statements about chronic valve disease is incorrect...?
–   Which statement about hypertrophic cardiomyopathy in cats is incorrect...?
–   Initial therapy for a dog in severe left heart failure should include...?
–   Which of the following is the drug of choice for the treatment of VPD with R on T phenomenon...?
–   A 7 year old boxer presents with a history of collapsing, irregular heart rhythm. Which diagnostic would you do...?
–   Which of the following statements is true about murmurs...?

---

[11] The widespread use of test banks has resulted in the majority of RUSVM students failing to actually learn the material, which is borne out by the consistently-declining passage rate of RUSVM students on the NAVLE vet licensing exam.  Indeed, RUSVM's pass rate has steadily declined over the last few years: 94% in 2013-2014, 90% in 2014-2015, 86% in 2015-2016, 83% in 2016-2017, and 82% in 2017-2018.  This decline is alarming not only because it amounts to 12% over the last 5 years, but also because it puts RUSVM substantially below the vet school average in the U.S. which is well over 90%.

7265291

- A 12 year old Cavalier King Charles Spaniel with chronic cough, you detect grade 3 AV block with mid systolic murmur loudest over the mitral valve. What are the next 2 diagnostic tests...?
- Which of the following is not associated with prolonged QRS...?
- What does a Holter Monitor investigate...?
- Which of the following about L-R shunts is correct...?
- Which statement about aortic stenosis is correct...?
- Which of the following about HCM in cats is correct...?

53. Because of Dr. Kelly's well-known pattern and pattern of copying and pasting the same exam questions again and again, Galligan and some of his classmates have estimated that up to 80-90% of students in Dr. Kelly's classes consulted the test banks that included not only actual copies of previous exams—at least six in number—with Dr. Kelly-approved answers yellow highlighted, but also a compendium of hundreds of sample questions and desired answers taken from previous exams—over 300 in number. With that advantage, the vast majority of students walked in to Dr. Kelly's Small Animal Medicine 1 cardiology exam in the spring of 2015 having had the benefit of studying almost half of his exam questions and desired answers.

54. Unlike the vast majority of his classmates, Galligan complied with Associate Dean Fuentealba's directive and the demands of the RUSVM Student Handbook, and he did not cheat on Dr. Kelly's exam. However, as an unfortunate by-product of his strong moral compass, Galligan did not pass Small Animal Medicine 1, missing a passing grade of 70% by only two points, or two questions. RUSVM Administration dismissed Galligan from its Doctor of Veterinary Medicine program ostensibly because of his "failure" to pass the class.

*"Kangaroo Court" of an Appeals Process*

55. Having devoted most of his adult life to the pursuit of veterinary medicine, Galligan was devastated upon receiving news of his dismissal and took the following actions. Galligan attempted to:

- Meet with Dean Elaine Watson and other RUSVM administrators to discuss his dismissal

appeal (which requests were denied);

- Argue that, as assured by Associate Dean St. Jean's May 21, 2014 letter, his probation period expired one year prior after successful completion of Semester II classes during the summer of 2014 and, separately, as confirmed by RUSVM's approval and facilitation of three additional semesters of Title IV loans, RUSVM Administration had no legitimate grounds for the dismissal pursuant to its own written policies and Dr. St. Jean's assurances (such argument was overruled);

- Present evidence of other students who had failed several classes, but were still on RUSVM's active roster and taking classes (this effort was rejected);

- Present evidence of his documented learning disability and unheeded written appeals communicated to Dr. Camp by his treators for examination accommodations afforded other students (which request was denied); and

- Learn the names of RUSVM faculty and staff on the appeals committee and ask to appear before them in person (which request was denied).

