**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| PETER M. GALLIGAN, | § | |
| | § | |
| PLAINTIFF | § | |
| | § | |
| V. | § | CIVIL CASE NO. 1:17-cv-06310 |
| | § | |
| ADTALEM GLOBAL EDUCATION INC. F/K/A | § | |
| DEVRY EDUCATION GROUP; ADTALEM | § | |
| GLOBAL HEALTH, INC. F/K/A DEVRY | § | |
| MEDICAL INTERNATIONAL, INC.; ROSS | § | |
| UNIVERSITY SCHOOL OF MEDICINE | § | |
| SCHOOL OF VETERINARY MEDICINE (ST. | § | |
| KITTS) LIMITED; AND DOES 1 THROUGH 50, | § | |
| | § | |
| DEFENDANTS | § | JURY TRIAL DEMANDED |

**PLAINTIFF'S RESPONSE TO
<u>DEFENDANTS' MOTION TO DISMISS THIRD AMENDED COMPLAINT</u>**

## **TABLE OF CONTENTS**

INTRODUCTION ..................................................................................................... 1

RELEVANT BACKGROUND ................................................................................. 2

LEGAL STANDARD............................................................................................... 3

ARGUMENT AND AUTHORITIES....................................................................... 4

I.    Plaintiff's Claims for Fraudulent Inducement and Negligent Misrepresentation
      Are Based on Legally Actionable Statements. ................................................... 4

      A.    The Statement in Ross's "Strategic Vision" is a Viable Basis for Plaintiff's
            Fraud and Misrepresentation Claims. ...................................................... 4

            1.    Defendants Misconstrue the Nature of Ross's Strategic Vision
                  Statement in a Feeble Attempt at Dismissal. ................................4

            2.    Defendants' Criticism of Plaintiff's Complaint is Readily Refuted. ...........7

      B.    The Statements in Ross's Student Handbook are Viable Bases for
            Plaintiff's Fraud and Misrepresentation Claims. ................................... 8

            1.    The 1st, 2nd, and 5th Statements are Actionable. ...........................................9

            2.    The 3rd Statement is Actionable Because It Constitutes a Statement
                  of Present Fact, Not Opinion or Future Intent. .........................10

            3.    The 4th Statement Constitutes More than Mere Puffing, and
                  Contrary to Their Contentions, Defendants Did Not Adhere To It. ..........11

II.   Plaintiff has Alleged a Cognizable Breach of Contract Claim Arising from
      Defendants' Numerous Breaches of the Student Handbook and AVMA Policies. .......... 13

      A.    Defendants' Breaches of the Student Handbook vis-à-vis Plaintiff Were
            Arbitrary, Capricious, and in Bad Faith.............................................. 13

            1.    Defendants' Sanctioning of Mass Student Cheating on
                  Examinations is Arbitrary, Capricious, and Representative of Bad
                  Faith. ..........................................................................................14

            2.    Plaintiff's Dismissal from Ross was Arbitrary, Capricious, and
                  Representative of Bad Faith.......................................................15

      B.    Defendants' Breach of AVMA Policies is Actionable Because Plaintiff is
            an Intended Third-Party Beneficiary of the AVMA-Ross Relationship.............. 16

i

III.    Plaintiff's Breach of Fiduciary Duty Claim Should Survive Because He Has
        Sufficiently Alleged the Existence of a Special Relationship with Defendants. .............. 18

IV.     Plaintiff Has Adequately Pled His Alternative Claim for Alter Ego. .............................. 23

CONCLUSION ..................................................................................................................... 25

8029157

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ........................................................................................................3

*Autotech Tech. Ltd. P'ship v Automationdirect.com*,
    471 F.3d 745 (7th Cir. 2006) .......................................................................................22

*Barbara's Sales, Inc. v. Intel Corp.*,
    879 N.E. 2d 910 (N.D. Ill. 2007) ...............................................................................12

*Bd. of Educ. of City of Chicago v. A, C & S, Inc.*,
    131 Ill. 2d 428, 546 N.E.2d 580 (Ill. 1989) .................................................................8

*BI3, Inc. v. Hamor*,
    No. 08 CV 2384, 2011 WL 1231156 (N.D. Ill. 2011) ...............................................24

*Bird v. Lewis & Clark Coll.*,
    104 F. Supp. 2d 1271 (D. Or. 2000) ...........................................................18, 19, 22, 23

*Chou v. Univ. of Chicago*,
    254 F. 3d 1347 (Fed. Cir. 2001) ............................................................18, 19, 20, 22, 23

*Chou v. Univ. of Chicago*,
    No. 99 C 4495, 2000 WL 222638 (N.D. Ill. Feb. 22, 2000) .......................................20

*Cosio v. Medical Coll. of Wisconsin, Inc.*,
    139 Wis. 2d 241, 407 N.W.2d 302 (Wis. App. 1987) ..........................................15, 16

*Crown Corr, Inc. v. Wil-Freds Constr., Inc.*,
    No. 94 C 6535, 1996 WL 221204 (N.D. Ill. Apr. 30, 1996) ...................................17, 18

*Flentye v. Kathrein*,
    485 F. Supp. 2d 903 (N.D. Ill. 2007) .........................................................................24

*Goss v. Lopez*,
    419 U.S. 565 (1975) ....................................................................................................16

*Hann v. The Paul Revere Ins. Co.*,
    No. 03 C 1062, 2004 WL 557380 (N.D. Ill. Feb. 17, 2004) .......................................24

*Holbrook v. Pitt*,
    643 F.2d 1261 (7th Cir. 1981) ................................................................................17, 18

i

*Illinois Non-Profit Risk Mgmt. Ass'n v. Human Serv. Ctr. of S. Metro-East*,
   378 Ill. App. 3d 713, 884 N.E.2d 700 (Ill. App. Ct. 4th Dist. 2008) .........................................7

*Johnson v. Schmitz*,
   119 F. Supp. 2d 90 (D. Conn. 2000) ......................................................................19, 21, 22, 23

*Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*,
   476 F. Supp. 2d 913 (N.D. Ill. 2007) ........................................................................................23

*Kellers Sys., Inc. v. Transp. Int'l Pool, Inc.*,
   172 F. Supp. 2d 992 (N.D. Ill. 2001) ........................................................................................23

*Kemmerer v. Bottling Grp., Inc. v. Sentry Equip. Erectors, Inc.*,
   No. 94 C 4802, 1996 U.S. Dist. LEXIS 12642 (N.D. Ill. Aug. 29, 1996) ...............................17

*Lagen v. Balcor Co.*,
   274 Ill. App. 3d 11, 653 N.E.2d 968 (Ill. App. Ct. 2d Dist. 1995) ............................................8

*Levin v. Posen Found.*,
   No. 1:13-CV-08102, 2018 WL 1587042 (N.D. Ill. Apr. 2, 2018) ..............................................6

*Liu v. Northwestern Univ.*,
   78 F. Supp. 3d 839 (N.D. Ill. 2015) .........................................................................................16

*MAG Portfolio Consult, GMBH v. Merlin Biomed Grp. LLC*,
   268 F.3d 58 (2d Cir. 2001).........................................................................................................24

*Miller v. William Chevrolet/GEO, Inc.*,
   326 Ill. App. 3d 642, 762 N.E.2d 1 (Ill. App. Ct. 1st Dist. 2001).............................................11

*O'Driscoll v. Argosy Univ.*,
   No. 12 C 10164, 2014 WL 714023 (N.D. Ill. Feb. 25, 2014)....................................................13

*Olson v. Champaign Cty., Ill.*,
   784 F.3d 1093 (7th Cir. 2015) ....................................................................................................3

