EXHIBIT B

 Caution

As of: June 5, 2019 3:57 PM Z

## *Kemmerer Bottling Group, Inc. v. Sentry Equip. Erectors, Inc.*

United States District Court for the Northern District of Illinois, Eastern Division

August 27, 1996, Decided ; August 29, 1996, DOCKETED

No. 94 C 4802

**Reporter**

1996 U.S. Dist. LEXIS 12642 *

KEMMERER BOTTLING GROUP, INC., n/k/a SELECT BEVERAGES, INC., Plaintiff, vs. SENTRY EQUIPMENT ERECTORS, INC., Defendant.

## Core Terms

parties, depalletizer, purchase order, letter of intent, shipping, down payment, third party beneficiary, date of delivery, summary judgment, third party, Bottling, revised, manufacturer, conveyor, rinser, confirmed, nonmoving, delivery, shipment, deliver, cancel, confer, RECOMMENDATION, negotiations, inferences, expired, shop

## Case Summary

**Procedural Posture**

Plaintiff corporation filed an action to recover losses it allegedly suffered when defendant corporation failed to ship certain bottling equipment by the date on which plaintiff believed the parties agreed. The parties filed cross motions for summary judgment with respect to defendant's liability.

**Overview**

Plaintiff contacted a company that represented manufacturers of capital equipment used in the beverage industry (representative) to purchase new equipment for its plant. The representative and defendant entered into a letter of intent for defendant to supply the equipment to plaintiff. Defendant was unable to provide a piece of equipment on the date that plaintiff alleged had been agreed upon, and plaintiff cancelled the order. Plaintiff filed an action alleging damages from a breach of the agreement between the representative and defendant. The magistrate judge recommended that both motions for summary judgment should be denied. The magistrate judge found that there was an issue of fact concerning whether plaintiff was an intended third party beneficiary that had an enforceable right under the agreement between the representative and defendant. There was an issue whether the parties intended to make plaintiff a third party

beneficiary of the agreement between the representative and defendant. The magistrate judge also found that there was a factual issue concerning defendant's obligation to deliver the equipment by a certain date.

**Outcome**

The magistrate judge recommended that both plaintiff's and defendant's motions for summary judgment should be denied.

## LexisNexis® Headnotes

Civil Procedure > ... > Discovery > Methods of Discovery > General Overview

Civil Procedure > ... > Summary Judgment > Burdens of Proof > General Overview

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > General Overview

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Genuine Disputes

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Materiality of Facts

*HN1*[⬇] **Discovery, Methods of Discovery**

Summary judgment is appropriate where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56(c).* To determine whether any genuine issue of fact exists, the court must go beyond the pleadings and assess whatever proof is presented by way of depositions, answers to interrogatories, admissions and affidavits.

1996 U.S. Dist. LEXIS 12642, *12642

Civil Procedure > ... > Summary Judgment > Burdens of Proof > Movant Persuasion & Proof

Evidence > Burdens of Proof > Initial Burden of Persuasion

Civil Procedure > Judicial Officers > Masters > General Overview

Civil Procedure > ... > Summary Judgment > Burdens of Proof > General Overview

Civil Procedure > ... > Summary Judgment > Burdens of Proof > Nonmovant Persuasion & Proof

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Genuine Disputes

*HN2*[⬇] **Burdens of Proof, Movant Persuasion & Proof**

The party seeking summary judgment bears the initial burden of proving there is no genuine issue of material fact. It may meet this burden without coming forward with affirmative evidence to negate the nonmoving party's claim if it can show that the nonmoving party has failed to establish the existence of an essential element on which the nonmoving party bears the burden of proof at trial. *Fed. R. Civ. P. 56(c)*. In response, the nonmoving party cannot rest on bare pleadings alone but must use the evidentiary tools listed above to designate specific material facts showing that there is a genuine issue for trial. To be material, a fact must be outcome determinative under the governing law. Although a bare contention that an issue of fact exists is insufficient to create a factual dispute, the nonmoving party's evidence is to be believed and all reasonable inferences from the facts must be viewed in that party's favor.

Contracts Law > Third Parties > Beneficiaries > Claims & Enforcement

*HN3*[⬇] **Beneficiaries, Claims & Enforcement**

Under Illinois law, the requisite intent to benefit the third party must be gleaned from the language of the contract and the circumstances surrounding the parties at the time of its execution.

Contracts Law > Third Parties > Beneficiaries > Claims & Enforcement

Contracts Law > Third Parties > General Overview

Contracts Law > Third Parties > Beneficiaries > General Overview

*HN4*[⬇] **Beneficiaries, Claims & Enforcement**

The alleged third party beneficiary bears the burden of establishing that it is a third party beneficiary of the contract for the purchase and sale of equipment. This means that the alleged third party beneficiary cannot maintain its breach of contract claim unless the parties to the contract intended, by entering into their contract, to confer a direct benefit upon the alleged third party beneficiary. It does not mean, however, that the contract had to be solely for the alleged third party beneficiary's benefit or that the contract had to actually name it as a third party beneficiary. No "magic words" are necessary. The question is whether the facts and circumstances establish that the contracting parties intended to confer a benefit directly upon the third person.