56. To add insult to injury, Galligan—an Eagle Scout and church leader with no history of violence of any kind, or threats of violence of any kind, or non-academic disciplinary action of any kind—was informed without any justification whatsoever that if he appeared on campus again, he would be arrested. To his extreme embarrassment, Galligan's picture was posted in all security stations around the campus and security officers were informed by RUSVM Administration to halt his entrance to the school. This outrageous intimidation flies smack in the face of Defendants' own broadcasted, clear and mandatory policies and procedures relating to retaliation. The RUSVM Student Handbook reads:

> RUSVM prohibits retaliation against anyone who reports an incident of alleged harassment, discrimination, or other unlawful conduct, or any person who assists or participates in a proceeding, investigation or hearing relating to such allegations. Retaliation includes, but is not limited to, any form of intimidation, reprisal, or harassment. . . .[12]

57. In reality, Galligan was dismissed and his appeals for reinstatement were rejected

---

[12] RUSVM Student Handbook at § 1.8.7.2 (Mar. 16, 2017) (available at https://veterinary.rossu.edu/content/dam/dmi/veterinary/documents/3%20RUSVM%20Student%20Handbook%20March%2016%202017.pdf).

7265291

in September 2015 because he confronted RUSVM's Administration about:

A.    Widespread cheating on examinations that included many repeat questions and professor-approved answers being distributed to and memorized by fellow classmates—a practice publicly condemned but privately condoned, indeed encouraged, by RUSVM's Administration;

B.    RUSVM's non-compliance with its own published policies relating to "academic misconduct," the student "Honor Code," "examination dishonesty," and "breaches of veterinary medical ethics,"[13] as well as its failure to provide accommodations for students with documented disabilities;

C.    RUSVM's non-compliance with the policies and procedures of its accrediting body—the AVMA—including "unbiased grading procedures," "fair and equitable assessment of student progress," a "fair and uniform grading system,"[14] as well as

---

[13]  Section 1.6.2.1 of the RUSVM Student Handbook contains the following provisions:

"Academic Misconduct": "It is an offense for any candidate (student) to make use of unfair means in any RUSVM assessment (e.g., test), to assist a candidate (another student) to make use of such unfair means, to do anything prejudicial to the good conduct of the assessment.... Receipt or transmission of unauthorized aid on ... examinations, ... unauthorized and/or improper use of examination materials or other forms of dishonesty in academic affairs are also considered as academic misconduct. Any candidate found to have cheated or attempted to cheat in an assessment may be deemed to have failed that assessment... ." § 1.6.2.1.

"Accessory" is defined as: "Aiding, abetting, inciting or cooperating with another person in the commission of a violation of RUSVM regulations, policies, the Honor Code or this Code of Conduct... ." § 1.6.2.2;

"Honor Code": "... Specific violations are as follows: 'Any acts of academic dishonesty pertaining to any quiz, examination or assignment' and '... giving or receiving aid during examinations...' and '... stealing ... or ... diverting for one's own use any property of RUSVM...' § 1.7; and

"Ethical, Attitudinal and Behavior Requirements": "... Because the medical profession is governed by ethical principles and bylaws, a veterinary student must have the capacity to understand, learn and abide by relevant and applicable values and laws. Examples of breaches of veterinary medical ethics include, but are not limited to: cheating ... or other forms of academic dishonesty..." § 2.4.1.

Dr. Kelly never returned his examinations to students. Therefore, inclusion of his exams by students in the test banks could have occurred only if actual examinations were stolen.

Again with the tacit permission of RUSVM's Administration, the vast majority of Galligan's classmates in Dr. Kelly's Spring of 2015 Small Animal Medicine 1 course aided, abetted and cooperated with other students and committed "academic misconduct," violated RUSVM's "Honor Code," engaged in dishonesty and breached RUSVM's "ethical requirements" by stealing and improperly using previous examination materials containing repeat questions, gave or received aid to each other during quizzes and examinations by colluding on answers—all in a conspiratorial and self-serving effort to raise their grades. In contrast, Galligan took Associate Dean Fuentealba's admonishments and threats literally and did not engage in any of these activities. As a direct and proximate result, Galligan did not score a passing grade of 70% in Dr. Kelly's class.

[14] The "Integrity Section" of the AVMA's "Fundamental Principles of Accreditation" in its policies and procedures mandates:

The following are some of the areas where special efforts must be made to ensure integrity of the (accreditation) process: ... The college must make every effort to protect students. The protection must include, but is not limited to **unbiased grading procedures** and access to educational opportunities ... and student services... .

AVMA Policies and Procedures § 5.2(c) (emphasis added). Also, "[t]he (vet school) curriculum shall provide: **fair and equitable assessment of student progress**. The grading system for the college must be relevant and **applied to all students in a fair and uniform manner**..." *Id.* at §7.9(h) (emphases added). Obviously, with 80-90% of Dr.