*Orzechowitz v. Nova Se. Univ.*,
   No. 13-62217-CIV, 2014 WL 1329890 (S.D. Fla. Mar. 31, 2014) ...........18, 19, 20, 21, 22, 23

*Pickett v. Hous. Auth. of Cook Cty.*,
   114 F. Supp. 3d 663 (N.D. Ill. 2015) ............................................................................3, 4, 5, 10, 25

*Rasgaitis v. Waterstone Fin. Grp., Inc.*,
   2013 IL App 2d 111112, 985 N.E.2d 621 (Ill. App. Ct. 2013)............................................5, 6

*Stargel v. NutraSweet Co.*,
   No. 13-cv-7575, 2014 WL 1662989 (N.D. Ill. Apr. 24, 2014)..................................................23

ii

*UOP v. Andersen Consulting*,
No. CV 950145753, 1997 WL 219820 (Conn. Super. Ct. Apr. 24, 1997) .............................11

**Other Authorities**

FED. R. CIV. P. 8(a)(2) ..................................................................................................................3

FED. R. CIV. P. 12(b)(6)................................................................................................................3

8029157

Plaintiff Peter M. Galligan ("Plaintiff") files this Response to the Motion to Dismiss Third Amended Complaint [ECF Nos. 62-63] filed by Defendants Adtalem Global Education Inc. f/k/a DeVry Education Group ("DeVry Group"), Adtalem Global Health, Inc. f/k/a DeVry Medical International, Inc. ("DeVry Medical"), and Ross University School of Medicine School of Veterinary Medicine (St. Kitts) Limited ("Ross") (collectively, "Defendants").

## INTRODUCTION

At this point in the proceeding—the third round of briefing surrounding Defendants' continued attempts to dismiss Plaintiff's claims—the Court is well-versed with the facts and allegations forming the basis of Plaintiff's complaint. In short, Plaintiff's claims stem from Defendants' wrongful conduct associated with his inducement to attend Ross, Defendants' unjustified and unlawful refusal to accommodate his documented learning disabilities, their improper and unlawful methods of grading due to their conscious disregard of widespread cheating by the vast majority of Ross students (not Plaintiff), and—ultimately—their wrongful dismissal of Plaintiff from campus and refusal to grant him any right to appeal, ostensibly in retaliation for Plaintiff's reporting of the aforementioned cheating scandal.

Defendants persist in seeking to undermine Plaintiff's claims, presumably in an effort to minimize the negative news that has befallen them in recent years. Indeed, it is no secret that Defendants are in hot water with the Department of Education.[1] Plaintiff posits that Defendants'

---

[1] Ross' condoning of widespread cheating and rewarding of those who do cheat has finally caught up with Defendants—Ross is graduating veterinary students who cannot pass the board exams and therefore risks losing its accreditation in the near future. *See* Adtalem Global Education Inc. Form 10-K for fiscal year ended June 30, 2018 (filed August 24, 2018), available at https://investors.adtalem.com/Cache/394769427.pdf, at p. 31 (Ross was in the "zone category" and thus has been in jeopardy of losing its Title IV eligibility for student funding in 2014-2015 and it was predicted to remain in the zone category for the 2015-2016 and 2016-2017 academic years, and Adtalem further predicted that if Ross remained in the "zone category" for the 2017-2018 academic year its students "would no longer have access to Title IV student aid as early as the beginning of 2020, which could have a material adverse effect on the business, financial condition, results of operations and cash

current status in that regard is due, at least in part, to their unfair treatment of students and their inability to adhere to governing laws as well as their own policies and procedures (including with respect to Plaintiff).

In short, just as he did in response to Defendants' previous dismissal efforts, Plaintiff maintains that his claims are adequately pled and are firmly supported by applicable law and facts. Accordingly, Defendants' present Motion to Dismiss should be denied and this case should proceed to the discovery phase and, in short order, trial.

## RELEVANT BACKGROUND

Plaintiff's lifelong ambition has been to become a veterinarian. ECF 57, Third Amended Complaint (hereinafter "TAC") at ¶1. To that end, he extensively researched veterinary programs and ultimately decided on Ross. *See id.* at ¶¶1, 25. Ross, which is located in Nevis, St. Kitts in the Caribbean, is a subsidiary of DeVry Medical, which in turn falls under the umbrella of DeVry Group. *Id.* at ¶¶7-9, 15.

Although Plaintiff has suffered from a learning challenge since junior high school which caused him to suffer anxiety attacks during examinations, he was reassured by Defendants' publicly-available materials citing their commitment to accommodating students with disabilities and to ensuring the mental and emotional stability of students—all of which he read prior to matriculating to Ross and relied upon in deciding to do so. *Id.* at ¶¶2, 25-30. Upon arriving at Ross in May 2013, he immediately notified Ross psychologist Dr. Camp of his disability and presented her with documentation supporting his diagnosis and treator recommendations for necessary testing accommodations. *Id.* at ¶¶32-33. However, at no time did Defendants grant Plaintiff those necessary accommodations. *Id.* at ¶¶34-35, 39, 55 Consequently, Plaintiff was

flows" for the school). Cognizant of these risks, Adtalem "may discontinue such programs or direct students to third-party lenders for financial support of student tuition and other expenses." *Id.*

unable to perform to his full ability on examinations. *See id.* at ¶¶35, 51-54.

Plaintiff's claims are also based on Defendants' failure to adhere to their stated policies regarding the prohibition against cheating and other conduct prejudicial to the fair administration of exams. *See id.* at ¶¶43-50, 63-64, 68-88. The vast majority of Ross students (not Plaintiff) cheated on exams, and Defendants turned a blind eye to that conduct. *Id.* at ¶¶47-50. By permitting it to continue, Defendants dishonored their own policies. *Id.* at ¶¶63-64, 68-88.

Plaintiff was initially put on academic probation, but that status was removed when he received passing grades and earned a cumulative GPA greater than 2.0 the semester after he returned from a brief sabbatical. *Id.* at ¶¶36-41. But even after successfully passing 15 classes and achieving a cumulative GPA of 2.3 over the next three semesters, Plaintiff was dismissed from Ross in May 2015 for failing a single class. *Id.* at ¶¶51-54. To make matters worse, he was denied any right to investigate or appeal his dismissal, and instead was threatened if he continued his efforts to do so. *Id.* at ¶¶55-57. Plaintiff filed suit against Defendants seeking to recover for their wrongdoing.

## LEGAL STANDARD

To survive a motion to dismiss pursuant to Rule 12(b)(6), a plaintiff's complaint "must state a claim to relief that is plausible on its face." *Pickett v. Hous. Auth. of Cook Cty.*, 114 F. Supp. 3d 663, 665 (N.D. Ill. 2015) (internal quotations and citation omitted). The plausibility standard "is not akin to a 'probability requirement[.]'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Co. v. Twombly*, 550 U.S. 544, 556 (2007)). Indeed, a complaint need only give the defendant fair notice of what the claim is and the grounds upon which it rests; specific facts are not necessary. *Olson v. Champaign Cty., Ill.*, 784 F.3d 1093, 1099–2000 (7th Cir. 2015) (internal quotations and citation omitted); *see also* FED. R. CIV. P. 8(a)(2). "A claim satisfies this standard when its factual allegations raise a right to relief above the speculative

3

level." *Pickett*, 114 F. Supp. 3d at 665 (internal quotations and citations omitted).

On a motion to dismiss, "the court takes all facts alleged by the plaintiff as true and draws all reasonable inferences from those facts in the plaintiff's favor, although conclusory allegations [. . .] are not entitled to this presumption of truth." *Id.* (citation omitted).