Contracts Law > Third Parties > Beneficiaries > Claims & Enforcement

*HN5*[⬇] **Beneficiaries, Claims & Enforcement**

Illinois recognizes a strong presumption that parties to a contract have bargained for themselves and only incidentally for third persons. To overcome this presumption, there must be either an express declaration that the parties acted for the benefit of a third person or an implication so strong as to amount to an express declaration.

Contracts Law > Third Parties > Beneficiaries > Claims & Enforcement

Contracts Law > Third Parties > Beneficiaries > General Overview

*HN6*[⬇] **Beneficiaries, Claims & Enforcement**

Illinois adheres to the rule that third party beneficiary status must be determined from the contract and the circumstances surrounding the parties at the time of its execution.

Contracts Law > Third Parties > Beneficiaries > Claims & Enforcement

Contracts Law > Third Parties > General Overview

1996 U.S. Dist. LEXIS 12642, *12642

Contracts Law > Third Parties > Beneficiaries > General Overview

*HN7*[↓] **Beneficiaries, Claims & Enforcement**

The parties' knowledge that a third party will ultimately benefit from a contract is generally not enough to make the third party a direct beneficiary of the contract. Similarly, knowledge that the contract goods will be delivered to a third party, alone, is insufficient. The alleged third party beneficiary must offer something to suggest that the parties to the contract affirmatively sought to benefit the alleged third party beneficiary, that is to say, that the benefit to it is a motivating factor in the decision to enter into the contract.

Contracts Law > Third Parties > Beneficiaries > Claims & Enforcement

Contracts Law > Third Parties > Beneficiaries > General Overview

Contracts Law > ... > Beneficiaries > Types of Third Party Beneficiaries > General Overview

Contracts Law > ... > Beneficiaries > Types of Third Party Beneficiaries > Intended Beneficiaries

*HN8*[↓] **Beneficiaries, Claims & Enforcement**

A statement of intent to resell to a third party prior to execution of the contract might be a sufficient allegation of intent to benefit the third party. Where there is evidence that promisee explicitly informed promisor that it was entering transaction on behalf of another is one type of case where third parties have been found to be intended beneficiaries.

Contracts Law > Contract Interpretation > General Overview

*HN9*[↓] **Contracts Law, Contract Interpretation**

A letter embodying preliminary negotiations may be enforceable if it is clear that the ultimate contract will be based on the terms of the letter and the parties intend to be bound by the letter. The scope and nature of any duty arising out of a letter of intent must be determined, in the first instance, from the language of the letter itself.

Contracts Law > Contract Interpretation > Ambiguities &

Contra Proferentem > General Overview

Contracts Law > Defenses > Ambiguities & Mistakes > General Overview

*HN10*[↓] **Contract Interpretation, Ambiguities & Contra Proferentem**

Where a contract is ambiguous, i.e., fairly susceptible to more than one meaning, the intended meaning becomes a question of fact. Moreover, evidence outside the contract itself may be considered in determining the parties' intent.

**Counsel:** [*1] For KEMMERER BOTTLING GROUP, INC., a Delaware corporation aka Select Beverages, Inc., plaintiff: Raymond J. Kelly, Jr., Douglas Joseph Bank, Bart Allen Lazar, Seyfarth, Shaw, Fairweather & Geraldson, Chicago, IL.

For SENTRY EQUIPMENT ERECTORS, INC., a Virginia corporation, defendant: George B. Collins, Christopher Robert Bargione, Collins & Bargione, Chicago, IL. Alexander W. Bell, Lynchburg, VA.

**Judges:** JOAN HUMPHREY LEFKOW, United States Magistrate Judge. The Honorable John A. Nordberg, United States District Judge

**Opinion by:** JOAN HUMPHREY LEFKOW

# Opinion

To: The Honorable John A. Nordberg

United States District Judge

**REPORT AND RECOMMENDATION**

Joan H. Lefkow, Magistrate Judge:

Plaintiff, Kemmerer Bottling Group, Inc. ("Kemmerer"), seeks recovery of losses it allegedly suffered when defendant, Sentry Equipment Erectors, Inc. ("Sentry"), failed to ship certain bottling equipment by the date on which Kemmerer believes the parties agreed. The parties have filed cross motions for summary judgment with respect to Sentry's liability. This court's jurisdiction is based on diversity of citizenship. Venue in this district is proper because events giving rise to the dispute took [*2] place here.