"services to support student wellness," "support for students with disabilities," and "the protection of students"; and

D. RUSVM's refusals to adhere to "best practices" relating to the testing of students and "chain of custody" protection of examinations consistent with the standards of the Department of Education and the allowance, indeed green-lighting, of "cheating" by its students as defined by the Department.[15]

In other words, RUSVM readily dismissed Galligan from its program in retaliation for his bringing to light RUSVM's numerous indiscretions.

*Defendants' Non-Compliance with the AVMA's Student Disability Policies*

58. Under its "Requirements of an Accredited College of Veterinary Medicine," the AVMA mandates:

Student support services ***must*** be available within the college or university. These ***must*** include, but are not limited to, appropriate services to support student wellness and to assist with meeting the academic and personal challenges of the DVM program; . . . [and] support for students with learning or other disabilities.[16]

59. However, no support or wellness services of any kind were made available to Galligan by RUSVM to assist him with his fully disclosed personal challenges or his documented learning disabilities.

*RUSVM's Non-Compliance with Its Own Disability Policies*

60. Further, the RUSVM Student Handbook, Sections 1.11.3, 1.11.4, and 1.11.5, respectively, declare:

---

Kelly's students having 40% or more of his Small Animal Medicine 1 cardiology exam questions and his desired answers memorized before walking into his examination room, with the "nodded head" and "thumbs up" quiet approval of Administration, the RUSVM grading system is anything but "fair," "equitable," "uniform" or "unbiased."

[15] Galligan does not know how photocopies of actual tests or questions were continually, pervasively and surreptitiously sourced by other students, but their presence in the hands of most students raises serious custody and control deficiencies by RUSVM's Administration, staff and faculty. Given the wide distribution of hundreds upon hundreds of previous test questions, correct answers and copies of actual tests accessible to students on Google Drive and other Internet platforms, RUSVM similarly breached its obligation to Galligan through its inadequate chain of custody of, limiting access to and physical control over previous Small Animal Medicine 1 examinations, as well as many other exams he took for the 20 total classes he passed successfully.

[16] Accreditation Policies and Procedures of the AVMA Council on Education § 7.6 (March 2014) (revised September 2014) (emphases added).

### 1.11.3 Commitment to Non-Discrimination and Equal Opportunity

It is RUSVM's policy to provide an environment free of unlawful harassment or discrimination based on [. . .] disability [. . .] or any other category protected by applicable law.  RUSVM complies with all applicable laws regarding discrimination, harassment, retaliation and equal opportunity.

### 1.11.4 Accommodation of Students with Disabilities

As part of its dedication to making educational opportunities available to a diverse range of students, RUSVM is committed to ensuring that qualified students with disabilities are afforded reasonable accommodations .  [. . .]"

### 1.11.5 Mental Health

The mental and emotional stability of students is a primary concern of RUSVM. [. . .]  The RUSVM Counseling Center is available to provide support and assistance to RUSVM students in maximizing their success while at RUSVM.  [. . .]"

Yet RUSVM did not reasonably accommodate Galligan's documented test-taking disability during examinations, provide support or assistance to Galligan to maximize his success, or comply with applicable law by providing Galligan an equal opportunity environment free of unlawful discrimination based on his disability.  And, with only one clinical psychologist available for 900 students struggling with the extreme rigors of a challenging veterinary medicine program, among other issues, on a remote island hundreds of miles from the United States, there were simply no clinical mental health resources available to Galligan to overcome his issues.

*RUSVM's Non-Compliance with Its Own Retaliation Policies*

61.     The RUSVM Student Handbook reads: "RUSVM prohibits retaliation against anyone who reports an incident of alleged [. . .] unlawful conduct, or any person who assists or participates in a proceeding, investigation or hearing relating to such allegations.  Retaliation

includes, but is not limited to, any form of intimidation, reprisal or harassment."[17]

62.     However, Galligan was not permitted proffer witnesses to testify to the facts presented above and submit supporting documentary evidence in his dismissal appeal, was treated differently than other students who failed multiple classes and were not dismissed, was deemed to be on probationary status contrary to RUSVM policy and the terms of Associate Dean St. Jean's May 21, 2014 letter, and was effectively thrown off the island of St. Kitts—not for "flunking" Dr. Kelly's class, but rather, as a form of reprisal for having the courage to raise numerous issues—including RUSVM's condoning of widespread cheating by its students and its failures to accommodate his documented learning disability.