## ARGUMENT AND AUTHORITIES

### I. PLAINTIFF'S CLAIMS FOR FRAUDULENT INDUCEMENT AND NEGLIGENT MISREPRESENTATION ARE BASED ON LEGALLY ACTIONABLE STATEMENTS.

Plaintiff asserts claims against Defendants for fraudulent inducement and negligent misrepresentation as a result of the representations they made in Ross's Strategic Vision Statement and its Student Handbook, which he read and relied upon. TAC at ¶¶25-30, 68-72. As a result of those representations, Plaintiff decided to "enter [Ross's] backbreaking veterinary medicine educational program, work day and night, six or seven days a week, for 27 months and assume almost $190,000 in Title IV federal loan and personal debt obligations—all to be denied reasonable accommodations and, ultimately, success." *Id.* at ¶72. Because Plaintiff sufficiently pled these claims, Defendants' motion should be denied.

### A. The Statement in Ross's "Strategic Vision" is a Viable Basis for Plaintiff's Fraud and Misrepresentation Claims.

#### 1. *Defendants Misconstrue the Nature of Ross's Strategic Vision Statement in a Feeble Attempt at Dismissal.*

In the course of deciding whether to attend Ross, Plaintiff read and relied upon Ross' published "Strategic Vision" which included the statement that Ross intended to "[i]ncrease total student numbers via reduced attrition [. . .] by increasing the quantity of quality student applicants, resulting in an increased completion rate. . . ." TAC ¶26.[2] Defendants now seek a

---

[2] Defendants curiously seem to take issue with the veracity of Plaintiff's extraction of this sentence. *See* Motion at p. 4 n.3. Their effort to call Plaintiff's character into question is not only unwarranted, but it is also unnecessary because at the motion to dismiss stage, "the court takes all facts alleged by the plaintiff

second bite at the apple when it comes to this statement. That effort should be rejected for a number of reasons.

As a preliminary matter, it cannot be ignored that the Court previously held that this specific statement could be actionable as long as Plaintiff properly pled his fraudulent inducement and negligent misrepresentation claims with particularity. *See* ECF 48, Order at p. 10. In other words, the Court only foresaw potential <u>pleading</u> issues with Plaintiff's claim based on this statement; it did not make any mention of substantive issues, such as this futuristic issue now being raised by Defendants. *See id.*[3]

This is presumably because Defendants' futuristic argument is nonsensical. Defendants misconstrue the nature of the statement at issue by arguing that is constitutes one of "intent concerning future conduct." Motion at p. 5. However, as pled, the statement is not futuristic at all; rather, it contemplates measures Ross professed to be actively taking at the then-present time. This construction is confirmed by the fact that Plaintiff's understanding of Ross' commitment to reduced attrition and high completion rates, including accommodations of students with documented disabilities, was triangulated and buttressed by his confirming call with a school admissions officer in April 2013 prior to his admission. TAC ¶26.[4] Simply because current actions inevitably have effects that will be felt in the future is not—and should not be—the test.

---

as true and draws all reasonable inferences from these facts in the plaintiff's favor." *Pickett*, 114 F. Supp. 3d at 665 (citation omitted). Regardless, to remove all doubt, Plaintiff now attaches that Strategic Vision—which he expressly stated he would be happy to provide upon the Court's request (*see* TAC at p. 9 n.4)—as **Exhibit A**.

[3] Defendants do not raise any issue with the manner in which Plaintiff pled this aspect of his claims. Even so, Plaintiff avers that he has properly pled this aspect of his claims with particularity in accordance with Rule 9(b). *See* TAC ¶¶ 25-26, 68-74.

[4] The import Mr. Galligan placed on the statement is a critical component of this analysis, as confirmed by the Seventh Circuit. *See Rasgaitis*, 2013 IL App (2d) 111112, ¶ 42, 895 N.E.2d at 634 ("[T]he general rule is that it is not 'the form of the statement which is more important or controlling, but the sense in which it is reasonably understood.' [. . .] Whether a statement is one of fact or of opinion depends on all the facts and circumstances of a particular case.") (quoting *West v. Western Cas. & Surety Co.*, 846 F.2d 387, 394 (7th Cir. 1988)).

Furthermore, the authority on this issue is not as rigid as Defendants suggest. In fact, there are clear exceptions to the rule that Defendants seek to impose, and those exceptions could certainly apply in this case. *See Rasgaitis v. Waterstone Fin. Grp., Inc.*, 2013 IL App 2d 111112, ¶ 42, 985 N.E.2d 621, 633–34 (Ill. App. Ct. 2013)[5]; *see also Levin v. Posen Found.*, No. 1:13-CV-08102, 2018 WL 1587042, at *11 (N.D. Ill. Apr. 2, 2018).

For instance, although the general rule is that "an expression of opinion will not support an action for fraud," the *Rasgaitis* Court recognized that "where a representation as to value is made as a statement of fact for the listener to rely upon, rather than a mere expression of opinion, the representation is treated as a statement of fact." 2013 IL App (2d) 111112, ¶ 42 (citation omitted). More specifically, "wherever a party states a matter which might otherwise be only an opinion but does not state it as the expression of the opinion of his own but as an *affirmative fact material to the transaction, so that the other party may reasonably treat it as a fact and rely upon it as such*, then the statement clearly becomes an affirmation of the fact within the meaning of the rule against fraudulent misrepresentation." *Id.* (internal quotations and citation omitted) (emphasis added) (holding that dismissal of fraud claims was improper because the representations at issue—including that the plaintiffs would enjoy $96,000 in returns in five years—were matters of fact, not opinion).[6] Similarly, the *Levin* Court held that an exception applies when the false promise or representation of future intent is itself the alleged scheme used to accomplish the fraud. 2018 WL 1587042, at *11.

Here, even if the relevant statement could logically be viewed as one of future intent or

---

[5] *Rasgaitis* is cited in *Abazari v. Rosalind Franklin University of Medicine & Science*, a case which Defendants cite. *See* Motion at p. 5.

[6] Notably, the *Rasgaitis* Court further acknowledged, in connection with this analysis, that "[n]o cause of action should be dismissed on the pleadings unless it ***clearly*** appears that no set of facts can be proved under the complaint entitling the plaintiffs to relief." 2013 IL App (2d) 111112, ¶ 43, 985 N.E.2d at 634 (emphasis added). Because there cannot be a clear finding here, dismissal would be improper.

opinion (not fact), the foregoing exceptions apply. Ross' stated commitment to increasing student applications and reducing attrition so as to increase completion rates is precisely the "alleged scheme used to accomplish the fraud" at issue because the manner in which Ross set out to achieving that goal was—at least in the case of Plaintiff—by professing to accommodate students with documented learning disabilities.

As a final point, one of the cases on which Defendants rely in support of their argument is readily distinguishable. *See Illinois Non-Profit Risk Mgmt. Ass'n v. Human Serv. Ctr. of S. Metro-East*, 378 Ill. App. 3d 713, 723–24, 884 N.E.2d 700, 710 (Ill. App. Ct. 4th Dist. 2008) (cited in Motion at p. 5). In *Illinois Non-Profit*, the challenged fraudulent inducement claim that was ultimately rejected related to non-specific future conduct—namely, adequacy-of-cash-flow to cover a financial obligation. *See id.* Because financial projections are typically treated by courts as statements of opinion, not fact, the *Illinois Non-Profit* Court rejected the plaintiff's fraudulent inducement claim based thereon. *See id.* Here, however, the Strategic Vision statement does not constitute a financial projection or anything else over which Defendants have no control; rather, it constitutes a statement of fact about present conduct Defendants took with respect to their admissions process. Thus, the *Illinois Non-Profit* holding is inapplicable here.