**PROCEDURE**

HN1[↑] Summary judgment is appropriate where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56(c)*. To determine whether any genuine issue of fact exists, the court must go beyond the pleadings and assess whatever proof is presented by way of depositions, answers to interrogatories, admissions and affidavits. *Id.* HN2[↑] The party seeking summary judgment bears the initial burden of proving there is no genuine issue of material fact. *Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553, 91 L. Ed. 2d 265 (1986)*. It may meet this burden without coming forward with affirmative evidence to negate the nonmoving party's claim if it can show that the nonmoving party has failed to establish the existence of an essential element on which the nonmoving party bears the burden of proof at trial. *Id. at 322, 106 S. Ct. at 2552-53*; *Fed. R. Civ. P. 56(c)*.

In response, the nonmoving party cannot rest on bare pleadings alone but must use the evidentiary tools listed above to designate specific material facts showing that there is a genuine issue for trial. *Celotex, [*3] 477 U.S. at 324, 106 S. Ct. at 2553*. To be material, a fact must be outcome determinative under the governing law. *Pritchard v. Rainfair, Inc., 945 F.2d 185, 191 (7th Cir. 1991)*. Although a bare contention that an issue of fact exists is insufficient to create a factual dispute. *Posey v. Skyline Corp., 702 F.2d 102, 105 (7th Cir. 1983)*, the nonmoving party's evidence is to be believed and all reasonable inferences from the facts must be viewed in that party's favor. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S. Ct. 2505, 2513, 91 L. Ed. 2d 202 (1986)*; *Korf v. Ball State University, 726 F.2d 1222, 1226 (7th Cir. 1984)*.

Because the parties have filed cross motions for summary judgment, the court must rule on each party's motion individually, determining in each case whether judgment may be entered in accordance with the above standards. What follows, then, is a largely undisputed version of the facts culled from the parties' submissions. To the extent that material facts are in dispute or there is disagreement over the reasonable inferences to be drawn from the facts, they will be discussed as necessary and resolved in favor of the nonmoving [*4] party on each motion.

## FACTUAL BACKGROUND

Kemmerer, a Delaware corporation with its principal place of business in Illinois, bottles and distributes soft drink beverages. Sentry is a Virginia corporation that manufactures equipment for use in the bottled beverage industry.

In November 1993, Kemmerer decided to eliminate production of its 16 oz. bottled soft drink line and replace it with a 20 oz. product line. To accomplish this change, Kemmerer needed a new machine, known as a bulk depalletizer, as well as a new bottle rinser and new conveyors. [1] [*5] Kemmerer contacted Specialized Packaging Concepts, Inc. ("Specialized"), a company which represents various manufacturers of capital equipment used in the food and beverage industry. [2] Kemmerer advised Stanley Stam, Specialized's president, that Kemmerer needed the depalletizer, conveyors and rinser by April 1994 and asked him to find and purchase the equipment on Kemmerer's behalf.

In late 1993 or early 1994, Stam contacted Sentry either directly or through its exclusive Illinois representative, Phil Soenke of Pro-Line Systems, Inc. ("Pro-Line"). Steve Stromer, a Sentry Sales Engineer, recalls that Stam telephoned him sometime prior to January 6, 1994 to determine whether Sentry manufactured depalletizers and could provide a quote. Stam told Stromer that he was working with the 7-Up bottler in Chicago [3] and that the bottler needed the equipment in April. Stromer advised Stam that an April delivery date would not be a problem, took down enough information to prepare a preliminary quote and sent the quote to Stam. Stromer then contacted Soenke at Pro-Line to notify him of this activity in his sales territory. Stam and Soenke, by contrast, both begin their version of events with an initial telephone call between Stam and Soenke. During this conversation, Stam advised Soenke that he was working on behalf of a customer, later identified as Kemmerer, and inquired whether Soenke would be willing to split his commission [*6] on the sale if Sentry equipment was purchased. There is some evidence that, during their early conversations, Stam advised Soenke that Kemmerer needed the equipment by April 15, 1994 and Soenke replied that such a delivery date should not be a problem. Stam and Soenke agreed that if the sale went through, they would split Soenke's standard 10% commission.

On January 6, 1994, Stam sent Soenke, via facsimile, a letter of intent for the purchase of a Sentry depalletizer, conveyor system and rinser with a delivery date on or about April 1,

---

[1] A bulk depalletizer removes bottles a layer at a time from pallets and moves them onto a mass conveyor bed. The conveyor then transports the bottles, single file, to the rinser for washing and, subsequently, to be filled with a beverage.

[2] Specialized was not a manufacturer's representative for Sentry.

[3] The parties often refer to Kemmerer as "7-Up" because Kemmerer was known as the 7-Up bottler prior to changing its name to Kemmerer. There is no dispute that 7-Up and Kemmerer are the same entity.

1996 U.S. Dist. LEXIS 12642, *6

1994. The letter indicated that a formal purchase order would issue after receipt and approval of a valid quotation for the equipment, but in no event later than January 20, 1994. The letter acknowledged that Sentry would not begin work until the formal purchase order was received [*7] and stated that if a purchase order was not issued by January 20, the letter of intent would expire without penalty. Stam expressly stated that the purpose of the letter was to reserve production time. That same day, Pro-Line forwarded and Sentry received the letter of intent.