*RUSVM's Non-Compliance with Its Own Ethical Policies and Procedures*

63.     Under the section entitled "Academic Misconduct," the RUSVM Student Handbook provides: "It is an offense for any [student] to make use of unethical or unfair means in any RUSVM assessment, to assist a covered person to make use of such unfair means, [or] to do anything prejudicial to the good conduct of the assessment[.]  . . .  ***Receipt or transmission of unauthorized aid on assignments or examinations, plagiarism, unauthorized and/or improper use of examination materials, or other forms of dishonesty in academic affairs are also considered as academic misconduct.***  Any covered person found to have cheated or attempted to cheat in an assessment may be deemed to have failed that assessment and will be subject to disciplinary action."[18]

64.     The Handbook further provides: "Because the medical profession is governed by ethical principles and bylaws, a veterinary student must have the capacity to understand, learn and abide by relevant and applicable values and laws.  Examples of breaches of veterinary

---

[17] RUSVM Student Handbook at § 1.8.7.2.
[18] RUSVM Student Handbook at § 1.6.2.1 (emphasis added).

7265291

medical ethics include, but are not limited to: ***cheating, plagiarism, or other forms of academic dishonesty*** . . . .”[19]

*Adtalem Attorney Misconduct*

65.     To further muzzle Galligan, and in violation of Florida Rules of Professional Conduct 4-4.2(a), Adtalem continued its outrageous conduct by communicating directly with him through its internal legal counsel, Audrey B. Kaplan, Esq., via email on December 28, 2015, without the knowledge or consent of Galligan's attorney and long after Adtalem and RUSVM had been informed multiple times in writing that Galligan was represented by counsel and intended to file an action against Adtalem and RUSVM.[20]

66.     In addition, and as a separate ethical violation, Adtalem—through its internal legal counsel, Kaplan—improperly obstructed Galligan's access to evidence.[21]    Kaplan threatened Galligan in her email, not copied to his counsel, with these words of intimidation and implied retribution: "Therefore, you should refrain from continuing to pursue this matter with individual colleagues[22] at RUSVM.  It would be inappropriate for the faculty to respond, and your communications will ultimately be forwarded to me."

67.     Under threat of being arrested if he appeared on campus, and under a lawyer's threat of consequences were he to talk to classmates or faculty, Galligan had no ability to defend his rights to reinstatement and to prosecute his case against Defendants.  Subsequently, through his legal counsel, Galligan appealed RUSVM's dismissal decision all the way to both the Chief

---

[19] RUSVM Student Handbook at § 2.4.1 (emphasis added).
[20] This act runs afoul of the Model Rules of Professional Conduct (specifically, Rule 4.2), which has been adopted verbatim as Rule 4.2 of the Illinois Rules of Professional Conduct.
[21] Such act runs afoul of the Model Rules of Professional Conduct (specifically, Rule 4.3), which has been adopted verbatim as Rule 4.3 of the Illinois Rules of Professional Conduct.
[22] Merriam-Webster defines the term "colleague" as "[a] person who works with you, a fellow worker."  By that definition, Kaplan's prohibition was directed to fellow students.

Executive Officer and General Counsel of Adtalem, who did not reply to his passionate pleas for reconsideration and reinstatement.

## CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF
### Fraudulent Inducement

68.     Plaintiff incorporates by reference and realleges all paragraphs above as if written in full herein.

69.     Defendants intentionally made material, knowing, false, misleading and deceptive representations of fact to Galligan in their advertisements and promotions intended to cause Galligan to act.  Galligan relied on the truth of those inducements, resulting in severe injury.  In particular, Defendants did not "increase total student numbers via reduced attrition . . . by increasing the quantity of quality student applicants, resulting in an increased completion rate" because they did not accommodate his well-documented learning disabilities, nor did they control and secure the rampant distribution of tests with repeat questions and professor-approved answers or prevent widespread cheating on examinations by students.