### 2. *Defendants' Criticism of Plaintiff's Complaint is Readily Refuted.*

Defendants also inexplicably argue that Plaintiff's misrepresentation claims should be dismissed for the "additional reason" that he "does not allege that the Strategic Vision statement was false[.]" Motion at p. 5. However, as confirmed by cursory reference to the Complaint, this is entirely untrue because Plaintiff specifically pled the following:

> [A]s [he] later learned, ***those inducements [including the Strategic Vision statement] turned out to be false*** because he was dismissed from RUSVM [for] no reason before he completed his studies, having received absolutely no accommodations for his well-documented learning disabilities or for the rampant cheating by his fellow students on course examinations (in which he did not

> partake) which impacted course grades and curves. In other words, [Ross] did nothing to reduce attrition or ensure the successful completion of studies when it came to Galligan, despite abundant documentation supporting his requested and medically-necessary accommodations. Moreover, [Ross'] visionary statement also turned out to be false because, as Galligan later learned, the way the school apparently sought to increase its graduation rate and ensure low attrition was by turning a blind eye to cheating by its students.

TAC ¶29 (emphasis added). There can be no clearer allegation of falsity.[7]

The authority on which Defendants rely does nothing to disturb Plaintiff's position. One of those cases did not even turn on the issue of a pleading of falsity and, more importantly, that court reversed trial court's dismissal of the plaintiffs' negligent misrepresentation claim. *See Bd. of Educ.*, 131 Ill.2d at 452–60, 546 N.E.2d at 591–95 (cited in Motion at p. 6). The other case involved specialized issues not present in this case (*i.e.*, cautionary statements in an offering document and claims closely resembling Federal securities-fraud claims). *Lagen v. Balcor Co.*, 274 Ill. App. 3d 11, 17–21, 653 N.E.2d 968, 973–75 (Ill. App. Ct. 2d Dist. 1995) (cited in Motion at pp. 5-6). The cautionary language protections applied in *Lagen* (a case involving an arm's length business transaction) do not apply here, in a case that involves a sophisticated educational institution and potential student in an inferior position. *See id.*

For the foregoing reasons, Defendants' motion to dismiss Plaintiff's fraudulent inducement and negligent misrepresentation claims premised on the Strategic Vision statement should be denied.

## B.     The Statements in Ross's Student Handbook are Viable Bases for Plaintiff's Fraud and Misrepresentation Claims.

Plaintiff also asserts fraudulent inducement and negligent misrepresentation claims premised on certain provisions of Ross's Student Handbook. *See* TAC¶¶ 60-64, 68-74.

---

[7] Defendants' argument is further undermined by the fact that it is questionable whether a plaintiff is even required to use the specific term "false" in his pleading. *See Bd. of Educ. of City of Chicago v. A, C & S, Inc.*, 131 Ill. 2d 428, 455–59, 546 N.E.2d 580, 593–94 (Ill. 1989) ("The pleadings must contain specific allegations of facts from which ***fraud is the necessary or probable inference . . . .***" (emphasis added)).

Specifically, Plaintiff alleges he read and relied upon the following statements by Defendants in deciding to apply for and attend Ross:

- It is [Ross'] policy to provide an environment free of unlawful harassment or discrimination based on . . . disability[.]
- [Ross] complies with all applicable laws regarding discrimination, harassment, retaliation and equal opportunity . . . .
- [Ross] is committed to ensuring that qualified students with disabilities are afforded reasonable accommodation.
- The mental and emotional stability of students is a primary concern of [Ross].
- It is an offense for any candidate to make use of unfair means in any [Ross] assessment, to assist a candidate to make use of such unfair means, [or] to do anything prejudicial to the good conduct of the assessment . . . . Receipt or transmission of unauthorized aid or other forms of dishonesty in academic affairs are also considered as academic misconduct.

*Id.* at ¶70 (quoting relevant provisions of the Ross Student Handbook).

### 1.    The 1st, 2nd, and 5th Statements are Actionable.

Defendants make much of which version of the Ross Student Handbook Plaintiff cites in his Complaint, yet they overlook the reality that the provisions cited in the TAC are substantially similar to those in the 2013 version of the Student Handbook (the one in place at the time Plaintiff applied to and decided to attend Ross)[8]:

| 2017 Version (Excerpts from TAC ¶ 70) | 2013 Version (Attached to Defendants' Motion as Ex. D) |
|---|---|
| "It is [Ross'] policy to provide an environment free of unlawful harassment or discrimination based on . . . disability." (§ 1.11.3) | "Some examples of acts of misconduct that are unacceptable and therefore subject to discipline include, but are not limited to: ... Harassment: Conduct by any means that is severe or pervasive, and is of such a nature that it would cause a reasonable person in the victim's position substantial emotional distress and undermine his or her ability to work, study or participate in his or her regular life activities or participate in the activities of [Ross]." (§ 11.2.10) |
| "[Ross] complies with all applicable laws regarding discrimination, harassment, retaliation and equal opportunity . . . ." (§ 1.11.3) | "As part of its dedication to making educational opportunities to a diverse range of students, [Ross] is committed to ensuring that qualified students with disabilities are afforded reasonable accommodations . . . ." (§ 1.7) |

---

[8] Defendants also ignore the important reality that following his unjustified dismissal from Ross, Plaintiff lost access to the 2013 version of the Student Handbook (as well as to his Ross e-mail address, access to Ross online URLs, documents and data), and thus he could not possibly have cited that version in connection with filing this lawsuit.

9

| "It is an offense for any candidate to make use of unfair means in any [Ross] assessment, to assist a candidate to make use of such unfair means, [or] to do anything prejudicial to the good conduct of the assessment . . . . Receipt or transmission of unauthorized aid or other forms of dishonesty in academic affairs are also considered as academic misconduct." (§ 1.11.4) | Ethical, Attitudinal and Behavioral Requirements: "Because the medical profession is governed by ethical principles ... a veterinary student must have the capacity to understand, learn and abide by these values and laws. Examples of breaches of veterinary medical ethics include, but are not limited to: cheating, plagiarism or other forms of academic dishonesty . . . ." (§ 1.5.1) |

*Compare* TAC ¶70 (quoting §§ 1.11.3, 1.11.4) *with* Ex. D to Defendants' Motion at §§ 1.5.1, 1.7, 11.2.10. Thus, regardless of which version of the Student Handbook one reads, there can be no question that Ross intended to prevent harassment and discrimination based on disability, to ensure the protection and reasonable accommodation of persons with disabilities, and to prevent and punish acts of academic dishonesty and misconduct. *Id.* There also can be no question that Plaintiff read and relied upon those statements before applying and matriculating to Ross. TAC ¶¶25, 27, 70; *see also Pickett*, 114 F. Supp. 3d at 665 (reiterating that on a motion to dismiss, the court takes all facts alleged by the plaintiff as true and draws all reasonable inferences from those facts in the plaintiff's favor).

Because that difference is the only argument Defendants raise with respect to the first, second, and fifth statements, and because Plaintiff can readily refute that argument, Plaintiff's fraudulent inducement and negligent misrepresentation claims premised on those statements should not be dismissed.[9]

## 2. The 3rd Statement is Actionable Because It Constitutes a Statement of Present Fact, Not Opinion or Future Intent.

In seeking dismissal of Plaintiff's fraud-based claims premised on the statement that Ross "is committed to ensuring that qualified students with disabilities are afforded reasonable accommodations" (TAC ¶70), Defendants offer a cursory argument that such statement is

---

[9] At the very least, Plaintiff should be entitled to replead his claims premised on those statements to match the exact text of the 2013 version of the Student Handbook, in light of the fact that he just received a copy of that version to which he previously did not have access by virtue of Defendants' motion.