After contacting Sentry's production manager to block out a section in Sentry's production schedule, Stromer sent a return fax to Stam on January 7 which referenced "Kemmerer Bottling Group - Northlake, IL" and thanked Stam for the letter of intent. Stromer stated that Sentry had "entered the equipment on our schedule," but that April 23 was the best Sentry could do for shipping the depalletizer. Stam subsequently replied that April 23 for the depalletizer was acceptable.

There is no agreement as to who initiated the letter of intent, i.e., whether Sentry requested it, whether Stam took it upon himself or whether Kemmerer suggested it. In any event, Stromer acknowledged that Sentry "needed a letter of intent to put the machine in our schedule" and that the letter "held that date [April 23] until we could get further paperwork from Specialized."

Stromer sent Stam a proposal/quotation for the "Kemmerer Bottling [*8] Group - Northlake, Illinois" project on or about January 11. The January 11 proposal (No. 2967) estimated that the equipment would be shipped within ten to twelve weeks but added,

> The above shipping estimate is based on shop capacity at the date of this proposal. Actual ship date is to be established at the time a formal order is received with appropriate down payment, confirming final specifications and including product samples.

It further indicated that the terms of payment were 35% down with the written purchase order and 65% upon shipment, net thirty days.

On January 20 or 21, Stam verbally conveyed purchase order numbers for the three pieces of equipment to Stromer. [4] On January 21, Stromer prepared three "Request to Open Shop Order" forms for the equipment based on the purchase order numbers received from Stam. The hard copies of the purchase orders are dated January 24, 1994. The purchase order for the

depalletizer differed from the proposal in that it eliminated the purchase of an optional operator's platform for the depalletizer and reflected a corresponding reduction in the total price for the depalletizer. It also discounted the total price for each piece [*9] of equipment by 5% due to an "OEM [original equipment manufacturer] discount." Apparently, Stromer and Stam also discussed other potential changes in the equipment and, on January 31, 1994, Stromer sent out a revised proposal (No. 2967-A) reflecting those changes, including the elimination of the operator's platform. [5] On that same day, both Sentry's engineering and production managers signed off on the January 21 request to open shop order forms. Despite the January 21 date on the forms, each one indicates that it is based on Proposal No. 2967-A, the revised proposal that was dated January 31. On each of the three forms, the production manager entered an actual ship date of April 30 for the equipment. This new date was not conveyed to Stam or Kemmerer. Stam did not issue new purchase orders in response to the revised quotation.

[*10] Sentry's engineering department received the actual shop order for the depalletizer on February 1, 1994. On February 2, 1994, Sentry invoiced Specialized for the 35% down payment on the equipment. On February 5, 1994, in response to a routine inquiry from Soenke at Pro-Line, Stromer advised that the ship date for the equipment would be April 29. Sentry received Specialized's check for the 35% down payment on February 22, 1994.

There was no further communication between the parties until the end of March or early April. At that time, Stam was working with Kemmerer to set up an installation schedule for the equipment. As part of that process, he called Stromer to confirm that the shipping dates set forth in Stromer's January 7 letter would be met. After checking, Stromer reported that shipment of the conveyors and rinser had been pushed back to coincide with the April delivery of the depalletizer. Approximately one week later, however, Stromer sent Stam a fax, dated April 6, 1994, indicating that the delivery information he had conveyed the week before was in error. Stromer further stated that none of Kemmerer's equipment could be shipped until the second week in May. Upon receipt [*11] of the fax, Stam called Stromer, advised him that the second week of May was unacceptable for Kemmerer and asked Stromer to determine what other arrangements could be made. Stromer did not call back. After several further attempts to contact Stromer, Stam tried to call Sentry's president, Adam Vinoskey, to ascertain whether the April 23 delivery date could be met and, if not, what ship date was

---

[4] Stam testified that he gave the number to Stromer on January 20, but Stromer stated that he believed he prepared the Request to Open Shop Orders on the same day that he talked to Stam.

[5] The revised proposal contained the same language as the original concerning the estimated shipping date and the setting of an actual shipping date after receipt of a formal order with down payment.

realistic. Stam's phone messages went unanswered.

On April 18, Stam wrote to Vinoskey outlining the various events that had taken place and requesting that Vinoskey contact Kemmerer directly. That same day, Stam and several Kemmerer personnel participated in a conference call with Stromer's supervisor, Barry Robertson, Sentry's vice president of marketing and sales. Robertson indicated that the depalletizer probably could not be delivered until June or July.

The next day, Robertson called Kemmerer again. During the conversation, Robertson reiterated the June/July delivery date [6] and, Mark Kimmel of Kemmerer responded that Kemmerer wanted to cancel the order for the depalletizer and apply the down payment toward the final payment on the conveyors and rinsers. Robertson confirmed Kemmerer's [*12] cancellation of Specialized's purchase order in a letter to Stam dated April 19, 1994. In this letter, Robertson apologized for the "delay in our shipping schedule," and "any inconvenience that our delay has caused."