70.     In his decision to attend RUSVM and during his time on campus, Galligan relied on RUSVM to fully comply with its own published policies, procedures and promises as memorialized in the publications cited above as well as in the RUSVM Student Handbook, including:

- "It is RUSVM's policy to provide an environment free of unlawful harassment or discrimination based on ... disability[.]"[23];

- "RUSVM complies with all applicable laws regarding discrimination, harassment, retaliation and equal opportunity..."[24];

---

[23] RUSVM Student Handbook at § 1.11.3.
[24] *Id.*

- "RUSVM is committed to ensuring that qualified students with disabilities are afforded reasonable accommodation...";[25]

- "The mental and emotional stability of students is a primary concern of RUSVM...."; and

- "It is an offense for any candidate to make use of unfair means in any RUSVM assessment, to assist a candidate to make use of such unfair means, [or] to do anything prejudicial to the good conduct of the assessment. . . . Receipt of transmission of unauthorized aid on assignments or examinations, . . . unauthorized and/or improper use of examination materials, or other forms of dishonesty in academic fairs are also considered as academic misconduct."

However, he found none of the above statements to be real, actualized or even close to the truth.

71.     In defiance of the imperatives of RUSVM's own Student Handbook and published Strategic Vision, as well as the mandates issued by its governing entity (the AVMA), when it came to Galligan, RUSVM did not provide an environment free from harassment or discrimination based on disability; did not adhere to applicable laws regarding discrimination, harassment, and equal opportunity; did not afford reasonable accommodations; did not at all seek to protect or ensure Galligan's mental health or emotional stability despite his well-documented learning disability; and did not provide an environment free of widespread breaches of academic honesty and mass student cheating on examinations.

72.     Defendants fraudulently induced Galligan to leave his home in California, enter their backbreaking veterinary medicine educational program, work day and night six or seven days a week for 27 months and assume almost $190,000 in Title IV federal loan and personal debt obligations—all to be denied reasonable accommodations and, ultimately, success.  As a direct and proximate result, Galligan was harmed and will continue to be harmed by Defendants' intentional misrepresentations, omissions, and concealments in an amount to be proven at trial, but currently estimated to be several million dollars.

---

[25] RUSVM Student Handbook at § 1.11.4.

7265291

## SECOND CLAIM FOR RELIEF
### Negligent Misrepresentation

73.     Plaintiff incorporates by reference and realleges all paragraphs above as if written in full herein.

74.     Defendants, in the course of their business, negligently provided Galligan with material, false and deceptive information, upon which he relied, to his significant detriment. Defendants had a duty to communicate accurate information to Galligan, including the standards to which it would adhere regarding retaliation and disability accommodation and honest testing of students, as set forth in the Student Handbook and detailed above.  As a direct and proximate result of RUSVM's provision of material, false, and deceptive information, Galligan was harmed and will continue to be harmed by Defendants' negligent misrepresentations, omissions, and concealments in an amount to be proven at trial, but currently estimated to be several million dollars.

## THIRD CLAIM FOR RELIEF
### Breach of Contract

75.     Plaintiff incorporates by reference and realleges all paragraphs above as if written in full herein.

76.     By admitting Galligan to RUSVM and accepting his tuition payments, Defendants agreed to an express and implied contract with Galligan which included adherence to the disability and class examination protocols, assurances, and promises contained in the RUSVM Student Handbook and adherence to the policies of its accrediting body, the AVMA.

77.     Section 2.8 of the Student Handbook makes clear that a student who is placed on Academic Probation can be removed from such status if, "at the end of the semester on [. . .] Academic Probation, they pass all courses and their cumulative GPA is 2.0 or higher."     After

returning from sabbatical in April 2014, Galligan—while on "Academic Probation"—successfully passed all of his make-up courses for Semester II, as well as all of his courses for Semesters III and IV. As such, Galligan should not have been subject to the same rules as students on "Academic Probation." Nevertheless, upon receiving a failing grade in Semester V, Galligan was immediately dismissed from RUSVM in contravention of the Student Handbook.