"merely another statement of Ross's intended future conduct." Motion at p. 8. However, like the other statements about which Defendants lodged a similar argument,[10] this statement represents a ***present*** commitment to take (and continue to take) certain actions in order to protect a certain class of students who deserve legal protections. By plain language, Ross represented that it <u>is</u> committed—in present tense—to taking certain actions and protections with respect to qualified students with disabilities. Defendants' misunderstanding of the plain language is fatal to its argument.

### 3. The 4th Statement Constitutes More than Mere Puffing, and Contrary to Their Contentions, Defendants Did Not Adhere To It.

Finally, Defendants' arguments with respect to the fourth statement do not support dismissal of Plaintiff's claims premised thereon.

As their initial argument, Defendants perfunctorily claim that the fourth statement is "mere puffing." (Motion at p. 8). However, the statement that "[t]he mental and emotional stability of students is a primary concern" of Ross is one of existing fact, not a nonactionable assertion of opinion. *See Miller v. William Chevrolet/GEO, Inc.*, 326 Ill. App. 3d 642, 649, 762 N.E.2d 1, 7 (Ill. App. Ct. 1st Dist. 2001). Indeed, statements about existing factual situations that are "intended to conjure up a specific, factual idea" about a product or service are sufficient to support fraud claims. *Id.* (phrase "executive driven" was "sufficiently susceptible of interpretation as a factual description of a car's history to defy [court's] characteriz[ation of] it as 'puffing' as a matter of law"); *see also UOP v. Andersen Consulting*, No. CV 950145753, 1997 WL 219820, at *4 n.3 (Conn. Super. Ct. Apr. 24, 1997) (cited in *Muir v. Playtex Prods., LLC*, 983 F. Supp. 2d 980, 989 (N.D. Ill. 2013)) (statement that defendant "has consistently proven its

---

[10] *See* Section I(A)(1), *supra* pp. 4-7.

ability to manage the installation of large, complex systems like CASA" was not puffery).[11] Here, the statement in question was intended to—and in fact did, in Plaintiff's case—conjure up specific, factual ideas about Ross' treatment of students with documented disabilities.

This conclusion is logical when the statement is placed in context. When considered alongside Defendants' other published assurances (*i.e.*, regarding the commitment to affording qualified students with disabilities reasonable accommodations), any reasonable consumer would conclude that Ross' "primary concern" for the mental and emotional stability of its students is exhibited through, *inter alia*, testing accommodations and other similar means.

Defendants secondarily argue that this statement cannot be actionable because "Ross did exactly what the Student Handbook said it would do" in granting him a right to return after taking a leave of absence. Motion at pp. 8-9. However, that argument is a red herring. Whether Defendants afforded Plaintiff the opportunity to take a medical leave of absence and then return to campus in 2014 is different from their failure to accommodate Plaintiff's documented learning disability and their inappropriate dismissal of Plaintiff from Ross in 2015—which form the real basis for Plaintiff's claim. *See* TAC ¶¶68-74. Defendants wrongly conflate one example of their stated means of promoting students' mental and emotional health (medical leaves of absence) with other means they purported to provide (*i.e.*, reasonable accommodation).

In short, the foregoing analysis supports the denial of Defendants' motion to dismiss with respect to all of the statements forming the basis of Plaintiff's fraudulent inducement and negligent misrepresentation claims.

---

[11] Defendants' reliance on *Barbara's Sales, Inc. v. Intel Corp.* in support of their argument is misplaced, as implicit statements that vaguely acclaim an entity or a product as "the best" or use other similarly-subjective characterizations are very different from an affirmative, clear expression of intended action—such as the statement at issue here. *Cf.* 879 N.E. 2d 910, 926–27 (N.D. Ill. 2007) (reversing class certification because defendant's implicit representation that Pentium 4 was the best and fastest on the market was not actionable under the IFCA).

12

## II. PLAINTIFF HAS ALLEGED A COGNIZABLE BREACH OF CONTRACT CLAIM ARISING FROM DEFENDANTS' NUMEROUS BREACHES OF THE STUDENT HANDBOOK AND AVMA POLICIES.[12]

Plaintiff's breach of contract claim is premised on various provisions of the Ross Student Handbook as well as AVMA policies to which Ross explicitly adhered.[13]  *See* TAC ¶¶57, 77-81. These provisions represent viable bases for Plaintiff's contract claim.

### A. Defendants' Breaches of the Student Handbook vis-à-vis Plaintiff Were Arbitrary, Capricious, and in Bad Faith.

The parties do not dispute the general rule that courts will not override the academic decisions of a university unless the decision was made arbitrarily, capriciously, or in bad faith. *See* Motion at p. 11; *see, e.g., O'Driscoll v. Argosy Univ.*, No. 12 C 10164, 2014 WL 714023, at *2 (N.D. Ill. Feb. 25, 2014) (a university's decision is actionable under a breach of contract theory when it represents "such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment").  However, it is clearly not the intention or effect of established law to provide a shield against or safe haven from liability for impermissible conduct considered quite apart from the normative educational function.  *See O'Driscoll*, 2014 WL 714023, at *2.

Defendants ignore the reality that this case presents allegations radically more random, unprofessional, unrestrained, unpredictable, and unreasonable than other student dismissal cases, such that it satisfies the "arbitrary and capricious" standard.  Specifically, Defendants violated the terms of their contract with Plaintiff in a manner distinct from traditional academic norms in

---

[12] Consistent with the Court's prior Order [*see* ECF 48], Defendants recognize that Plaintiff's claims for their failure to accommodate his alleged disability and their retaliation against him for requesting accommodations are actionable (*see* Motion at p. 10); thus, Plaintiff's claims based on sections 1.8.7.2, 1.11.3, and 1.11.4 are not subject to dismissal and neither party addresses them in this round of briefing.

[13] Plaintiff maintains that his breach claim premised on AVMA policies is viable under the notion that he was an intended third-party beneficiary of the AVMA-Ross relationship, and therefore respectfully requests that the Court decline to dismiss that aspect of his claim.  *See* Section II(B), *infra* pp. 17-18.

two critical ways.

### 1. Defendants' Sanctioning of Mass Student Cheating on Examinations is Arbitrary, Capricious, and Representative of Bad Faith.

Defendants do not dispute the numerous provisions of the Student Handbook prohibiting cheating. *See* Motion at pp. 9-11. Instead, they posit that their conscious disregard for the mass cheating of Ross students—which resulted in the inability of honest students who did not cheat, such as Plaintiff, to suffer the downside of examination curves and, at least in Plaintiff's case, receive a failing grade—was somehow not arbitrary, capricious, or in bad faith. *See id.* at p. 11. That argument defies all good sense.

The relevant provisions of the Student Handbook are representative of traditional policies enacted by many educational institutions and entities regarding cheating—namely, prohibiting students from making use of unfair means in tests or doing things prejudicial to their good conduct (§ 1.6.2.1), giving/receiving aid during an exam (§ 1.7), or cheating, plagiarism, or other forms of academic dishonesty (§ 2.4.1).[14] Those accepted academic norms were similarly articulated by Ross' former Associate Dean Fuentealba, who stressed intellectual honesty and declared any student's use of test banks to constitute "cheating" subject to discipline. TAC ¶¶44-49.