After cancelling the order with Sentry, Kemmerer purchased a substitute depalletizer from another manufacturer and received it the last week of May 1994.

## ANALYSIS

The parties raise two principal issues in their cross motions: 1) Is Kemmerer a third party beneficiary of the contract at issue? and 2) Does the contract require Sentry to deliver the depalletizer by April 1994? In order for Kemmerer to succeed on its motion, it must establish, as a matter of law, that the answer to both questions is yes. Sentry, by contrast, need only show that one of the questions must be answered "no."

### A. Kemmerer's Standing as a Third Party [*13] Beneficiary

The parties do not dispute that Sentry and Specialized negotiated and entered into the contract for the purchase and sale of the depalletizer. Therefore, Kemmerer has no standing to enforce the contract unless it can establish that it is a third party beneficiary of the contract. Sentry argues that, under Virginia law, Kemmerer is not a third party beneficiary, but Kemmerer relies on Illinois law to argue that it is. Significantly, both parties also insist that the application of the other state's law would not affect the result. This is not

surprising. Research discloses that Illinois and Virginia apply essentially the same standard to determine whether a nonparty qualifies as a third party beneficiary of a contract. See e.g., GLS Development, Inc. v. Wal-Mart Stores, Inc., 1996 U.S. Dist. LEXIS 7549, 1996 WL 296594, at *5 (N.D. Ill. May 31, 1996)(for a nonparty to enforce a contract, the contracting parties must have intended to confer a direct, as opposed to incidental, benefit upon the nonparty); Ward v. Ernst & Young, 246 Va. 317, 330, 435 S.E.2d 628, 634 (1993)(third party contracts are enforced when the parties to the contract clearly and definitely intended to confer [*14] a benefit upon the nonparty). When the laws of two states connected to a suit will not make a difference in the outcome, there is no conflict of law and no reason to turn to the choice of law rules. Malatesta, 275 Ill. App. 3d 370, 655 N.E.2d 1093, 211 Ill. Dec. 710 (1995)(conflict exists only where difference in law changes outcome). Absent such a conflict, then, the court should apply Illinois law. Ventura v. Home Servicing of America, 1996 U.S. Dist. LEXIS 4583, 1996 WL 17229], at *6 (N.D. Ill. Apr. 11, 1996), citing, Zurich Insur. Co. v. Heil Co., 815 F.2d 1122, 1123 (7th Cir. 1987).

Nevertheless, Sentry contends, Virginia is especially strict in its construction of the third party beneficiary rules and, unlike Illinois, the intent to benefit the third party must be expressed within the four corners of the contract. The Supreme Court of Virginia, however, has disclaimed such a "four corners" test. See Ward, 246 Va. at 330, 435 S.E.2d at 635. In Ward, the court looked instead to the entire record to determine the parties' intent. Similarly, HN3[↑] under Illinois law, the requisite intent to benefit the third party must be gleaned from the language of the contract and the circumstances [*15] surrounding the parties at the time of its execution. GLS Development, 1996 WL 296594, at *5; Sosin v. Hayes, 258 Ill. App. 3d 949, 952, 630 N.E.2d 969, 971, 196 Ill. Dec. 804 (1994). Because there is no true conflict, Illinois law will be applied.

HN4[↑] Kemmerer bears the burden of establishing that it is a third party beneficiary of the contract for the purchase and sale of the depalletizer. Corrugated Paper Products v. Longview Fibre Co., 868 F.2d 908, 910 (7th Cir. 1989). As noted above, this means that Kemmerer cannot maintain its breach of contract claim unless Sentry and Specialized intended, by entering into their contract, to confer a direct benefit upon Kemmerer. GLS, 1996 WL 296594, at *5. It does not mean, however, that the contract had to be solely for Kemmerer's benefit or that the contract had to actually name Kemmerer as a third party beneficiary. Id. No "magic words" are necessary. The question is whether the facts and circumstances establish that the contracting parties intended to confer a benefit directly upon the third person. Sosin, 258 Ill. App. 3d at 952, 630 N.E.2d at 971. Nevertheless, HN5[↑]

---

[6] There is some evidence, however, that Vinoskey called Stam prior to the cancellation and assured him that Sentry could ship the equipment by the end of May.