78. By virtue of section 1.11.3 of the Student Handbook, Defendants promoted RUSVM's "policy to provide an environment free from harassment or discrimination based on [. . .] disability [. . .] or any other category protected by applicable law." Likewise, under section 1.11.4, Defendants agreed to "ensur[e] that qualified students with disabilities are afforded reasonable accommodations," and under section 1.11.5, Defendants touted that the "mental and emotional stability of students is a primary concern[.]" However, despite presenting RUSVM administration with abundant evidence supporting his documented disability on various occasions, Galligan was not afforded reasonable accommodations. Moreover, RUSVM offered no explanation or justification for its denial of reasonable accommodations to Galligan.

79. In addition, pursuant to section 1.8.7.2 of the Student Handbook, Defendants agreed that retaliation would be prohibited against "anyone who reports an incident of alleged harassment, discrimination, or other unlawful conduct, or any person who assists or participates in a proceeding, investigation or hearing relating to such allegations." Galligan was retaliated against in the form of being dismissed from RUSVM without a valid basis and being denied a proper appeal process because he confronted RUSVM for its failure to adhere to its own policies and procedures as well as those of the AVMA, and because he reported widespread cheating at the school by other students.

80. Further, RUSVM violated many of its own Academic Misconduct and Ethical

7265291

Policies and Procedures. Under section 1.6.2.1 of the Student Handbook, RUSVM makes clear that students are prohibited from "mak[ing] use of unfair means in any RUSVM assessment" or "[doing] anything prejudicial to the good conduct of an assessment," and that a student's "[r]eceipt or transmission of unauthorized aid on assignments or examinations . . . and/or improper use of examination materials, or other forms of dishonesty in academic affairs are also considered as academic misconduct." Likewise, section 1.7 of the Student Handbook details specific violations of the Honor Code as including "[a]ny acts of academic dishonesty pertaining to any quiz, examination, or assignment" or "[g]iving or receiving aid during examinations[.]" And section 2.4.1, which sets forth Ethical, Attitudinal, and Behavioral Requirements, delineates what RUSVM considers to be breaches of veterinary medical ethics, including "cheating, plagiarism, or other forms of academic dishonesty." RUSVM violated each of the foregoing sections by failing to safeguard exams, prohibiting professors from repeating test questions, and refusing to shut down student test banks or to discipline students for using them.

81.     Finally, Defendants adopted the policies mandated by the AVMA (*i.e.*, §§ 5.2(c) and 7.9(h)) and agreed to apply "unbiased grading procedures," "fair and equitable assessment of student progress," and a "fair and uniform grading system." However, by condoning widespread cheating by the majority of students and by subjectively applying the dismissal policies to Galligan, Defendants failed to adhere to those policies.

82.     The contract between Defendants and Galligan contained an implied covenant of good faith and fair dealing, which precluded the Defendants from evading the spirit of the contract between Defendants and Galligan, willfully or negligently rendering deficient performance, interfering with Galligan's ability to benefit from its terms and conditions, acting or not acting in contravention of Galligan's reasonable expectations, failing to abide by the

31

standards, policies, and promises promulgated by the Defendants, or otherwise acting in an arbitrary, capricious, or bad faith manner with respect to Galligan.

83.     Defendants breached this covenant by making it impossible for Galligan to realize the benefits of his contract and by allowing their employees and agents to act in bad faith and in a manner that interfered with Galligan's reasonable contract expectations.

84.     Defendants' actions and omissions enumerated above represent arbitrary, capricious, or bad faith conduct toward Galligan and constitute material and substantial breaches of the contract as well as their covenant of good faith and fair dealing.  As a direct and proximate result of said breaches, Galligan was damaged and will continue being damaged in an amount to be proven at trial, but currently estimated to be several million dollars.

### FOURTH CLAIM FOR RELIEF
### Breach of Fiduciary Duty

85.     Plaintiff incorporates by reference and realleges all paragraphs above as if written in full herein.

86.     Defendants owed Galligan fiduciary duties of the highest order because of the special circumstances of their relationship.  Galligan, at the time of his application to RUSVM, was 25 years of age and had virtually no business experience.  He also suffered from a medically-recognized and well-documented learning disability which required special consideration by any school he attended.  He entrusted his business affairs and his future (namely, his driving ambition to become a vet and the quality of his post-graduate education) as well as his health and mental condition (namely, his well-documented learning disabilities) to Defendants.  Defendants, especially RUSVM, had many years of experience in recruiting students and in running "for-profit" schools, including RUSVM, and in facilitating student loans