However, Defendants inexplicably did not enforce those requirements. Their failure to do so—and the resulting impact on Plaintiff—cannot be viewed as anything *but* arbitrary,

---

[14] Although the Court has previously determined that AVMA policies and procedures cannot form a valid basis for Plaintiff's breach of contract claim due to privity issues [*see* ECF 48, Order at p. 13], reference to those policies is certainly instructive for purposes of determining whether Defendants' conduct was arbitrary, capricious, or in bad faith. For instance, it must be noted that the AVMA—Ross' accrediting body—places paramount importance on integrity, including the implementation of "unbiased grading procedures" and "fair and equitable assessment of student progress" that is "applied to all students in a fair and uniform manner." TAC ¶57 & n.14. The Department of Education, whose policies also bear relevance given that the DOE provides millions of dollars in student loans to Ross students, likewise adheres to best practices regarding student testing and chain of custody examination requirements. TAC ¶57.

capricious, or in bad faith. Specifically, by consciously turning a blind eye to rampant cheating by Ross students and permitting the continued use of test banks, Defendants knowingly prejudiced the honest students who did not partake in those activities (including Plaintiff). And in Plaintiff's case, a direct result was his inability to compete with the other students and, ultimately, his placement on the failing side of the curve of certain examinations. *See* TAC ¶¶4, 29. There can be no logical, good faith explanation for Defendants' conscious disregard for their own Student Handbook provisions or the policies followed by the entities providing them with accreditation and funding. As such, Defendants' Motion should be denied on this front.

### 2. *Plaintiff's Dismissal from Ross was Arbitrary, Capricious, and Representative of Bad Faith.*

There also is no dispute that the Student Handbook imposed certain rules regarding probation, and that it prohibited retaliation against anyone who reported an incidence of unlawful conduct. TAC ¶¶40, 55, 61. Plaintiff maintains that his breach of contract claim premised on Defendants' wrongful dismissal of him in violation of those provisions was more than simply unexpected; rather, it was arbitrary, capricious, and in bad faith, and thus is actionable.

When informed of Ross' decision to dismiss him, Plaintiff was not permitted to meet with school administrators; argue the non-applicability of his probation status (pursuant to the written commitment of Associate Dean St. Jean in May 2014); present discriminatory evidence of dissimilar treatment of other students who had failed exams; present evidence of his documented learning disability and unheeded testing accommodation appeals; or appear before the appeals committee comprised of anonymous members. TAC ¶¶55-57. In other words, Defendants did not honor their commitments to Plaintiff and did not offer any justifiable reason why.

Defendants' reliance on *Cosio* to support their argument for dismissal is misplaced. *See*

15

Motion at p. 11 (citing *Cosio v. Medical Coll. of Wisconsin, Inc.*, 139 Wis. 2d 241, 246, 407 N.W.2d 302, 305 (Wis. App. 1987)). In *Cosio*, unlike in the present case, there were no testing integrity assurances, promised disability protections, or appeals provisions in the school's handbook. *See* 139 Wis. 2d at 246. Nor was there any verbal affirmation by a school official of prohibitions against dishonesty. *See id.* Here, all of the above circumstances were present, which necessitates a different outcome.

In short, there can be no logical, good faith explanation for Defendants' failure to adhere to its policies when it came to Plaintiff's dismissal; to the contrary, Plaintiff posits that Defendants tailored their actions in light of Plaintiff's complaints about his denied testing accommodations and Defendants' implicit authorization of mass student cheating. *See* TAC ¶¶ 77, 84. Such treatment of a person with a disability has previously been held to give rise to an actionable breach of contract claim. *See Liu v. Northwestern Univ.*, 78 F. Supp. 3d 839, 847–48 (N.D. Ill. 2015).[15]

### B.   Defendants' Breach of AVMA Policies is Actionable Because Plaintiff is an Intended Third-Party Beneficiary of the AVMA-Ross Relationship.

Plaintiff has also pled a viable claim for breach of contract premised on Defendants' breach of the AVMA policies. Defendants ignore pertinent law supporting the notion that Plaintiff was a third-party beneficiary of the AVMA-Ross relationship, and they disregard facts that clearly establish this reality.

It is well-settled that "a third party may have enforceable rights under a contract if the

---

[15] Plaintiff's position is reinforced by the necessary application of due process in situations involving a student's dismissal. *See, e.g., Goss v. Lopez*, 419 U.S. 565, 580–81 (1975). As the *Goss* Court noted, "it would be a strange disciplinary system in an educational institution if no communication was sought by the disciplinarian with the student in an effort to inform him of his dereliction and to let him tell his side of the story." *Id.* at 580. "[R]equiring effective notice and informal hearing permitting the student to give his version of the events will provide a meaningful hedge against erroneous action." *Id.* at 583. "At least the disciplinarian will be alerted to the existence of disputes about facts and arguments about cause and effect." *Id.* at 583–84.

contract was made for his direct benefit." *Holbrook v. Pitt*, 643 F.2d 1261, 1270 (7th Cir. 1981) (citing cases). Importantly, "[n]o magic words are necessary" to create third-party beneficiary status, and the contract at issue need not be solely for the third party's benefit or actually name him as a third-party beneficiary. *Kemmerer v. Bottling Grp., Inc. v. Sentry Equip. Erectors, Inc.*, No. 94 C 4802, 1996 U.S. Dist. LEXIS 12642, at *15 (N.D. Ill. Aug. 29, 1996) (attached hereto as **Exhibit B**), *adopted*, No. 94 C 4802, 1997 WL 722593, at *3–4 (N.D. Ill. Nov. 10, 1997) (finding the existence of sufficient evidence of contractual intent to benefit a third party); *see also Crown Corr, Inc. v. Wil-Freds Constr., Inc.*, No. 94 C 6535, 1996 WL 221204, at *2 (N.D. Ill. Apr. 30, 1996) (citation omitted) (holding that a third party "need not be specifically named in the contract; it is enough if the plaintiff may be identified at the time performance is due as a member of the class intended to be benefitted"). If it is clear from the purposes underlying the formation of a contract that it was undertaken to directly benefit the plaintiff, he has rights to enforce that contract. *See id.*; *see also Holbrook*, 643 F.2d at 1270–71 (citations omitted) (plaintiffs had enforceable rights under the contracts between HUD and property owners because, as low-income tenants, they were the primary intended beneficiaries of the Section 8 program). This is distinct from a situation in which a third party may only reap incidental benefits from a contract. *See id.*

Here, Plaintiff was an intended third-party beneficiary of the relationship between Ross and the AVMA, its accrediting body. Plaintiff was induced to apply for and attend Ross based on the numerous materials published on Ross' website. TAC ¶25. Among those materials was a webpage touting Ross' accreditation by the AVMA and a direct link to the AVMA's accreditation resources. *See id.* at ¶30 & n.5. Those AVMA resources included, notably, policies concerning cheating and non-discrimination based on disability mandates. *Id.* at ¶57 &

17

n.14, 16.  Similar to the reasoning in *Holbrook*, if veterinary students such as Plaintiff are not the primary intended beneficiaries of the policies of the body that accredits the institutions to which they apply and attend, the legitimacy of that accreditation is called into question.  *See* 643 F.2d at 1271.  The fact that Plaintiff is not specifically named in the AVMA procedures is not dispositive.  *See, e.g., Crown*, 1996 WL 221204, at *2.

For the foregoing reasons, Plaintiff's breach of contract claims premised on Defendants' breaches of the Student Handbook and AVMA policies should not be dismissed.

### III. PLAINTIFF'S BREACH OF FIDUCIARY DUTY CLAIM SHOULD SURVIVE BECAUSE HE HAS SUFFICIENTLY ALLEGED THE EXISTENCE OF A SPECIAL RELATIONSHIP WITH DEFENDANTS.