1996 U.S. Dist. LEXIS 12642, *15

Illinois recognizes a strong presumption that [*16] parties to a contract have bargained for themselves and only incidentally for third persons. *Hunter v. Old Ben Coal Co., 844 F.2d 428, 432 (7th Cir. 1988).* To overcome this presumption, there must be either an express declaration that the parties acted for the benefit of a third person or an implication so strong as to amount to an express declaration. *Slate Printing Co. v. Metro Envelope Co. 532 F. Supp. 431, 433 (N.D.Ill. 1982).*

Sentry argues that, under Illinois law, the contract language must either expressly or impliedly manifest the parties' intent to confer a direct benefit upon the third party. I do not find this argument to be persuasive. Although some courts have so described the rule in Illinois, *see e.g., Hunter, 844 F.2d at 432; Wheeling Trust & Savings Bank v. Tremco, Inc., 153 Ill. App. 3d 136, 140, 505 N.E.2d 1045, 1048, 106 Ill. Dec. 254 (1987),* the Illinois Supreme Court does not appear to require the manifestation of intent to be contained in the contract. Rather, HN6[↑] it has consistently adhered to the rule that third party beneficiary status must be determined from the contract and the circumstances surrounding the parties at the time of [*17] its execution. *XL Disposal Corp. v. John Sexton Contractors Co., 168 Ill. 2d 355, 361, 659 N.E.2d 1312, 1316, 213 Ill. Dec. 665 (1995); Altevogt v. Brinkoetter, 85 Ill. 2d 44, 56 421 N.E.2d 182, 187, 51 Ill. Dec. 674 (1981); Resnik v. Curtis & Davis, Architects & Planners, Inc., 78 Ill. 2d 381, 385, 400 N.E.2d 918, 919, 36 Ill. Dec. 338 (1980).* Even so, HN7[↑] the parties' knowledge that a third party will ultimately benefit from a contract is generally not enough to make the third party a direct beneficiary of the contract. Similarly, knowledge that the contract goods will be delivered to a third party, alone, is insufficient. *Corrugated Paper, 868 F.2d at 912; Wheeling Trust, 153 Ill. App. 3d at 140, 505 N.E.2d at 1048.* Rather, Kemmerer must offer something to suggest that Sentry and Specialized affirmatively sought to benefit Kemmerer, that is to say, that the benefit to Kemmerer was a motivating factor in the decision to enter into the contract. *Corrugated Paper, 868 F.2d at 912.*

Here, Kemmerer's proof is sufficient to reasonably suggest that the benefit to Kemmerer prompted the parties to contract. There is evidence that Kemmerer engaged Specialized [*18] specifically to find the depalletizer on behalf of Kemmerer. Although none of the documents which the parties exchanged expressly refer to Kemmerer as a third party beneficiary, Sentry's response to Specialized's letter of intent, as well as its proposal and revised proposal reference Kemmerer Bottling Group as their subject matter. Moreover, Stam, in his initial conversations with Sentry and Pro-Line, advised that he was acting on behalf of Kemmerer in his efforts to acquire the depalletizer, rinser and conveyor. In *Altevogt, 85 Ill. 2d at 56-57, 421 N.E.2d at 188,* the Illinois Supreme Court suggested

that such HN8[↑] a statement of intent to resell to a third party *prior* to execution of the contract might be a sufficient allegation of intent to benefit the third party. *See also Corrugated Paper, 868 F.2d at 913* (where there is evidence that promisee explicitly informed promisor that it was entering transaction on behalf of another is one type of case where third parties have been found to be intended beneficiaries). It is also undisputed that Stam told Sentry and Pro-Line that Kemmerer needed the equipment by April 1994 and obtained assurances that Sentry could meet Kemmerer's [*19] required time frame. As a result, Sentry and Pro-Line were aware that compliance with Kemmerer's requirements, not those of Specialized, was essential to the transaction. Additionally, there is evidence that, in finalizing the proposals, Stam provided Sentry with specifications regarding the building parameters of Kemmerer's Northlake facility which were used to develop the layout for the equipment. In other words, the equipment, once manufactured, was to be unique to Kemmerer's Northlake facility. Finally, Stromer conceded at his deposition that he was aware that Stam had to review the proposals with Kemmerer. Such circumstances indicating that the promisor has designed its product for the third party's use have been found sufficient to render the third party a direct beneficiary of the contract. *See id.* (collecting cases). I conclude that, when construed in favor of Kemmerer, the evidence permits a reasonable inference that the parties entered into the contract intending Kemmerer to be a direct beneficiary thereof. [7]

[*20] Nevertheless, these pieces of evidence do not, in light of all the evidence, conclusively establish that the parties intended to confer a direct benefit on Kemmerer. At the very least, the presence of two contracts (the Specialized/Sentry purchase order and the Kemmerer/Specialized purchase order) raises a question regarding the parties' intentions. As Sentry points out, ultimately, Stam chose to have Specialized "carry the paper on the deal." There was no provision to release Specialized from its obligations under the Specialized/Sentry purchase order in the event that Kemmerer cancelled the Kemmerer/Specialized purchase order. Although Kemmerer could have contracted directly with Sentry, it chose to deal "strictly through Specialized" and how Specialized "dealt with