32

for their students.  Defendants were in a dominant position vis-à-vis Galligan as the providers of his education and the decision-makers with respect to his grades, academic standing, and test-taking accommodations.  Galligan placed trust and confidence in Defendants to reasonably accommodate his disabilities and avoid engaging in retaliation or other forms of discrimination toward Galligan on the basis of his disabilities.  Galligan also placed trust and confidence in Defendants to ensure a fair grading system marked by honesty, not plagued by widespread cheating by the majority of RUSVM students which, in turn, negatively impacted Galligan's grades.

87.     The duties owed by Defendants included good faith, fair dealing, loyalty, candor, full and accurate disclosure, oversight, the exercise of prudent academic and business judgment, compliance with all applicable federal and state laws, and due care.

88.     Defendants breached the fiduciary duties as described above and, as a direct and proximate result, Galligan suffered and will continue to suffer damages in an amount to be proven at trial, but currently estimated to be several million dollars.

## FIFTH CLAIM FOR RELIEF
### Alter Ego (in the alternative)

89.     Plaintiff incorporates by reference and realleges all paragraphs above as if written in full herein.  Plaintiff pleads this Fifth Claim for Relief in the alternative to the aforementioned claims.

90.     Alternatively, there is such a unity of interest and ownership that the separate personalities of Adtalem, DeVry Medical, and RUSVM no longer exist; therefore the adherence to the corporate fiction of the separate corporate existence of those entities would sanction a fraud or promote injustice.

33

91.     Indeed, as set forth on DeVry's SEC Form 10-K filed on August 25, 2016, DeVry Medical is one of Adtalem's "reporting segments," and DeVry Medical in turn operates RUSVM.  Adtalem also characterizes the employees of RUSVM and other educational programs under its umbrella as Adtalem employees.  DeVry's SEC Form 10-K further recognizes that RUSVM is "supported by administrative staff located in Miramar, Florida and North Brunswick, New Jersey."  Thus, Adtalem itself recognizes that it controls and manipulates DeVry Medical and RUSVM.  To find otherwise would promote injustice, because individuals such as Plaintiff rely on DeVry's 10-K to accurately represent Adtalem's corporate structure.

## DEMAND FOR JURY TRIAL

Plaintiff hereby requests a trial by jury.

## PRAYER

WHEREFORE, Plaintiff Peter M. Galligan requests that the Court grant the following relief in his favor:

- Compensatory damages suffered by Galligan in an amount to be proven at trial, but believed to be in excess of several million dollars;

- Restitution in an amount to be proven at trial, but believed to be in excess of $190,000, plus accrued interest owed to the federal government;

- Punitive damages;

- An injunction requiring Defendants to expunge Galligan's transcript from any and all references to dismissal, failure, academic probation, or the like;

- Reasonable attorneys' fees and costs of suit;

- Prejudgment interest; and

- Any such additional and further relief, at law or in equity, which the Court deems to be just, proper, and equitable.

7265291

Dated this 11th day of March, 2019.

Respectfully submitted,

/s/ Michael W. Ford
Michael W. Ford, Esq.
Law Offices of Michael W. Ford
*(local counsel)*
4 Timberwood Lane
Riverwoods, IL 60015
Telephone: (847) 948-7884
Email: mfordski@gmail.com
IL Bar # 0846139
Member, Trial Bar U.S. District Court N.D. IL

- and -

/s/ Emil T. Bayko
Emil T. Bayko
PORTER HEDGES LLP
1000 Main Street, 36th Floor
Houston, Texas  77002
Telephone: (713) 226-6608
Facsimile: (713) 226-6208
Email: tbayko@porterhedges.com
IL Bar # 0141356

**ATTORNEYS FOR PLAINTIFF**
**PETER M. GALLIGAN**

OF COUNSEL:
Alison P. Henderson
Texas State Bar No. 24087707
Federal ID No. 2228628
PORTER HEDGES LLP
1000 Main Street, 36th Floor
Houston, Texas  77002
Telephone: (713) 226-6000
Facsimile: (713) 226-6211
ahenderson@porterhedges.com

35