Resorting to an ill-conceived scare tactic, Defendants state that "[a]llowing Plaintiff to proceed with his breach of fiduciary duty claim would effectively mean that every college, graduate school, and professional school in America has a fiduciary relationship with its learning disabled students and would reverse the Court's prior holding that no such relationship exists as a matter of law."  Motion at pp. 12-13.  If Defendants are to be believed, then it is impossible for student, even a disabled student, to be in a fiduciary relationship with his school.  This is simply not correct.  It is very possible for fiduciary duties to exist between a student and his or her college because of the student's disability.  *See Bird v. Lewis & Clark Coll.*, 104 F. Supp. 2d 1271, 1277 (D. Or. 2000), *aff'd*, 303 F.3d 1015 (9th Cir. 2002) (denying summary judgment where plaintiff's pleading and the factual record sufficiently stated a claim for breach of fiduciary duty premised on plaintiff's placement of "special confidence" in defendants to accommodate her physical disability).  It is also very possible for a student (and even a graduate student with no disability) to adequately plead the existence of special circumstances and get his or her opportunity to present his or her cases to a jury.  *See, e.g., Chou v. Univ. of Chicago*, 254 F. 3d 1347, 1354 (Fed. Cir. 2001) (reversing dismissal of fiduciary duty claim asserted against

18

University of Chicago and faculty member); *Orzechowitz v. Nova Se. Univ.*, No. 13-62217-CIV, 2014 WL 1329890, at *3–5 (S.D. Fla. Mar. 31, 2014) (denying motion to dismiss breach of fiduciary duty claim against university and professor because of existence of special circumstances); *Johnson v. Schmitz*, 119 F. Supp. 2d 90, 97–98 (D. Conn. 2000) (denying motion to dismiss breach of fiduciary duty claim asserted against Yale University and faculty advisors).

The main takeaways of the *Bird*, *Chou*, *Orzechowitz*, and *Johnson* cases are:

(1) that while in each case the special circumstances of the student are unique to her or him, just like the special circumstances pled by Plaintiff in this case are unique to him, the students in *Bird*, *Chou*, *Orzechowitz*, and *Johnson*, just like Plaintiff here, placed themselves and their educations in a role subservient to the professionals at their respective schools, entrusting those professionals and their schools with their future careers; and

(2) the courts in those cases afforded the student her or his opportunity to prove at trial whether a fiduciary relationship existed.

*See id.*

In *Bird*, the court found a fiduciary duty was created because of the disability of a student participating in an overseas program. 104 F. Supp. 2d at 1277. Bird claimed that she had "reposed a special confidence in [the college] because of her disabled status." *Id.* Bird alleged further that when the program administrators "said they understood her needs and would strive to meet them," they knowingly accepted this trust. *Id.* The court explained that fiduciary duties exist "where there has been a special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of the one reposing the confidence." *Id.* Viewing the facts in the light most favorable to Bird, the court determined that Bird had sufficiently stated her breach of fiduciary claim and that the case could go to trial. *Id.*

8029157

In *Chou*, a doctoral student who subsequently became a post-doctoral research assistant, sued the University of Chicago, her academic advisor Dr. Roizman, and two other defendants for, *inter alia*, breach of fiduciary duty. *Chou v. Univ. of Chicago*, No. 99 C 4495, 2000 WL 222638, at *3 (N.D. Ill. Feb. 22, 2000), *aff'd in part*, 254 F.3d 1347 (Fed. Cir. 2001). The defendants moved to dismiss, and the federal district court granted the motion. *Id.* Chou appealed, and the appellate court reinstated her breach of fiduciary duty claims against the University of Chicago and Dr. Roizman. *Chou*, 254 F. 3d at 1362–63 (applying Illinois law). In so doing, the appellate court recognized that "a fiduciary relationship may . . . arise from the special circumstances of the parties' relationship, such as when one party justifiably places trust in another so that the latter gains superiority and influence over the former." *Id.* at 1362 (citation omitted). Because there was a disparity in the parties' experience and roles, and because Dr. Roizman (as the department chairman) had the power and responsibility to make decisions affecting Chou's future, the court held that Chou sufficiently stated a claim for breach of fiduciary duty and that the district court erred in dismissing that claim.[16]

In *Orzechowitz*, a nursing student brought a nine-count complaint against Nova Southeastern University ("NSU") and Professor Stern for discriminating against her on the basis that she was a pregnant, Orthodox Jewish woman. 2014 WL 1329890, at *1. The district court denied the defendants' motion to dismiss the plaintiff's breach of fiduciary duty claim, holding that because she had pled that (1) NSU had promoted itself as providing a "safe, caring and nurturing learning environment [. . .] free of discriminatory practices," and (2) she had "vested confidence in NSU in good faith and accepted this invitation of trust and relied upon NSU to

---

[16] The *Chou* Court reasoned that Chou adequately stated claims against the University of Chicago under the doctrine of respondent superior for Dr. Roizman's tortious acts. 254 F. 3d at 1361. As this Court noted in its Opinion and Order, "the plaintiff need not plead legal theories, it is the facts that count." ECF 48, Order at p. 4 (citing *Hatmaker v. Mem'l Med Ctr.,* 619 F.3d 741, 743 (7th Cir. 2010).

provide her with a safe, caring and nurturing environment," sufficient facts were pled showing the existence of a fiduciary relationship between the plaintiff and NSU and the professor. *Id.* at *4–5.

Finally, in *Johnson*, a doctoral student brought his suit against Yale University and individual members of his faculty advisory committee. 119 F. Supp. 2d at 92. The court denied the defendants' motion to dismiss the claim for breach of fiduciary duty. *Id.* at 98. In analyzing that claim, the court noted that "[a] fiduciary relationship is 'characterized by a unique degree of trust and confidence between the parties, one of whom has superior knowledge, skill or expertise and is under a duty to represent the interests of the other.'" *Id.* at 97 (citations omitted). After reviewing the pertinent facts, the court concluded that Johnson's relationship with his two faculty advisors could constitute a fiduciary one because the advisors were entrusted with guiding Johnson in writing his dissertation which, of course, was necessary for Johnson to achieve his educational goals. *Id.* at 98. To be fully transparent, the *Johnson* opinion solely addressed the defendants' motions to dismiss; it did not conclusively establish the existence of a fiduciary relationship. *Id.* However, the court did note that Johnson should be entitled to prove at trial whether such a relationship existed. *Id.* This is all that Plaintiff asks for in this case – a chance to prove at trial that a fiduciary relationship existed between himself and Ross.

Turning to this case, as this Court already held, "[t]o determine if special circumstances exist, courts consider the degree of kinship between the parties; the disparity in age, health, mental condition, education and business experience between the parties; and the extent to which the servient party entrusted his business affairs to the dominant party and placed trust and confidence in it." ECF 48, Order at pp. 14-15 (citing *Autotech Tech. Ltd. P'ship v Automationdirect.com*, 471 F.3d 745, 749 (7th Cir. 2006)). It is farcical for defendants to claim

that Plaintiff did nothing more than "essentially parrot[] the foregoing list of items set forth in *Autotech*. Motion at p. 12. In excruciating detail over the course of 21 pages, Plaintiff pled specific facts establishing that a fiduciary duty exists, the fiduciary duty was breached, and the breach proximately caused the injury about which he complains. TAC at ¶¶85-88; *see also id.* at ¶¶1-5, 25-64. Plaintiff's relationship with Ross spanned over four years, starting in 2012 when Plaintiff began reading materials and watching videos published by Ross to induce him to attend Ross, through his application, interview and acceptance process in 2012-13, in his first semester at Ross beginning in May 2013, and concluding with his termination by Ross in September 2016. *See id.*

Much like the students in *Bird*, *Chou, Orzechowitz*, and *Johnson*, 25-year old Plaintiff placed himself and his education in a position subservient to Ross and its professionals. *See id.* at ¶86. Based on written materials provided and representations made by Ross, Plaintiff justifiably placed his trust and confidence in Ross to do two things so that he could compete against his fellow students, graduate from Ross, and fulfill his life-long dream of practicing veterinary medicine: (1) provide Plaintiff with reasonable testing accommodations based on his well-documented learning disabilities, of which Ross was fully aware; and (2) provide Plaintiff an environment that ensured a fair grading system marked by honesty, not plagued by widespread cheating by the majority of Ross students which, in turn, negatively impacted Plaintiff's grades because he refused to cheat. *See id.* at ¶¶1-5, 25-35, 43-64, 85-88. In both cases, Ross had all the power and Plaintiff had none. Only Ross could grant Plaintiff reasonable testing accommodations, and none were provided. Only Ross could stop the widespread cheating on exams by the simple act of making professors stop repeating exam questions, and Ross did not do so. Plaintiff learned the hard way—when he tried to do something about the

widespread cheating on tests, he was kicked out of Ross and banned from the island on which Ross is located. *Id.* at ¶¶ 2-5, 25-64, 85-88.