---

[7] Kemmerer also points out that despite Sentry's claim that the purchase order for the depalletizer only benefitted *Specialized*, Sentry allowed a *Kemmerer* employee, Mark Kimmel, to cancel it. While this evidence might suggest that Kemmerer was a third party beneficiary of the contract, the parties' intent to benefit Kemmerer must be established as of the time that the contract was formed. *Corrugated Paper Products, Inc. v. Longview Fibre Co., 868 F.2d 908, 913 (7th Cir. 1989),* citing, *F.W. Hempel & Co., Inc. v. Metal World, Inc., 721 F.2d 610, 614 & n.7 (7th Cir. 1983).* Consequently, I did not rely on these post-formation communications.

their supplier was up to them." Moreover, despite Stam's characterization of the money he made on the deal as a commission from the manufacturer, when construed in a light favorable to Sentry, it could reasonably be described as a profit realized by purchasing the equipment at a discount and reselling it at a higher price.

In the end, the paper trail offered on these cross motions for summary judgment does not conclusively [*21] establish the intent of the parties at the time the contract was formed. When the evidence before the court gives rise to conflicting, albeit reasonable, inferences, summary judgment is inappropriate. It is expected that, at trial, the witnesses will provide supplemental testimony to clarify the parties' intent. It is likely that the ultimate determination of Kemmerer's ability to enforce the contract will turn on the credibility of those witnesses. I conclude that, on this record, there are triable issues of fact which preclude determining, as a matter of law, whether Kemmerer is a third party beneficiary of the contract for the purchase and sale of the depalletizer. Because this finding precludes the entry of summary judgment in favor of Kemmerer, it unnecessary to consider the remaining arguments that Kemmerer offered in support of its motion.

## B. Contractual Obligation to Deliver by April 1994

Sentry next contends, irrespective of the standing issue, that it is entitled to summary judgment because the contract at issue did not obligate Sentry to deliver the depalletizer by April 1994. It asserts that there was no contract until Sentry received Specialized's down [*22] payment on February 22, 1994 (the acceptance) in response to Sentry's January 31 revised proposal (the offer). Sentry then reasons that the revised proposal's shipment terms plainly indicate that delivery would be ten to twelve weeks after receipt of the down payment - between May 2 and 16, 1994.

Kemmerer offers several alternative sources for finding an obligation to deliver the depalletizer in April 1994. First, it characterizes Stam's initial advice that Kemmerer needed the equipment in April as an offer to purchase conditioned on April delivery which Sentry accepted when it assured Stam that April delivery was not a problem. Kemmerer asserts that this oral contract was confirmed via the January 6 letter of intent, Sentry's January 7 response, the two proposals and Specialized's purchase orders. This argument is not compelling. Although the parties' submissions establish that Stam made preliminary inquiries regarding Sentry's ability to meet an April delivery date if he placed an order with Sentry, nothing in the record suggests that these inquiries constituted an offer to buy goods which invited Sentry's acceptance. I conclude that none of these preliminary inquiries evidence [*23] the requisite objective intent to be bound in a

contractual sense. See *Empro Mfg. Co., Inc. v. Ball-Co Mfg. Inc., 870 F.2d 423, 425 (7th Cir. 1989)*.

The next potential source of contractual liability is the January 6 letter of intent to which Sentry responded on January 7. Kemmerer urges that the letter of intent was a written offer to purchase the equipment for delivery on or about April 1, 1994 which Sentry then accepted with an additional, non-conforming term concerning the April 23, 1996 delivery date for the depalletizer. When Stam subsequently confirmed April 23 as an acceptable delivery date, that date became part of the contract.

HN9 ] A letter embodying preliminary negotiations may be enforceable if it is clear that the ultimate contract will be based on the terms of the letter and the parties intend to be bound by the letter. *Id.* The scope and nature of any duty arising out of a letter of intent must be determined, in the first instance, from the language of the letter itself. *A/S Apothekernes Laboratorium v. I.M.C. Chemical Group, Inc., 873 F.2d 155, 158 (7th Cir. 1989)*. Here, the letter clearly contemplates additional steps before a duty to perform arose. [*24] For example, Stam specifically recognized that Sentry had no duty to begin work on the equipment until Specialized issued a formal purchase order and that no purchase order would issue until Specialized received and approved a valid quotation from Sentry. Thus, the letter itself precludes any finding that it is the definitive purchase and sale agreement.