Like the courts in *Bird*, *Chou, Orzechowitz*, and *Johnson*, this Court should afford Plaintiff a chance to prove at trial that a fiduciary relationship existed between himself and Ross and therefore deny Defendants' Motion.

## IV. PLAINTIFF HAS ADEQUATELY PLED HIS ALTERNATIVE CLAIM FOR ALTER EGO.

Finally, Plaintiff has pled a viable alternative claim of alter ego against Defendants. *See* TAC ¶¶89-91 (pleading particular facts demonstrating the hierarchical relationship of Defendants under which Adtalem controls and operates DeVry Medical and Ross, as Adtalem itself has admitted in its public securities filings); *see also, e.g., Stargel v. NutraSweet Co.*, No. 13-cv-7575, 2014 WL 1662989, at *3 (N.D. Ill. Apr. 24, 2014) (setting forth elements of alter ego claim).[17]  In seeking to dismiss this claim, Defendants essentially suggest that Plaintiff must prove his claim now, at the pleading phase.  Defendants' effort must be rejected.

It is well-established that as long as a plaintiff's complaint "fairly alleges an entity exists as the alter ego of another and provides factual manifestations suggesting the existence that the two operate as a single entity, a motion to dismiss will be denied."  *Kellers Sys., Inc. v. Transp. Int'l Pool, Inc.*, 172 F. Supp. 2d 992, 1001 (N.D. Ill. 2001) (citation omitted).  Under Rule 8(a)'s liberal notice pleading standards, courts will not dismiss a complaint unless it is clear that there are no facts that the plaintiff could prove consistent with the pleadings.  *Id.* at 1000 (citation omitted) (denying defendant's motion to dismiss alter ego claim where common ownership was undisputed and where plaintiff alleged commingling of funds and assets).  In particular, as long

---

[17] Even if the Court were to apply Delaware law to this claim, as Defendants suggest might be appropriate (*see* Motion at p. 13 n.6), the analysis would be similar.  *See Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 476 F. Supp. 2d 913, 932 (N.D. Ill. 2007), *rev'd on other grounds*, 529 F.3d 371 (7th Cir. 2008) ("At the outset, we note that Delaware law is almost identical to Illinois law as it relates to veil piercing claims.") (citation omitted).

as a plaintiff alleges that "a parent is the alter ego of its subsidiary, dismissal of [his or] her complaint is unwarranted if [he or] she alleges any facts which suggest that the corporations operated as a single entity." *Hann v. The Paul Revere Ins. Co.*, No. 03 C 1062, 2004 WL 557380, at *2 (N.D. Ill. Feb. 17, 2004) (citations omitted) (denying motion to dismiss where plaintiff alleged that defendant controlled all of its subsidiaries' claims processing and policies and made the decision to deny certain benefits claims); *see also Flentye v. Kathrein*, 485 F. Supp. 2d 903, 912–13 (N.D. Ill. 2007) (denying motion to dismiss where plaintiff sufficiently alleged alter ego theory based on shareholder's control and domination of other entities that essentially were empty shells).

Defendants make much of the long list of elements utilized by Illinois and Delaware courts (and others) when faced with alter ego claims. *See* Motion at pp. 13-14. However, Defendants ignore the reality that Plaintiff need not establish those at the early pleading stage; rather, he must only ***eventually*** need to prove them in the case. *See Flentye*, 485 F. Supp. 2d at 912. Those factors are "remarkably fact-intensive" and thus certainly cannot be assessed at such a nascent stage in a case. *BI3, Inc. v. Hamor*, No. 08 CV 2384, 2011 WL 1231156, at *12 (N.D. Ill. 2011) (denying summary judgment where there were "a number of facts in the record which would support the plaintiff's [alter ego] claim"); *see also MAG Portfolio Consult, GMBH v. Merlin Biomed Grp. LLC*, 268 F.3d 58, 64 (2d Cir. 2001) ("[O]ur case law teaches determining whether to pierce the corporate veil is a very fact specific inquiry involving a multitude of factors." (citation omitted)).

Here, there can be no question that Plaintiff has satisfied the threshold pleading requirement for his alter ego claim. Plaintiff specifically alleges that the Defendants operate as one integrated system and even share common staff. TAC ¶91. Additionally, all student loan

paperwork and funding for Ross flows through Adtalem, such that Adtalem has exclusive control over those funds for Ross' benefit. *See id.* at ¶¶11, 48 & n.10. These allegations certainly are sufficient to put Defendants on notice of Plaintiff's claim and survive dismissal, particularly when construed liberally in Plaintiff's favor. *See Pickett*, 114 F. Supp. 3d at 665. As such, Defendants' motion to dismiss should be denied with respect to this claim.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court deny Defendants' Motion to Dismiss and permit the claims in his Third Amended Complaint to proceed. Plaintiff further requests such other and further relief, at law or in equity, to which he may be justly entitled.

8029157

Dated this 5th day of June, 2019.

Respectfully submitted,

*/s/ Michael W. Ford*
Michael W. Ford, Esq.
Law Offices of Michael W. Ford
*(local counsel)*
4 Timberwood Lane
Riverwoods, IL 60015
Telephone: (847) 948-7884
Email: mfordski@aol.com
IL Bar # 0846139
Member, Trial Bar U.S. District Court N.D. IL

- and -

*/s/ Emil T. Bayko*
Emil T. Bayko
PORTER HEDGES LLP
1000 Main Street, 36th Floor
Houston, Texas 77002
Telephone: (713) 226-6608
Facsimile: (713) 226-6208
Email: tbayko@porterhedges.com
IL Bar # 0141356

**ATTORNEYS FOR PLAINTIFF
PETER M. GALLIGAN**

OF COUNSEL:
Alison P. Henderson
Texas State Bar No. 24087707
Federal ID No. 2228628
PORTER HEDGES LLP
1000 Main Street, 36th Floor
Houston, Texas 77002
Telephone: (713) 226-6728
Facsimile: (713) 226-6328
Email: ahenderson@porterhedges.com

26

## CERTIFICATE OF SERVICE

I hereby certify that on June 5, 2019, a true and correct copy of the foregoing pleading was electronically filed in accordance with the Federal Rules of Civil Procedure and was served via e-mail upon the following counsel of record:

Brian Stolzenbach
Megan Troy
Thomas Horan
SEYFARTH SHAW LLP
233 S. Wacker Drive, Suite 8000
Chicago, IL 60606-6448
(312) 460-5551
bstolzenbach@seyfarth.com
mtroy@seyfarth.com
thoran@seyfarth.com

*/s/ Emil T. Bayko*
Emil T. Bayko

27

8029157