Nevertheless, Stam was careful to include language extinguishing all obligations under the letter of intent if a purchase order did not issue by January 20, 1994. Because there would be no need for such language if the parties did not intend the letter to be binding, its inclusion suggests that the parties may have intended to be bound to some extent. *Dawson v. General Motors Corp., 977 F.2d 369, 374 (7th Cir. 1992)*(the fact that a formal document is anticipated does not preclude enforcement of a specific preliminary promise). For example, a letter of intent may contain an enforceable promise that the parties will negotiate exclusively with each other until they determine that no agreement can be reached, *see, e.g., Feldman v. Allegheny Intern., Inc., 850 F.2d 1217, 1219 (7th Cir. 1988)*; or that the parties will conduct [*25] further negotiations in "good faith." *See e.g., Venture Associates Corp. v. Zenith Data Systems Corp., 987 F.2d 429, 433 (7th Cir. 1993)*. Here, the letter of intent in effect sets out Specialized's commitment to work with Sentry for a brief period of time (approximately two weeks) toward a formal agreement regarding the purchase and sale of the equipment in return for Sentry's reservation of a spot in its production schedule. In response, Sentry notified Stam that the depalletizer was "entered in the schedule" with a delivery date of April 23, thus evidencing Sentry's intent to save the April

1996 U.S. Dist. LEXIS 12642, *25

23 ship date at least until the letter of intent expired. Indeed, the deposition testimony of Sentry's sales engineer, Stromer, confirms Sentry's understanding that the letter of intent "held [the April 23] date until we could get further paperwork from Specialized."

The question then is whether there is evidence of record from which it could be inferred that Sentry breached this preliminary agreement. Sentry contends that Stam did not issue the written purchase orders until January 24, three days after the letter of intent expired. As a result, Sentry maintains that as of January 21, **[*26]** it was under no obligation to hold the April 23 shipping date. Kemmerer disputes whether the letter of intent expired without the issuance of formal purchase orders. At his deposition, Stam stated that he verbally conveyed formal purchase order numbers to Stromer on January 20, 1994, the last day permitted by the letter of intent. [8] Nothing in the letter of intent suggests that verbal purchase orders would not be enough to continue holding the date. As a result, it cannot be said on this record that there was no breach of this preliminary agreement.

Although Sentry spends a fair amount of time arguing that the parties had no contract until Specialized "accepted" the January 31 revised proposal (the "offer") by making the down payment, ultimately it makes no difference to **[*27]** the outcome of Sentry's motion. Even accepting Sentry's description of the contract, a question of fact would remain regarding Sentry's obligation to meet an April 1994 delivery date. Sentry points to the "plain" language of the revised proposal to argue that the agreed shipment was to be ten to twelve weeks from the receipt of a down payment. The proposal, however, is less than clear in that regard. While it provides that the approximate shipping time is ten to twelve weeks, it leaves open the obvious question: ten to twelve weeks from what starting point? Although the proposal also provides that the actual shipping date will be established at the time a formal order and down payment is received, that does not require the ten to twelve week period to begin on the date that Sentry received the down payment as Sentry contends. While Sentry's position is certainly a reasonable one, it is also reasonable to infer that the parties intended the ten to twelve week period to run from the date of the proposal itself. Indeed, Stromer stated that when he sent out the initial proposal on January 11, it was his understanding that the ten to twelve week period ran from January 11. Under this latter **[*28]** interpretation, once Sentry received the down payment, it would set the actual shipment date sometime

within ten to twelve weeks of the proposal. Assuming the January 31, 1994 revised proposal is the operative contract document as Sentry claims, this interpretation would result in an actual shipment date between April 10 and April 24, 1994.

_HN10_[⬆] Where a contract is ambiguous, i.e., fairly susceptible to more than one meaning, the intended meaning becomes a question of fact. _Dribeck Importers, Inc. v. G. Heileman Brewing Co., Inc, 883 F.2d 569, 573 (7th Cir. 1989)_. Moreover, evidence outside the contract itself may be considered in determining the parties' intent. Here, Kemmerer has offered several pieces of evidence suggesting that Sentry and Specialized intended that the depalletizer would be delivered in April, 1994. For example, during negotiations, the parties were aware that Kemmerer needed the equipment in April; the letter of intent, at least briefly, established an April delivery date; Stromer stated that until mid-April, it was his belief and intention that the depalletizer would be shipped in April; and, internally at least, Sentry assigned April 30 as the actual shipping **[*29]** date. In light of the ambiguity of the contract documents, these pieces of evidence raise a question of fact as to whether the parties intended Sentry to be contractually obligated to deliver the depalletizer to Kemmerer in April 1994. Because Sentry has not established, as a matter of law, that it had no obligation to deliver the depalletizer in April, it is not entitled to summary judgment on this basis.

## RECOMMENDATION

For the foregoing reasons, it is hereby recommended that both plaintiff's and defendant's motions for summary judgment be denied.

Written objection to any finding of fact, conclusion of law, or the recommendation for disposition of this matter must be filed with the Honorable John A. Nordberg within ten days after service of this Report and Recommendation. _See Fed. R. Civ. P. 72(b)_. Failure to object will waive any such issue on appeal.

Respectfully submitted,

JOAN HUMPHREY LEFKOW

United States Magistrate Judge

Dated: August 27, 1996

---

[8] Stromer testified that Stam gave him the verbal purchase order numbers on January 21, 1994, the day after the letter of intent expired. With respect to Sentry's motion for summary judgment, Stam's version of events must be taken as true.